# In the United States Court of Appeals for the Fifth Circuit

───────

VOTE.ORG,

*Plaintiff-Appellee*

*v.*

JACQUELYN CALLANEN, ET AL.,

*Defendants*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF TEXAS; LUPE C. TORRES, IN HIS OFFICIAL CAPACITY AS THE MEDINA COUNTY ELECTIONS ADMINISTRATOR; TERRIE PENDLEY, IN HER OFFICIAL CAPACITY AS THE REAL COUNTY TAX ASSESSOR-COLLECTOR,

*Intervenor Defendants-Appellants*

───────

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

───────

# INTERVENOR DEFENDANTS' EMERGENCY MOTION TO STAY INJUNCTION PENDING APPEAL AND FOR A TEMPORARY ADMINISTRATIVE STAY

───────

*(Counsel Listed on Inside Cover)*

ROBERT HENNEKE
General Counsel

CHANCE WELDON
Director of Litigation

AUTUMN HAMIT PATTERSON
Senior Attorney
apatterson@texaspolicy.com

Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2728
Fascimile: (512) 472-2728

Counsel for Intervenor Defendants-Appellants Lupe C. Torres and Terrie Pendley

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JUDD E. STONE II
Solicitor General
Judd.Stone@oag.texas.gov

MICHAEL R. ABRAMS
Assistant Solicitor General

KATHLEEN T. HUNKER
Special Counsel

CORY A. SCANLON
JOHNATHON STONE
Assistant Attorneys General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Intervenor Defendant-Appellant Ken Paxton, Attorney General of Texas

# Certificate of Interested Persons

No. 22-50536

Vote.org,

*Plaintiff-Appellee*

*v.*

Jacquelyn Callanen, Et al.,

*Defendants*

Ken Paxton, In His Official Capacity as the Attorney General of Texas; Lupe C. Torres, In His Official Capacity as the Medina County Elections Administrator; Terrie Pendley, In Her Official Capacity as the Real County Tax Assessor-Collector,

*Intervenor Defendants-Appellants*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Judd E. Stone II

Judd E. Stone II
*Counsel of Record for Intervenor Defendant-Appellant Ken Paxton, in his official capacity as the Attorney General of Texas*

i

## Introduction and Nature of Emergency

The Texas Election Code offers Texans ample methods to register to vote. But just as "[n]o court has ever held that a voter has a right to cast a ballot by the method of his choice," *Veasey v. Abbott*, 830 F.3d 216, 307 (5th Cir. 2016) (en banc) (Jones, J., concurring in part and dissenting in part), no court has ever held that a voter has a right to *register* to vote by the method of his choice, either.

The district court's decision below broke new ground in that regard. Plaintiff Vote.org developed a web app to assist voters in submitting their registration forms. But the app's functionality is incompatible with the Election Code. The app scans the voter's signature and then submits the voter's completed registration form to a third-party vendor, which in turn faxes the form to the voter's county registrar. The Election Code, however, requires voters who submit a faxed form to mail that form to the registrar with the voter's original, "wet" signature. Plaintiff's app does not afford voters the chance to comply with that requirement.

Plaintiff did not identify, and the district court did not cite, a single case determining that States must allow voters to register by digital signature. But in an unprecedented decision, the district court held that the Election Code's wet signature rule violates section 1971 of the Civil Rights Act and unduly burdens the right to vote under the *Anderson-Burdick* standard for First and Fourteenth Amendment challenges to election laws.

This Court is likely to reverse. Plaintiff is a nonprofit entity with no members. It lacks standing to bring voting rights claims on behalf of third-party Texas citizens who are capable of bringing those claims on their own accord and are not parties to

this litigation. Plaintiff's section 1971 claim is likely to fail because Congress did not provide a cause of action to sue under section 1971, and because Texas's wet signature requirement does not hinder voters from registering to vote. Plaintiff's *Anderson-Burdick* claim is just as dubious. Framed in the proper light, the wet signature rule is part of a broad *expansion* of the opportunity to register to vote. It is not a burden at all. And even if it does impose some *de minimis* burdens, those burdens are vastly outweighed by the rule's function as a bulwark against election fraud.

With a major midterm election rapidly approaching, the district court's permanent injunction prevents the uniform enforcement of the State's election laws across Texas's 254 counties. It threatens the State's interests in preserving the integrity of its elections. And it forebodes substantial confusion for voters and election officials alike. Because of these irreparable injuries, the Court should enter a stay pending appeal, and it should immediately enter a temporary administrative stay while it considers this application. Recently, this Court has entered multiple stays pending appeal and temporary administrative stays of "patently wrong" district court orders like the one entered in this case. *See, e.g.*, *In re Abbott*, 954 F.3d 772, 778, 781 (5th Cir. 2020). It should do the same here.

## BACKGROUND

**1.** Texas election officials make every effort to ensure that "[r]egistering to vote in Texas is easy[.]" *See* Voter Registration, https://www.votetexas.gov/register-to-vote/ (last accessed June 23, 2022). Applicants must fill out and submit a signed, written application form to a voter registrar. Tex. Elec. Code §§ 13.002; 13.143(d-

2). Any "person desiring to register to vote" can submit his application to the county registrar by personal delivery or mail. *Id.* § 13.002(a). If a voter needs assistance, he may appoint an agent to submit the application on his behalf. *Id.* § 13.003. The Code designates certain government offices to act as "voter registration agencies," including the Department of Public Safety (DPS), the Health and Human Services Commission, and public libraries. *Id.* § 20.001. Each of these offices "provide[s] a voter registration application form to each" qualified individual "in connection with the person's application for initial services" and any subsequent renewals. *Id.* § 20.031.

In 2013, the Legislature enacted, and the Governor signed, SB 910, legislation that for the first time allowed individuals to transmit voter registration forms via fax. Act of May 26, 2013, 83rd Leg., R.S., ch. 1178, § 3, 2013 Tex. Gen. Laws 2923, 2923-24. The legislation provided that registrars were deemed to have received an application on the day it was faxed to them, so long as the application was subsequently submitted by mail and received within four business days. *Id.*

During the 2021 regular legislative session, the Legislature passed HB 3107, a "cleanup" measure that clarified several provisions of the Code. Act of May 28, 2021, 87th Leg., R.S., ch. 711, 2021 Tex. Sess. Law Serv. 1469. HB 3107 modified the language in SB 910 to provide that "a copy of the original registration application containing the voter's original signature must be submitted by personal delivery or mail" within four business days of the fax transmission of the form. Tex. Elec. Code § 13.143(d-2). A registrant may correct any signature defect within ten days of being

notified of the issue, thereby preserving the original effective date of the registration. *Id.* § 13.073.

**2.** Plaintiff Vote.org is a nonprofit entity that advocates for internet-based voter registration options. Exhibit A at 5. It does not have members; the prospective voters who use plaintiff's web apps are not members of the organization itself. Exhibit B at 83. In 2018, plaintiff developed a web app that allowed prospective registrants to input their information into embedded fields and upload an electronic image of their signature. Exhibit A at 5. The web app transposed the information and signature file onto a voter registration application form and transmitted the application form to plaintiff's fax vendor, which in turn sent the form via fax to the county voter registrar. *Id.* at 5-6. Another third-party vendor then mailed a printed version of the application to the county voter registrar. *Id.*

In 2018, plaintiff introduced its software in several Texas counties without first clearing its use with the Secretary of State. Exhibit B at 78, 102. This initial rollout was marred by technical difficulties. Approximately 15 percent of the applications submitted through the app to Dallas County contained signature lines that were blank, blacked out, illegible, or otherwise of very poor quality. *Id.* at 516. Other counties experienced similar problems. The Travis County Tax Assessor-Collector's office was alarmed to find that many signatures were poor, blank, or blacked out, and warned that "[t]his is a real problem and [the office is] concerned about proceeding until this is cleared up." *Id.* at 7. To make matters worse, plaintiff's "pilot program" failed to transfer all the applications to county election officials via fax, including at least 259 applications in Dallas County. *Id.* at 519. In this litigation,

plaintiff's CEO has admitted that her engineering team will need to "fix" the issues with imaged signatures before the app can be used again. *Id.* at 76.

Concerned that voters might find themselves disenfranchised because of these types of apps, the Secretary issued a press release cautioning that "[a]ny web site that misleadingly claims to assist voters in registering to vote online by simply submitting a digital signature is not authorized to do so." Press Release, Texas Secretary of State, Secretary Pablos Reminds Texans To Exercise Caution When Registering To Vote (Oct. 4, 2018). Various plaintiff groups then sued the Secretary, contending that requiring a wet signature on a voter registration form violates the Constitution and section 1971. *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 876 (5th Cir. 2021) (per curiam). But this Court held that the Secretary retained immunity from suit under *Ex parte Young. Id.* at 879.

**3.** On July 8, 2021, plaintiff sued four county election officials seeking to enjoin the wet signature requirement contained in section 13.143(d-2) of the Election Code. Exhibit A at 1. Texas Attorney General Ken Paxton intervened in the suit to defend the constitutionality of the statute. *See* 28 U.S.C. § 2403(b). Lupe C. Torres and Terrie Pendley, in their official capacities as the Medina County Election Administrator, and Real County Tax Assessor-Collector, respectively, intervened as well.[1]

After extensive discovery, the court issued an opinion on the parties' competing motions for summary judgment. The court found that the wet signature requirement

---

[1] For ease of reference, this motion refers to these Intervenor-Defendants as "Defendants."

5

violates section 1971 because a wet signature is "not material" to determining whether the applicant is "qualified to vote." Exhibit C at 16-22. Even though "Texas provide[d] abundant evidentiary and legal support for the conclusion that a signature is important and vital to determine a voter's qualification to vote," *id.* at 17, the court held that Texas did not sufficiently demonstrate that the wet signature requirement was "necessary to prevent voter registration fraud" or useful in investigating fraud. *Id.* at 18, 21.

The court also held that the wet signature requirement violates the First and Fourteenth Amendments. The court determined that the requirement imposed "more than slight" burdens on Texas voters. *Id.* at 28. Although the court recognized that Texas's asserted interest in protecting election integrity was compelling, the court faulted Defendants for purportedly failing to provide any "argument or . . . evidence" showing that the wet signature rule serves that interest. *Id.* at 30-34. On that basis, the court concluded that there was "no valid justification" for the burden. *Id.* at 34.

Based on these rulings, the court granted a permanent injunction providing that "Defendants, Intervenors, and their officers, agents, servants and employees . . . may not require a voter registrant who submits a voter registration form by telephonic facsimile machine to also provide a copy of the original registration application containing the voter's original signature." *Id.* at 37. Defendants filed a notice of appeal the day that the court issued its final judgment. ECF No. 145; Exhibit D at 1. One business day later, Defendants asked the district court to stay its

injunction pending appeal. On June 21, the district court denied that motion. Exhibit E; *see* Fed. R. App. P. 8(a)(2).

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction over the district court's permanent injunction under 28 U.S.C. § 1291.

## ARGUMENT

"An appellate court's power to hold an order in abeyance while it assesses the legality of the order has been described as 'inherent[.]'" *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). All four factors relevant to a stay are met here: (1) Defendants are likely to succeed on the merits; (2) they will suffer irreparable harm in the absence of a stay; (3) plaintiff will not be substantially harmed by a stay; and (4) the public interest favors a stay. *See id.*

## I. Defendants Are Likely to Succeed on Appeal.

Defendants are likely to succeed on appeal for three reasons. *First*, plaintiff lacks standing to remediate injuries suffered by third-party voters. *Second*, plaintiff is unlikely to succeed on its section 1971 claim. That statute does not create a private cause of action, and even if it did, section 1971 was enacted to address race discrimination, and plaintiff has not alleged or introduced any evidence of race discrimination in this suit. On the merits, plaintiff's section 1971 claim is fatally flawed because a signature is "material in determining whether such individual is qualified under State law to vote in such election," 52 U.S.C. § 10101(a)(2)(B), and no voter is deprived of the opportunity to vote by virtue of the wet signature

requirement. *Third*, plaintiff's *Anderson-Burdick* claim is likely to fail because any burden that the wet signature requirement causes is outweighed by the State's interests in stamping out fraud and preserving the integrity of its elections.

### A. Plaintiff lacks standing to sue on behalf of Texas voters.

Plaintiff brings its section 1971 and *Anderson-Burdick* claims under section 1983. Exhibit A at 4. Because plaintiff is not a membership organization, Exhibit B at 83, it must show that it has standing as an organization to bring suit. *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010). Even assuming plaintiff has identified a diversion of resources sufficient to make that showing, *see id.*, plaintiff still must demonstrate that it has *statutory* standing to bring suit under section 1983.

As a general rule, a plaintiff "must assert his own legal rights and interests, not those of third parties." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988). Section 1983 is no exception: it provides a cause of action only when the plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a third party's rights. Thus, "like all persons who claim a deprivation of constitutional rights," plaintiff was "required to prove some violation of [its] personal rights." *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986). So when "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, that plaintiff lacks statutory standing, regardless of whether the plaintiff was injured. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011). *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), is a good illustration. The Supreme Court found that a lawyer "clearly had no standing" to bring a section 1983

claim for an injury he suffered as a result of "the alleged infringement of the rights of his client," because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 292-93.

The claims that plaintiff has brought hinge on allegations that Texas has unlawfully infringed its citizens' access to the franchise. Exhibit A at 8, 10-11. But plaintiff is an artificial entity without voting rights. Plaintiff claims that it has suffered an injury because it cannot use its preferred technology to register voters, but that injury is not remotely equivalent to a *voter's* personal claim that he has been denied the right to vote. "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011).

Consider plaintiff's constitutional claims. Plaintiff avers that the wet signature requirement imposes a "logistical hurdle that eligible Texans must navigate to exercise their most fundamental right." Exhibit A at 12. The focus is on voters—not plaintiff's rights as a nonprofit entity. That makes sense because plaintiff does not, and cannot, explain how the wet signature rule precludes anyone in its organization from speaking or otherwise exercising its First or Fourteenth Amendment rights. Plaintiff's inability to use its preferred software until that software complies with the Election Code is insufficient. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013). The entire inquiry therefore turns on whether plaintiff can assert statutory and constitutional claims on behalf of Texas voters. Unsurprisingly, the

district court did not identify any case allowing a nonprofit entity lacking both members and any close connection to voters to assert voting rights claims.[2]

This is also not one of the rare circumstances in which the "third party for some reason cannot assert its own rights." *McCormack*, 845 F.2d at 1341. Individual voters, and organizations that have voters as members, assert claims challenging provisions of the Texas Election Code all the time. Indeed, various groups sued the Secretary to challenge the wet signature rule in 2018. Plaintiff offered no evidence that voters would be unable to bring challenges to the rule if they desired to do so. The fact that no voter joined this suit thus underscores not just plaintiff's lack of standing, but also the relative ease with which voters can register in Texas.

## B.   Plaintiff is unlikely to prevail on its section 1971 claim.

Plaintiff is unlikely to prevail on its section 1971 claim for three reasons: first, the statute does not authorize a cause of action. Second, section 1971 only outlaws race discrimination, and plaintiff advanced no arguments that the wet signature rule is racially discriminatory. And third, an original, wet signature is material to determining whether an individual is qualified to vote, and no voter is deprived of the opportunity to vote by virtue of the wet signature requirement.

**1.** Section 1971 of the Civil Rights Act provides that:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act

---

[2] Plaintiff's CEO explained that "Vote.org doesn't assist people in registering to vote." Exhibit B at 135. Rather, "Vote.org has built the tech, a voter goes to it and they register themselves to vote." *Id.* at 139.

requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B). Congress provided that the Attorney General may bring an action to enjoin violations of this "materiality" provision. *Id.* § 10101(c).

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Absent that intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286-87.

Section 1971 contains no indication of congressional intent to create a private right, much less a private remedy. The text is focused on the local official it regulates, not individual voters. "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Id.* at 289 (quotation omitted). Section 1971 "is framed in terms of the obligations imposed on the regulated party" (the local official), while voters are "referenced only as an object of that obligation." *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013).

Accordingly, section 1971 does not create a federal right "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). Nor does section 1971 create private remedies. Instead, it authorizes the Attorney General to bring suit. *See* 52 U.S.C. § 10101(c). The "express provision of one method of

enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290.

Multiple courts have agreed that section 1971 does not create an implied cause of action. *See McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000); *e.g.*, *McKay v. Altobello*, No. 2:96-cv-3458, 1996 WL 635987, at *2 (E.D. La. Oct. 31, 1996). Although the Eleventh Circuit has held to the contrary, *see Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003), the court's analysis of *Sandoval* was limited to a "see also" citation, *id*. at 1296, and it relied on repudiated reasoning from *Allen v. State Board of Elections*, 393 U.S. 544, 556-57 (1969), which arose from an era before the Court adopted "a far more cautious course before finding implied causes of action." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (plurality op.).

**2.** Plaintiff's claim fails for another reason: "[w]ell-settled law establishes that § 1971 was enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009) (Rosenthal, J.). Accordingly, "only racially motivated deprivations of rights are actionable under 42 U.S.C. § 1971." *Id*. But plaintiff's complaint contained no allegations that the wet signature requirement was racially motivated.

**3.** On the merits, the wet signature requirement is "material," among other reasons, because any person who refuses to subject themselves to Texas's common-sense fraud prevention measures is disqualified from registering to vote. Moreover, a defect in signature does not result in "denial" of the vote. Texas law ensures that the registrant can correct the defect within 10 days of notification of rejection, which

in turn preserves the original effective date for the registration. 52 U.S.C. § 10101(a)(2)(B); Tex. Elec. Code § 13.073.

The district court's holding on plaintiff's 1971 claim compels election officials to allow online voter registration even though the Legislature has never authorized it. And the court's reasoning wholly ignores the State's well-founded concerns that defective third-party software might disenfranchise vulnerable voters. Defendants are likely to prevail on this claim. At a minimum, a stay pending appeal is warranted to allow this Court to carefully address the district court's novel determinations.

## C. Plaintiff is unlikely to prevail on its *Anderson-Burdick* claim.

Courts assess claims challenging election restrictions under the *Anderson-Burdick* test. That test requires courts to "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Steen*, 732 F.3d at 387 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Then, courts "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule." *Id.* (quoting *Anderson*, 460 U.S. at 789). Finally, courts weigh the "character and magnitude of the asserted injury" against the "precise interests put forward by the State," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 387-88 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). When a state election law imposes only "reasonable, nondiscriminatory restrictions" upon the rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

**1.** Here, any burden on voters is *de minimis*. When the Legislature enacted HB 3107 in 2021, it refined legislation from 2013 that had provided, for the first time, a right to submit registration forms via fax. HB 3107 expands the methods that Texans can use to register to vote; it does not take opportunities away from voters.

This Court's decision in *Texas League of United Latin American Citizens v. Hughs*, 978 F.3d 136 (5th Cir. 2020) ("*LULAC*") is instructive. At the height of the Covid-19 pandemic, Governor Abbott issued a proclamation allowing voters to deliver a mail-in ballot anytime until Election Day, rather than just on Election Day itself. *Id.* at 140. Based on concerns that certain counties wanted to set up multiple delivery locations, which threatened election uniformity and integrity, the Governor released a subsequent proclamation specifying that mail-in ballots could be delivered to only one designated location per county. *Id.* Various voters and groups objected to that follow-on proclamation. The Court rejected those challenges and explained that "the proclamation is part of the Governor's expansion of opportunities to cast an absentee ballot in Texas well beyond the stricter confines of the Election Code." *Id.* at 144.

That reasoning maps neatly onto these facts. HB 3107's language requiring an "original wet signature" does not burden voters at all. It helps them: it is part of the Legislature's expansion of the opportunity to register for the vote. Like the proclamations at issue in *LULAC*, HB 3107 only makes sense when considered together with SB 910. In tandem, the two pieces of legislation ensure that voters can submit registration forms via fax. They also reflect security measures that the Legislature found necessary to prevent potential abuses.

The district court analyzed the wet signature rule in a vacuum. Exhibit C at 24-25. *LULAC* makes clear that such a narrow focus constitutes error. The Court there observed that the district court's analysis of the one delivery location rule "fail[ed] to account for the numerous ways Texans can vote early or absentee in the November 3 election." *LULAC*, 978 F.3d at 145. The same is true here—the district court failed to consider the numerous ways that voters can register to vote. *See* Tex. Elec. Code §§ 13.002(a), 13.003, 20.001. Those extensive registration options render plaintiff's *Anderson-Burdick* claim a nonstarter.

Even if this Court were to consider fax registration in isolation, the burdens it imposes are still quite slight. Signature requirements are a familiar aspect of modern life. Asking for a signature from a citizen registering to vote is not a serious inconvenience. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008). Further, this burden is equally shared and non-discriminatory. All Texans registering to vote must provide a signature. *See Anderson*, 460 U.S. at 788. And the burden of mailing a registration form is not severe; it is the same burden that voters who submit ballot applications to vote by mail, and then use that method to vote, comply with frequently.

The district court reasoned that the wet signature rule "renders the [fax] option identical to the option of submitting a voter registration postcard" because "the registrant must have a printer and must pay for postage or pay for transportation." Exhibit C at 27. But that reasoning ignores the most salient benefit of faxing the registration form: the effective date of the submission is the day the fax is transmitted, not the day the original form is placed in the mail. Tex. Elec. Code

§ 13.143(d)(2). And that distinction may make all the difference between a voter's application being accepted or rejected.

**2.** The district court also improperly discarded the State's interests in the wet signature requirement. "Texas 'indisputably has a compelling interest in preserving the integrity of its election process.'" *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 239 (5th Cir. 2020) (citation omitted). Inaccuracies in voter registration are a serious problem. *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018). "Any corruption in voter registration affects a state's paramount obligation to ensure the integrity of the voting process and threatens the public's right to democratic government." *Voting for Am., Inc.*, 732 F.3d at 394.

The wet signature requirement advances the State's interests in multiple respects. It guarantees that registrants attest to meeting the qualifications to vote. Exhibit B at 419. Early voting ballot boards and signature verification committees might compare the voter's wet signature with later signatures the voter provided if the authenticity of the registration or corresponding ballot is in question. Tex. Elec. Code § 87.027. Registration files with county officials are also subject to inspection by Texas authorities investigating election-related offenses concerning signature misappropriation. *E.g.*, Exhibit B at 179-80.

The district court discounted those interests for two primary reasons. First, the court faulted the State for allowing voters to use electronic signatures in other circumstances—for example, when an individual renews his driver's license through DPS. Exhibit C at 31. That comparison is inapt. The State is confident in not just the

reliability and security of DPS's keypad software but also DPS's processes. The same cannot be said for software developed and maintained by outside parties.

Second, the district court concluded that Defendants did not offer sufficient evidence that the wet signature requirement prevents election fraud. Exhibit C at 18, 20. The court again engaged in reasoning that this Court repudiated in *LULAC*. The district court there "demanded evidence of 'actual examples of voter fraud' justifying the centralization of mail ballot delivery locations." 978 F.3d at 147. But such evidence "has never been required to justify a state's prophylactic measures to decrease occasions for vote fraud or to increase the uniformity and predictability of election administration." *Id.*

Legislatures, rather than courts, are best equipped to determine the particular risks associated with electronic submission of signatures. The Texas Legislature chose "among many permissible options" when designing its registration process. *Thompson v. Dewine*, 976 F.3d 610, 620 (6th Cir. 2020) (per curiam) (citation omitted). Accordingly, plaintiff's *Anderson-Burdick* claim is unlikely to succeed on appeal.

## II. The Other Factors Favor a Stay.

Enjoining state officials from carrying out validly enacted, constitutional laws governing elections imposes irreparable harm. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (citation omitted). And it is one of the most fundamental obligations of the State to enact clear and uniform laws for voting to ensure "fair and honest"

elections, to bring "order, rather than chaos, . . . [to] the democratic process[]," and ultimately to allow the right to vote to be fully realized. *Storer v. Brown*, 415 U.S. 724, 730 (1974).

The permanent injunction upsets those crucial interests. The injunction cannot apply statewide—the Attorney General intervened solely to defend the constitutionality of a statute that neither he nor the State enforces. 28 U.S.C. § 2403(b). This means that the injunction applies only to the four counties that plaintiff initially sued and the two intervenor-counties who joined the case as defendants. Haphazard enforcement of the Code threatens to cause substantial confusion in the months leading up to the voter registration deadline.

The Court must also consider whether issuance of a stay will substantially injure plaintiff. In considering that factor, "the maintenance of the status quo is an important consideration in granting a stay." *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021). A stay would maintain the status quo that has existed in Texas since 2013, or at a minimum, since 2018, when the Secretary issued his press release confirming that wet signatures are required for faxed applications. In the one instance in which plaintiff's app was live, things went terribly awry. Thus, there is no guarantee that voters would even want to use plaintiff's platform or be able to do so. *See* Exhibit B at 76. And no Texas voters came forward in this suit to express support for, or a desire to use, plaintiff's web app to register to vote. Whatever plaintiff's interest, it must give way to the irreparable harm the injunction inflicts on the public interest in the integrity of the ballot. *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per

curiam) (when the State seeks a stay pending appeal, "its interest and harm merge with that of the public.").

## III. The Court Should Enter a Temporary Administrative Stay.

For the reasons set out above, Defendants are entitled to a stay pending appeal. They further request that the Court immediately enter an administrative stay while the Court considers this motion. Such administrative stays are routine. *E.g.*, *Richardson*, 978 F.3d at 227-28. In the absence of a stay pending appeal, a temporary administrative stay will prevent irreparable harm while the Court considers the motion for a stay pending appeal.

## Conclusion

The Court should immediately enter a temporary administrative stay while it considers this motion and then stay the district court's injunction pending appeal.

Respectfully submitted.

Robert Henneke
General Counsel

Chance Weldon
Director of Litigation

/s/ Autumn Hamit Patterson
Autumn Hamit Patterson
Senior Attorney
apatterson@texaspolicy.com

Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2728
Fascimile: (512) 472-2728

Attorneys for Intervenor Defendants-Appellants Lupe C. Torres and Terrie Pendley

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

/s/ Judd E. Stone II
Judd E. Stone II
Solicitor General
Judd.Stone@oag.texas.gov

Michael R. Abrams
Assistant Solicitor General

Kathleen Hunker
Special Counsel

Cory Scanlon
Johnathon Stone
Assistant Attorneys General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Intervenor Defendant-Appellant Ken Paxton, Attorney General of Texas

## Certificate of Compliance with Rule 27.3

I certify the following in compliance with Fifth Circuit Rule 27.3:

- Before filing this motion, counsel for Appellants contacted the clerk's office and opposing counsel to advise them of Appellants' intent to file this motion.

- The facts stated herein supporting emergency consideration of this motion are true and complete.

- The Court's review of this motion is requested as soon as possible, but **no later than Friday, July 1, 2022.** Appellants respectfully request an immediate temporary administrative stay while the Court considers this motion.

- True and correct copies of relevant orders and other documents are attached as exhibits to this motion.

- This motion is being served at the same time it is being filed.

/s/ Judd E. Stone II
JUDD E. STONE II

## Certificate of Conference

On June 24, 2022, counsel for Appellants conferred with counsel for Appellee, who stated that Appellee opposes the relief requested in this motion and will file a response in opposition to the motion.

/s/ Judd E. Stone II
JUDD E. STONE II

## CERTIFICATE OF SERVICE

On June 27, 2022, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Judd E. Stone II
JUDD E. STONE II

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,188 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Judd E. Stone II
JUDD E. STONE II