**No. 22-50536**

# In the United States Court of Appeals for the Fifth Circuit

VOTE.ORG,

*Plaintiff-Appellee*

*v.*

JACQUELYN CALLANEN, ET AL.

*Defendants*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF TEXAS; LUPE C. TORRES, IN HIS OFFICIAL CAPACITY AS THE MEDINA COUNTY ELECTIONS ADMINISTRATOR; TERRIE PENDLEY, IN HER OFFICIAL CAPACITY AS THE REAL COUNTY TAX ASSESSOR-COLLECTOR,

*Intervenor Defendants-Appellants*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## BRIEF FOR APPELLANTS

*(Counsel Listed on Inside Cover)*

Robert Henneke
General Counsel

Chance Weldon
Director of Litigation

Autumn Hamit Patterson
Senior Attorney
apatterson@texaspolicy.com

Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

Counsel for Intervenor Defendants-Appellants Lupe C. Torres and Terrie Pendley

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Judd E. Stone II
Solicitor General

Michael R. Abrams
Assistant Solicitor General
Michael.Abrams@oag.texas.gov

Kathleen T. Hunker
Special Counsel

Sara B. Baumgardner
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Intervenor Defendant-Appellant Ken Paxton, Attorney General of Texas

# Certificate of Interested Persons

No. 22-50536

Vote.org,

*Plaintiff-Appellee,*

*v.*

Jacquelyn Callanen, et al.,

*Defendants,*

Ken Paxton, In His Official Capacity as the Attorney General of Texas; Lupe C. Torres, In His Official Capacity as the Medina County Elections Administrator; Terrie Pendley, In Her Official Capacity as the Real County Tax Assessor-Collector,

*Intervenor Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Michael R. Abrams

Michael R. Abrams

*Counsel of Record for Intervenor Defendant-Appellant Ken Paxton, Attorney General of Texas*

## STATEMENT REGARDING ORAL ARGUMENT

This case merits oral argument. The district court permanently enjoined the enforcement of a Texas law that requires prospective voters who submit a registration application by fax to submit a follow-up copy of the application with "the voter's original signature." The injunction undercuts the State's well-established interest in the integrity of its voter rolls and the public's confidence in the democratic process. And the court's holding that a non-membership organization can vindicate a third party's right to vote implicates significant, and currently unresolved, questions of standing. In light of these issues and the importance of this matter to the State, oral argument is likely to aid the Court's decisional process.

# TABLE OF CONTENTS

Page

Statement Regarding Oral Argument ....................................................................i

Table of Authorities ...........................................................................................iii

Introduction........................................................................................................ 1

Statement of Jurisdiction ................................................................................... 2

Issues Presented ................................................................................................. 3

Statement of the Case ........................................................................................ 3

    I.   Texas's Voter Registration Laws ........................................................... 3

        A.   Pre-existing options to register to vote ........................................... 3

        B.   SB 910, HB 3107, and the new option to register by fax ...................... 5

    II.  Factual Background ............................................................................... 6

    III. Procedural History ............................................................................... 9

Summary of the Argument................................................................................. 12

Standard of Review ........................................................................................... 15

Argument........................................................................................................... 15

    I.   Plaintiff Lacks Standing to Vindicate the Rights of Texas Voters.............. 15

        A.   Plaintiff has not shown that it was harmed by a diversion of resources to non-routine activities...................................................... 16

        B.   Any injury plaintiff has sustained is self-inflicted.............................20

        C.   Plaintiff cannot base its standing on the rights of Texas voters. ................................................................................................. 21

    II.  The Original Signature Requirement Does Not Violate Section 1971 of the Civil Rights Act..................................................................24

        A.   Section 1971 does not create a private right of action.........................25

        B.   Plaintiff cannot prevail on a section 1971 claim absent evidence of racial discrimination. ......................................................29

        C.   The original signature requirement does not deprive anyone of the right to vote and is material to determining whether an individual is qualified to vote under Texas law. ................................ 31

            1.   The requirement does not deprive anyone of the right to vote. ......................................................................................32

       2.   The requirement is material to determining voter qualifications under Texas law.....................................................34

  III.  The Original Signature Requirement Does Not Violate the Constitution.................................................................................38

      A.   The original signature requirement does not burden voters...............39

      B.   The original signature requirement serves compelling state interests. ...................................................................................42

  IV.  The District Court Did Not Properly Balance the Equities. ....................46

Conclusion...............................................................................................48

Certificate of Service................................................................................49

Certificate of Compliance .........................................................................49

## Table of Authorities

Page(s)

**Cases**

*Alexander v. Sandoval,*
   532 U.S. 275 (2001).................................................................*passim*

*Allen v. State Bd. of Elections,*
   393 U.S. 544 (1969) ........................................................................27

*Anderson v. Celebrezze,*
   460 U.S 780 (1983) ............................................... 14, 38, 39, 41

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
   178 F.3d 350 (5th Cir. 1999) ................................... 13, 15, 20

*Bennett v. Spear,*
   520 U.S. 154 (1997).......................................................................20

*Brnovich v. Democratic Nat'l Comm.,*
   141 S. Ct. 2321 (2021) ........................................... 34, 40, 45

*Broyles v. Texas,*
   618 F. Supp. 2d 661 (S.D. Tex. 2009) ...........................13-14, 28, 29

*Burdick v. Takushi,*
   504 U.S. 428 (1992) .........................................................38, 39, 46

*City of Boerne v. Flores,*
   521 U.S. 507 (1997) .......................................................................31

*City of Mobile v. Bolden*,
   446 U.S. 55 (1980) ...................................................................... 31

*Common Cause v. Thomsen*,
   574 F. Supp. 3d 634 (W.D. Wis. 2021) ............................................ 22

*Condon v. Reno*,
   913 F. Supp. 946 (D.S.C. 1995) ...................................................... 36

*Conn v. Gabbert*,
   526 U.S. 286 (1999) ...................................................................... 22

*Crawford v. Marion County Election Board*,
   553 U.S. 181 (2008) ................................................................ 42, 45

*Czyzewski v. Jevic Holding Corp.*,
   580 U.S. 451 (2017) ...................................................................... 30

*Danos v. Jones*,
   652 F.3d 577 (5th Cir. 2011) ................................................ 13, 16, 22

*Dekom v. New York*,
   No. 12-CV-1318, 2013 WL 3095010 (E.D.N.Y. June 18, 2013) ......... 27

*Delancey v. City of Austin*,
   570 F.3d 590 (5th Cir. 2009) .......................................................... 25

*Diaz v. Cobb*,
   435 F. Supp. 2d 1206 (S.D. Fla. 2006) ....................................... 36, 37

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ...................................................................... 46

*El Paso County v. Trump*,
   982 F.3d 332 (5th Cir. 2020) .................................................... *passim*

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
   489 U.S. 214 (1989) ...................................................................... 42

*Evanston Ins. Co. v. Mid-Continent Cas. Co.*,
   909 F.3d 143 (5th Cir. 2018) .......................................................... 15

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ................................................................ 25, 26

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ....................................................... 12-13, 15, 16

*Hersh v. United States*,
   553 F.3d 743 (5th Cir. 2008) .......................................................... 30

*High v. E-Sys. Inc.*,
   459 F.3d 573 (5th Cir. 2006). ......................................................... 15

iv

*Hoyle v. Priest*,
  265 F.3d 699 (8th Cir. 2001) ............................................................ 36

*Husted v. A. Philip Randolph Inst.*,
  138 S. Ct. 1833 (2018) .................................................................... 43

*Ill. State Bd. of Elections v. Socialist Workers Party*,
  440 U.S. 173 (1979) ........................................................................ 46

*Ind. Democratic Party v. Rokita*,
  458 F. Supp. 2d 775 (S.D. Ind. 2006) .............................................. 29

*Kirksey v. City of Jackson*,
  663 F.2d 659 (5th Cir. 1981) ........................................................... 29

*La. ACORN Fair Hous. v. LeBlanc*,
  211 F.3d 298 (5th Cir. 2000) ............................................... 16, 17, 19

*Lemons v. Bradbury*,
  538 F.3d 1098 (9th Cir. 2008) ......................................................... 41

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................. 10, 15, 20

*Maryland v. King*,
  567 U.S. 1301 (2012) ...................................................................... 14

*Mays v. LaRose*,
  951 F.3d 775 (6th Cir. 2020) ........................................................... 42

*McCormack v. Nat'l Collegiate Athletic Ass'n*,
  845 F.2d 1338 (5th Cir. 1998) .............................................. 13, 21, 23

*McDonald v. Bd. of Election Comm'rs*,
  394 U.S. 802 (1969) ........................................................................ 32

*McKay v. Altobello*,
  No. 96-3458, 1996 WL 635987 (E.D. La. Oct. 31, 1996)............... 27, 29

*McKay v. Thompson*,
  226 F.3d 752 (6th Cir. 2000) ........................................................... 27

*Migliori v. Cohen*,
  36 F.4th 153 (3d Cir. 2022) ................................................. 27, 28, 29

*Munro v. Socialist Workers Party*,
  479 U.S. 189 (1986) ........................................................................ 45

*NAACP v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010) ....................................................*passim*

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................. 11, 12

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011) .............................................................. 22

*Org. for Black Struggle v. Ashcroft*,
    978 F.3d 603 (8th Cir. 2020) ...................................................... 15, 47

*Org. for Black Struggle v. Ashcroft*,
    No. 2:20-CV-04184-BCW, 2021 WL 1318011 (W.D. Mo. Mar. 9, 2021) .......... 36

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ............................................................................ 42

*Reno v. Bossier Par. Sch. Bd.*,
    520 U.S. 471 (1997) ........................................................................ 31

*Richardson v. Tex. Sec'y of State*,
    978 F.3d 220 (5th Cir. 2020) ...................................................... 42, 43

*Ritter v. Migliori*,
    142 S. Ct. 1824 (2022) ......................................................... 31, 34, 35

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) .................................................. 27, 28

*Spivey v. Ohio*,
    999 F. Supp. 987 (N.D. Ohio 1998) .................................................. 27

*Storer v. Brown*,
    415 U.S. 724 (1974) .................................................................... 38, 46

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ...................................................... 23, 42

*Tex. Democratic Party v. Hughs*,
    474 F. Supp. 3d 849 (W.D. Tex 2020) ............................................. 16

*Tex. Democratic Party v. Hughs*,
    860 F. App'x 874 (5th Cir. 2021) ............................................ 8, 9, 23

*Tex. League of United Latin Am. Citizens v. Hughs* (*LULAC*),
    978 F.3d 136 (5th Cir. 2020) ........................................ 32, 39, 40, 44

*Thompson v. Dewine*,
    959 F.3d 804 (6th Cir. 2020) .......................................................... 45

*Thompson v. DeWine*,
    976 F.3d 610 (6th Cir. 2020) .......................................................... 45

*Thrasher v. Ill. Republican Party*,
    No. 4:12-cv-4071, 2013 WL 442832 (C.D. Ill. Feb. 5, 2013) ............. 29

*United States v. Mississippi*,
    380 U.S. 128 (1965) ........................................................................ 31

*United States v. Ward*,
  345 F.2d 857 (5th Cir. 1965) ............................................................ 33
*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) .............................................................. 1
*Veasey v. Abbott*,
  870 F.3d 387 (5th Cir. 2017) ........................................................15, 47
*Vote.org v. Callanen*,
  39 F.4th 297 (5th Cir. 2022) ......................................................*passim*
*Voting for Am., Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ....................................................... 38, 43
*Warth v. Seldin*,
  422 U.S. 490 (1975) ......................................................................22
*Ex parte Young*,
  209 U.S. 123 (1908) ........................................................................9
*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ............................................................. 25, 27

## Constitutional Provisions, Statutes and Rules

U.S. Const., amend. XV ................................................................30
28 U.S.C.:
  § 1291 ............................................................................................2
  § 1331............................................................................................2
  § 1343 ............................................................................................2
  § 2403(b) ................................................................................ 9, 46
42 U.S.C. § 1983 ....................................................................*passim*
52 U.S.C.:
  § 10101(a) ....................................................................................30
  § 10101(a)(1) ..............................................................................30
  § 10101(a)(2)................................................................................30
  § 10101(a)(2)(B) ..................................................................*passim*
  § 10101(c) ............................................................................. 13, 26
Act of May 26, 2013, 83d Leg., R.S., ch. 1178, § 3,
  2013 Tex. Gen. Laws 2923 ............................................................5
Act of May 28, 2021, 87th Leg., R.S., ch. 711,
  2021 Tex. Sess. Law Serv. 1469 ................................................ 6, 21
Civil Rights Act of 1964, tit I, Pub. L. 88-352, § 101, 78 Stat. 241 ..........28

vii

Tex. Elec. Code:

§ 11.002 ................................................................................ 14
§ 11.002(a)(1) ...................................................................... 34
§ 11.002(a)(2) ...................................................................... 34
§ 11.002(a)(3) ...................................................................... 34
§ 11.002(a)(4) ...................................................................... 34
§ 11.002(a)(5) ...................................................................... 34
§ 11.002(a)(6) ................................................................. 12, 34
§ 13.002 ................................................................................. 3
§ 13.002(a) ................................................................... *passim*
§ 13.002(b) ....................................................... 5, 12, 20, 34
§ 13.003 ........................................................................... 3, 40
§ 13.038 ........................................................................... 4, 33
§ 13.041 ............................................................................... 4
§ 13.071 ............................................................................. 47
§ 13.072 ............................................................................. 47
§ 13.073 ....................................................................... 12, 33
§ 13.073(a) ........................................................................ 32
§ 13.073(c) ............................................................... 6, 14, 33
§ 13.143 ............................................................................... 5
§ 13.143(d-2) ............................................................... *passim*
§ 20.001 ...................................................................... 3, 33, 40
§ 20.031 ........................................................................... 4, 33
§ 20.122 ............................................................................. 40
§ 31.003 ............................................................................. 46
§ 84.001 ............................................................................. 41
§ 84.002(c) ........................................................................ 41
§ 87.027 ............................................................................. 43

Fed. R. Civ. P.:

5.1(c) .............................................................................. 9, 46
24 ....................................................................................... 9

## Other Authorities

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 (1982)............22

Tex. Sec'y of State, Press Release: Secretary Pablos Reminds Texans To
Exercise Caution When Registering To Vote (Oct. 4, 2018), *available at*
https://www.sos.state.tx.us/about/newsreleases/2018/100418.shtml ..............8

Tex. Sec'y of State, Election Advisory No. 2022-08 (Jan. 28, 2022),
*available at* sos.texas.gov/elections/laws/advisory2022-08.shtml ................... 43

Tex. Sec'y of State, *Request for Voter Registration Applications*, *available
at* https://www.sos.state.tx.us/elections/voter/reqvr.shtml (last
visited Sept. 28, 2022) ....................................................................................... 5

Tex. Sec'y of State, *Voter Registration*, https://www.votetexas.gov/register-
to-vote/ (last visited Sept. 28, 2022) ............................................................... 3

# Introduction

The district court's judgment halts a common-sense measure designed to ensure the security of Texas elections. The judgment also opens the door to a notion that neither the Supreme Court nor this Court has ever recognized—the right to register to vote by the method of one's choice—and grants a third-party entity that does not vote, let alone register to vote, standing to enforce it. *Cf. Veasey v. Abbott*, 830 F.3d 216, 307 (5th Cir. 2016) (en banc) (Jones, J., concurring in part and dissenting in part).

This Court should reverse. Plaintiff Vote.org developed a web app with the stated goal of helping Texans submit voter-registration forms. But the app suffers a fatal design flaw (in addition to technical problems): it is incompatible with the Texas Election Code. The app functions by uploading a picture of a signature and then submitting a completed voter-registration form to a third-party vendor, which in turn faxes the form to the county registrar. The Election Code, however, requires voters who submit a faxed form to later send that form to the registrar with the voter's original, "wet" signature. Plaintiff's app does not afford voters the chance to comply with that requirement.

Plaintiff did not identify, and the district court did not cite, a single case finding that States must allow voters to register by electronic signature. And defendants introduced a wealth of evidence showing that registering to vote in Texas is a straightforward process. But the district court nonetheless held that the Election Code's original signature requirement violates section 1971 of the Civil Rights Act—because, that court said, it is not material to the qualifications for voting—and unduly

burdens the right to vote under the *Anderson-Burdick* standard for First and Fourteenth Amendment challenges to election laws.

That decision was wrong in its analysis of jurisdiction and the merits. Plaintiff is a nonprofit entity with no members. Not only has it failed to allege a cognizable injury, but it also lacks standing to bring voting-rights claims on behalf of Texas citizens who can bring those claims of their own accord and are not parties to this litigation. Plaintiff's section 1971 claim fails, among other reasons, because Congress did not provide a private cause of action under section 1971 and Texas's original signature requirement does not hinder Texans from registering to vote. The constitutional claim lacks merit, too. Framed in the proper light, the requirement is part of a broad *expansion* of the opportunity to register to vote; it is not a burden at all. And even if it does impose some *de minimis* burdens, those burdens are vastly outweighed by the requirement's function as a bulwark against election fraud.

This Court concluded that "defendants have shown a strong likelihood of success on the merits" when it stayed the district court's injunction pending appeal. *Vote.org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022). With the benefit of full briefing, the judgment should now be reversed.

## STATEMENT OF JURISDICTION

Plaintiff brought federal claims and invoked the district court's jurisdiction under 28 U.S.C. sections 1331 and 1343. ROA.26-27. The district court entered a final judgment on June 17, 2022. ROA.1824-25. Defendants filed a notice of appeal the same day. ROA.1826-28. This Court has appellate jurisdiction under 28 U.S.C. section 1291.

## Issues Presented

1. Whether plaintiff has standing to remediate alleged obstacles to Texas citizens' ability to register to vote.

2. Whether section 1971 of the Civil Rights Act creates a private cause of action for non-discriminatory requirements, and if so, whether the original signature requirement violates section 1971 of the Civil Rights Act.

3. Whether the original signature requirement violates the First and Fourteenth Amendments.

4. Whether plaintiff demonstrated entitlement to a permanent injunction.

## Statement of the Case

## I.   Texas's Voter Registration Laws

### A.   Pre-existing options to register to vote

Texas election officials make every effort to ensure that "[r]egistering to vote in Texas is easy[.]" *See* Tex. Sec'y of State, *Voter Registration*, *available at* https://www.votetexas.gov/register-to-vote/ (last visited Sept. 28, 2022). Applicants must fill out and submit a signed, written application form to a voter registrar. Tex. Elec. Code §§ 13.002, 13.143(d-2). Any "person desiring to register to vote" can submit his application to the county registrar by personal delivery or mail. *Id.* § 13.002(a). If a voter needs assistance, he may appoint an agent to submit the application on his behalf. *Id.* § 13.003. The Code designates certain government offices to act as "voter registration agencies," including the Department of Public Safety (DPS), the Health and Human Services Commission, and public libraries. *Id.* § 20.001. Each of these offices "provide[s] a voter registration application form to

each" qualified individual "in connection with the person's application for initial services" and any subsequent renewals. *Id.* § 20.031.

In addition to those voter-registration agencies, Texas counties can appoint volunteer deputy registrars to distribute application forms in their communities and accept them on the county's behalf. *Id.* §§ 13.038, 13.041. County election officials employ large numbers of volunteer deputy registrars to facilitate voter registration for as many Texans as possible: for example, the Travis County Tax Assessor-Collector currently works with about 2,500 volunteer deputy registrars. ROA.2285, 2287 (all sealed).[1] They go "anywhere" where "more than a few people" are gathered so residents can have the opportunity to register to vote in places where it is convenient for them, such as coffee shops, libraries, farmer's markets, and other local events. ROA.2287 (sealed). Similarly, Bexar County employs approximately 2,000 volunteer deputy registrars and makes a wide variety of voter-registration opportunities available to its residents. ROA.2158-62 (sealed).

Texas also ensures access to voter-application forms for Texans who wish to register on their own initiative. County election officials make voter-registration applications available to groups in their communities, which then distribute the forms to facilitate registration. ROA.2120-21 (sealed). Any of these groups can also obtain

---

[1] Several of the appendices supporting the parties' summary-judgment motions were filed under seal, *e.g.*, ROA.1956, because a few documents within large PDFs of combined exhibits were subject to the Court's protective order, *e.g.*, ROA.2521. For that reason, many of the record citations in this brief reference documents under seal.

applications from the Texas Secretary of State's office free of charge. ROA.2120 (sealed). The Secretary will also mail registrants a postage-paid application form upon request, as will county registrars. ROA.1960 (sealed). And the Secretary of State's website provides a copy of the application form, which registrants may fill out and print. Tex. Sec'y of State, *Request for Voter Registration Applications*, *available at* https://www.sos.state.tx.us/elections/voter/reqvr.shtml (last visited Sept. 28, 2022); ROA.1959-60 (sealed); *see* ROA.1958 (sealed). Texas's voter-registration program has proven successful: for example, in Travis County, 97% of eligible residents were registered to vote in the lead-up to the November 2020 election. ROA.2288 (sealed).

## B.  SB 910, HB 3107, and the new option to register by fax

In 2013, the Legislature enacted, and the Governor signed, SB 910, legislation that for the first time allowed individuals to transmit voter-registration forms via fax. Act of May 26, 2013, 83d Leg., R.S., ch. 1178, § 3, 2013 Tex. Gen. Laws 2923, 2923-24. The legislation provided that registrars were deemed to have received an application on the day it was faxed to them, so long as the application was also mailed within four business days. *Id.*; *see* Tex. Elec. Code §§ 13.002(a), 13.143. But nothing in SB 910 altered the long-standing requirement that the applicant provide an original, "wet" signature on his or her voter-registration application. ROA.2358 (sealed); *see* Tex. Elec. Code § 13.002(b). Instead, the whole point of the provision "was to allow [the registrants] to hold their place in line, to hold their effective date, but to follow it up with the original signed copy of the voter registration application" in the next four business days. ROA.2358 (sealed).

During the 2021 regular legislative session, the Legislature passed HB 3107, a "cleanup" measure that clarified several provisions of the Election Code. Act of May 28, 2021, 87th Leg., R.S., ch. 711, 2021 Tex. Sess. Law Serv. 1469. HB 3107 modified the language in SB 910 to provide that "a copy of the original registration application containing the voter's original signature must be submitted by personal delivery or mail" within four business days of the fax transmission of the form. Tex. Elec. Code § 13.143(d-2). A registrant may correct any signature defect within ten days of being notified of the issue, thereby preserving the original effective date of the registration. *Id.* § 13.073(c).

## II.  Factual Background

Plaintiff Vote.org is a nonprofit entity that advocates for internet-based voter-registration options. ROA.27. It does not have members; the prospective voters who use plaintiff's web apps are "users." ROA.2027, 2038-39 (all sealed). According to plaintiff's CEO, Vote.org "doesn't register voters" or help voters register themselves; it simply "provide[s] the tools and information" to help voters "initiate their registration process." ROA.2032 (sealed).

In 2018, plaintiff developed a web app that allowed prospective registrants to input their information into embedded fields and upload electronic images of their signatures. ROA.27, 2025-27 (sealed). This image of a signature can come from anywhere; the original of the image need not be affixed to an application for voter registration. *See* ROA.2027, 2377-78 (all sealed). Plaintiff's web app transposed the information and signature file onto a voter-registration application form and transmitted the form to plaintiff's fax vendor, which in turn sent the form via fax to the county

voter registrar. ROA.27-28, 2026-27 (sealed). Another third-party vendor then mailed a printed version of the application to the county voter registrar. ROA.28, 2026 (sealed). At no point before 2018 did plaintiff make this tool available in Texas. ROA.2030-32 (sealed).

Plaintiff introduced its software in several Texas counties without first clearing its use with the Secretary of State. ROA.2034-36, 2057 (all sealed). Election officials in other counties refused to integrate this app into their voter-registration operations, and some even expressed concern to plaintiff's staff that the e-sign function violated Texas law. ROA.2033, 2036, 2037-38, 2044, 2058, 2458-59, 2468-69, 2470 (all sealed).

The initial rollout in advance of the 2018 midterm election was "an unmitigated disaster" marred by technical difficulties. *Vote.org*, 39 F.4th at 301. Roughly 15% of the applications submitted through the app to Dallas County contained signature lines that were blank, blacked out, illegible, or otherwise of very poor quality. ROA.2470-71 (sealed). Other counties experienced similar problems. The Travis County Tax Assessor-Collector's office was alarmed to find that many signatures were poor, blank, or blacked out, and warned that "[t]his is a real problem and [the office is] concerned about proceeding until this is cleared up." ROA.1962, 2222 (all sealed). To make matters worse, plaintiff's "pilot program" failed to transfer all the applications to county election officials via fax. For example, at least 259 applications in Dallas County were not transferred. ROA.2474 (sealed). Indeed, even before the Secretary of State weighed in, Dallas County concluded that it needed to reject "all of the applications submitted by Vote.org" because they lacked original signatures.

ROA.2472 (sealed). The Bexar County Elections Administrator likewise testified that she had decided to return the registration applications independent of her later conversations with the Secretary's office because the applications lacked original signatures. ROA.2173-74 (sealed). And in her deposition, plaintiff's CEO has admitted that her engineering team will need to "fix" the issues with imaged signatures before the app can be used again. ROA.2031 (sealed).[2]

Concerned that voters might find themselves disenfranchised because of these types of apps, the Secretary issued a press release cautioning that "[a]ny web site that misleadingly claims to assist voters in registering to vote online by simply submitting a digital signature is not authorized to do so." Tex. Sec'y of State, Press Release: Secretary Pablos Reminds Texans To Exercise Caution When Registering To Vote (Oct. 4, 2018), *available at* https://www.sos.state.tx.us/about/news-releases/2018/100418.shtml (last visited September 28, 2022). At that point, plaintiff immediately turned off its e-sign tool in Texas. ROA.2029, 2034, 2046 (all sealed). Various plaintiff groups then sued the Secretary, contending that requiring an original signature on a voter-registration form violates the Constitution and section 1971. *Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 876 (5th Cir. 2021) (per curiam). That lawsuit ended when this Court held that the Secretary retained

---

[2] The district court wrongly concluded, based on a deposition excerpt, that Vote.org fixed the problem with many of the images being of poor quality. ROA.1804. But the cited deposition excerpt simply reflects that *some* signatures in the pilot program were legible, ROA.2228 (sealed), not that Vote.org fixed the problem, ROA.2031 (sealed).

immunity from suit under *Ex parte Young*, 209 U.S. 123 (1908). *Hughs*, 860 F. App'x at 879.

## III. Procedural History

In July 2021, plaintiff sued four county election officials[3] seeking to enjoin the original signature requirement in section 13.143(d-2) of the Election Code, asserting that the requirement violates the First and Fourteenth Amendments and section 1971 of the Civil Rights Act—because, plaintiff avers, an original signature is immaterial to an individual's qualifications for voting. ROA.23-36; *see* 52 U.S.C. § 10101(a)(2)(B). Texas Attorney General Ken Paxton intervened in the suit to defend the constitutionality of the statute. ROA.142; *see* 28 U.S.C. § 2403(b); Fed. R. Civ. P. 5.1(c) ("[T]he attorney general may intervene" when the constitutionality of a state statute is at issue.). Lupe C. Torres and Terrie Pendley, in their official capacities as the Medina County Elections Administrator and Real County Tax Assessor-Collector, respectively, intervened under Federal Rule of Civil Procedure 24 in defense of the statute, too.[4] ROA.114.

At the outset of the proceedings, the district court found that plaintiff sufficiently alleged an injury in fact based on "the additional time, effort, and money

---

[3] Those officials—Jacquelyn Callanen, the Bexar County Elections Administrator; Bruce Elfant, the Travis County Tax Assessor-Collector; Remi Garza, the Cameron County Elections Administrator; and Michael Scarpello, the Dallas County Elections Administrator, ROA.23—have not appealed from the district court's final judgment and are not parties to this appeal.

[4] For simplicity, this brief refers to the Intervenor-Defendants collectively as "defendants."

expended to 'redesign its Texas voter registration programs.'" ROA.278. After extensive discovery and defendants' submission of substantial evidence on plaintiff's lack of standing,[5] the court declined to revisit that holding, ROA.1792, and instead issued an opinion on the parties' competing motions for summary judgment. ROA.1787-823. The court found that the original signature requirement violates section 1971's "materiality" provision because the court determined that an original signature is "not material" to determining whether the applicant is "qualified to vote." ROA.1802-08; *see* 52 U.S.C. § 10101(a)(2)(B) (providing that "[n]o person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission" on a voter registration application "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election"). Even though "Texas provide[d] abundant evidentiary and legal support for the conclusion that a signature is important and vital to determine a voter's qualification to vote," ROA.1803, the court held that Texas had not sufficiently demonstrated that the original signature requirement was "necessary to prevent voter registration fraud" or useful in investigating fraud. ROA.1804, 1808.

---

[5] "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," but "[i]n response to a summary judgment motion . . . the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" establishing his standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The court also held that the original signature requirement violates the First and Fourteenth Amendments, determining that the requirement imposed "more than slight" burdens on Texas voters. ROA.1814. Although the court recognized Texas's compelling interest in protecting election integrity, it faulted defendants for purportedly failing to provide any "argument or . . . evidence" showing that the requirement serves that interest. ROA.1816-20. On that basis, the court concluded that there was "no valid justification" for the burden. ROA.1820.

Based on these rulings, the court granted a permanent injunction providing that "Defendants, Intervenors, and their officers, agents, servants and employees . . . may not require a voter registrant who submits a voter registration form by telephonic facsimile machine to also provide a copy of the original registration application containing the voter's original signature." ROA.1823. Defendants filed a notice of appeal the day that the court issued its final judgment. ROA.1824-25, 1826-28.

A panel of this Court granted a stay pending appeal. *Vote.org*, 39 F.4th at 300, 309. The panel concluded that defendants were likely to prevail on each of their arguments. *Id.* at 302-03 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

*First*, the Court found that plaintiff likely lacked standing because, "without question," the plaintiff's claim "invokes the rights of Texas voters and not its own—an organization plainly lacks the right to vote." *Id.* at 303. And even if the plaintiff "fit within the exception to the general prohibition on third-party standing," section 1983 does not allow a plaintiff to sue to remedy a violation of someone else's rights. *Id.* at 304.

*Second*, defendants were likely to prevail on their section 1971 claim because the original signature requirement (1) deprived no voter of the opportunity to vote and (2) is material to determining whether an individual is qualified to vote. *Id.* at 305-07. If a faxed application is rejected for failing to comply with the requirement, Texas law requires the applicant to receive "a second bite at the apple" and gives applicants other means of registering. *Id.* at 306; Tex. Elec. Code §§ 13.002(a), 13.073. Moreover, to be qualified to vote in Texas, one must be registered, and to register, one must submit a written and signed application. *Vote.org*, 39 F.4th at 306 (citing Tex. Elec. Code §§ 11.002(a)(6), 13.002(a)-(b)). Requiring an original signature ensures that "an applicant has read, understood, and attested that he meets the qualifications for voting." *Id.*

*Third*, the panel held that defendants would likely prevail on plaintiff's constitutional claim for at least two reasons: (1) the original signature requirement "imposes at most a very slight burden on the right to vote," and (2) the State's interests "are surely adequate" to justify any slight burden the requirement imposes because it helps deter voter fraud. *Id.* at 308. The panel then concluded that the remaining *Nken* factors favored defendants and granted a stay pending appeal. *Id.* at 300, 308-09.

## Summary of the Argument

**I.** Plaintiff does not have standing. Because it has no members, plaintiff must show that it has standing as an organization to bring suit. *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010); ROA.2022, 2038-39 (all sealed). Plaintiff has not alleged a "concrete and demonstrable" diversion of resources differing from its routine activities sufficient to give rise to an injury in fact. *Id.* at 238 (quoting *Havens*

*Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Even if it had, that injury is self-inflicted and thus not fairly traceable to defendants' conduct. *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999).

Because plaintiff's claims hinge on allegations that Texas's original signature requirement unlawfully infringes Texans' right to vote, plaintiff is attempting to step into the shoes of third-party voters. ROA.34-35. When the alleged rights at issue belong to a third party, the plaintiff lacks statutory standing regardless of whether the plaintiff sustained an injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011). So, even if plaintiff identified a diversion of resources sufficient to fulfill the injury-in-fact requirement, or its inability to use its preferred technology to register voters constituted an injury for standing purposes, plaintiff cannot demonstrate statutory standing under sections 1971 or 1983 because it has not shown that *its own* voting rights were infringed. Nor is this case among the rare circumstances in which "the third party for some reason cannot assert its own rights." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1998).

**II.** Plaintiff's section 1971 claim fails for three reasons. *First*, section 1971 does not confer a private right of action. The U.S. Attorney General may bring an action to enjoin violations of section 1971's "materiality" provision. 52 U.S.C. § 10101(c). But the statute does not indicate that Congress intended to create a private right, much less a private remedy. *See Alexander v. Sandoval*, 532 U.S. 275, 286, 289 (2001). *Second*, section 1971 "was enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements," so "only racially motivated deprivations of rights are actionable" under that statute. *Broyles v.*

*Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009) (mem. op.). Plaintiff has not alleged that the original signature requirement was racially motivated. *Third*, plaintiff's section 1971 claim fails on the merits. The requirement does not deprive anyone of the right to vote, especially in light of Texas's mandatory cure provision that allows a registrant to correct the defect and preserve the original date of registration. Tex. Elec. Code § 13.073(c). And the requirement is "material" in determining whether an individual is qualified to vote because (among other reasons) it ensures that voters acknowledge that they meet Texas's qualification requirements. Moreover, anyone who does not subject himself to Texas's common-sense fraud-prevention measures cannot become a registered voter and, without being a registered voter, a person is not a qualified voter. 52 U.S.C. § 10101(a)(2)(B); Tex. Elec. Code § 11.002.

**III.** Under the *Anderson-Burdick* test, the original signature requirement does not burden the right to vote at all; rather, it refines legislation that *expands* the ability to register to vote by allowing registrants to submit voter-registration forms via fax. But even if it does restrict the right to vote, any burden is slight because asking a citizen for her signature when she registers to vote is not a serious inconvenience. Moreover, the requirement advances the State's "important regulatory interests" by guaranteeing that registrants attest to meeting the qualifications to vote and helping protect elections against fraud. *Anderson v. Celebrezze*, 460 U.S 780, 788 (1983).

**IV.** Finally, the district court erred in granting a permanent injunction. Enjoining state officials from carrying out validly enacted, constitutional laws governing elections imposes irreparable harm. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Meanwhile, plaintiff did not show any harm in voter

registrars' ongoing enforcement of the original signature requirement. And whatever plaintiff's interest, it must give way to the irreparable harm the injunction inflicts on the public interest in the integrity of the ballot. *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020).

## STANDARD OF REVIEW

The Court reviews rulings on cross-motions for summary judgment de novo, construing all evidence and inferences in favor of the non-moving parties. *Evanston Ins. Co. v. Mid-Continent Cas. Co.*, 909 F.3d 143, 146 (5th Cir. 2018). Summary judgment is appropriate if "the evidence shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *High v. E-Sys. Inc.*, 459 F.3d 573, 576 (5th Cir. 2006).

## ARGUMENT

## I.  Plaintiff Lacks Standing to Vindicate the Rights of Texas Voters.

As a non-membership organization, ROA.2038-39 (sealed), plaintiff must pass the same standing test as individual plaintiffs. *Fowler*, 178 F.3d at 356; *accord Havens*, 455 U.S. at 378-79. Thus, to demonstrate that it has standing, plaintiff must show that (1) it suffered an injury in fact that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61.

Plaintiff did not introduce competent evidence to meet that burden. It has not suffered a cognizable injury in fact. And even if it had, that injury is self-inflicted and does not give it standing to assert a violation of Texans' rights to vote. *See Danos*, 652 F.3d at 582.

## A. Plaintiff has not shown that it was harmed by a diversion of resources to non-routine activities.

"An organization suffers an injury in fact if a defendant's actions 'perceptibly impair[]' the organization's activities and consequently drain the organization's resources." *El Paso County v. Trump*, 982 F.3d 332, 343 & n.66 (5th Cir. 2020) (quoting *Havens*, 455 U.S. at 379). But "[n]ot every diversion of resources to counteract the defendant's conduct" comprises an injury in fact. *City of Kyle*, 626 F.3d at 238. Allegations of harm must be "concrete and demonstrable." *Id.* (quoting *Havens*, 455 U.S. at 379). Proving a concrete injury requires the plaintiff to provide detail about *how* its activities were impaired and its resources diverted. *See, e.g.*, *El Paso County*, 982 F.3d at 344; *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000).

Non-specific, less-detailed allegations of harm will not demonstrate an injury in fact, especially on review of summary-judgment rulings with a developed record. *Compare, e.g.*, *Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 853 (W.D. Tex 2020) (noting that at the motion-to-dismiss stage, the district court may make its decision based on the pleadings and motion alone), *rev'd on other grounds*, 860 F. App'x 874, *with El Paso County*, 982 F.3d at 343-44, 347 (vacating a grant of summary judgment when plaintiff made only "conclusory assertions" of diverted resources

and did not identify "any particular projects that suffered because of" that alleged diversion); *see also supra* n.4. An organization cannot demonstrate that it has standing merely by asserting that the defendant's action frustrated its mission or alleging, without more, that a matter "started to take over an inordinate amount" of work and staff time. *ACORN*, 211 F.3d at 305-06. Nor has an organization alleged a concrete injury in fact without "identify[ing] any particular projects that suffered because of the diversion of resources" or by "merely 'conjectur[ing] that the resources [it] devoted . . . could have been spent on other unspecified . . . activities.'" *El Paso County*, 982 F.3d at 344-45 & n.70 (quoting *City of Kyle*, 626 F.3d at 239). A plaintiff must identify "specific projects [it] had to put on hold" to counteract the challenged law or "describe in . . . detail how [it] had to re-double efforts" to carry out its mission. *ACORN*, 211 F.3d at 305. Finally, the organization's "reaction to the allegedly unlawful conduct must differ from its routine activities" or "normal operations." *El Paso County*, 982 F.3d at 344; *see City of Kyle*, 626 F.3d at 238-39.

This record lacks "concrete and demonstrable" evidence that plaintiff's activities were impaired because plaintiff provides no details explaining how it responded to defendants' allegedly harmful action. *ACORN*, 211 F.3d at 304-05. Plaintiff's CEO described plaintiff's most significant injuries as the organization's inability to carry out its mission and the generalized loss of time, energy, and technology it used to build its e-sign tool for Texas. ROA.2040-41, 2048, 2087 (all sealed). But plaintiff's bare assertion that its mission has been frustrated cannot constitute an injury for standing purposes. *See ACORN*, 211 F.3d at 305-06. And plaintiff's other allegations are nebulous at best, as they do not specify in "any detail" concrete activities

that Vote.org undertook to counteract the original signature requirement or projects it would have worked on absent the requirement. *Id.* at 305; *e.g.*, ROA.2040-44, 2087 (all sealed).

Plaintiff's allegations also fail to show a "concrete and demonstrable" diversion of resources in terms of monetary expenditures. *City of Kyle*, 626 F.3d at 238. It has produced no evidence showing that it diverted any funds because of the original signature requirement. It has provided only a bare-bones budget summary describing (among other things) its nationwide expenses, but nowhere does plaintiff show the resources it allegedly diverted *to Texas*. ROA.2011-12 (sealed); *see* ROA.2041 (sealed). Indeed, according to this breakdown, plaintiff has not experienced *any* fiscal detriment. Its actual expenses were greater in 2018, when it rolled out the app, than its budgeted expenses for 2021. ROA.2011-12 (sealed). And plaintiff's proposed budget for 2022—a midterm election year—contemplates far fewer expenses than its budget in 2018, which was the last midterm election year and the same year the organization introduced its e-sign tool in Texas. ROA.2011-12 (sealed). Plaintiff's own records thus show that the organization has not experienced financial harm on account of the original signature requirement. In fact, the exact opposite appears to be true.

Other alleged diversions of resources "fall within the general ambit" of plaintiff's normal operations, making them "activities that [do] not satisfy the requirements of standing." *El Paso County*, 982 F.3d at 344. While plaintiff avers that the original signature rule will require it to build new technology for Texas, it provides no evidence that it has begun that endeavor or expended any resources to do so.

ROA.2041 (sealed). Similarly, though it claims that its staff must now expend time "think[ing] about other ways" to serve Texas voters, ROA.2040-41 (sealed), plaintiff has neither accounted for the number of hours that activity purportedly takes up nor named specific projects it had to put on hold because its staff are otherwise occupied. ROA.2042-44, 2048 (all sealed) (naming Vote.org's projects generally but not naming a specific endeavor it halted to work on Texas-specific technology); *see ACORN*, 211 F.3d at 305. And "think[ing] about other ways" to "serve the voters" is not a deviation from plaintiff's routine operations—presumably, that is one of the main ways plaintiff fulfills its mission. *See El Paso County*, 982 F.3d at 344; ROA.2038 (sealed) (explaining that at Vote.org, "we all enjoy discussing" various topics surrounding plaintiff's mission "all the time"). Although plaintiff avers that any time spent thinking about the Texas-specific technology is time not spent cultivating apps for other states, working on app processes for individual states like Texas is a run-of-the-mill, everyday aspect of plaintiff's business. ROA.2048 (sealed); *see El Paso County*, 982 F.3d at 344.

Plaintiff also insists that its technology is now "waste[d]" because it cannot use its e-sign tool in Texas and had to turn off its technology in Texas after the Secretary issued his statement. ROA.2031, 2034, 2046 (all sealed). That is unhelpful for standing purposes. The construction of such technology is part of plaintiff's routine business activities, so that construction and concomitant outlay of expenses do not constitute an injury in fact. *See El Paso County*, 982 F.3d at 344; ROA.2041 (sealed). It is not enough for plaintiff to "conjecture[] that the resources" it "devote[s]" to thinking about new ways to advance its mission in Texas "could have been spent on

other unspecified . . . activities." *City of Kyle*, 626 F.3d at 239. Without more, these allegations of harm amount to nothing more than "vague, conclusory assertion[s] that the organization had to divert resources." *El Paso County*, 982 F.3d at 344; *accord City of Kyle*, 626 F.3d at 238-39. Moreover, at no point before the 2018 rollout did plaintiff have a routine practice of offering its e-sign tool to Texas voters, ROA.2030-32 (sealed), so turning off the e-sign function in Texas *returns* events to the status quo. Plaintiff therefore has not shown that it sustained an injury in fact. *See Lujan*, 504 U.S. at 560.

### B.   Any injury plaintiff has sustained is self-inflicted.

"An organization cannot obtain standing to sue in its own right as a result of self-inflicted injuries, i.e., those that are not 'fairly traceable to the actions of the defendant.'" *Fowler*, 178 F.3d at 358 (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). Even assuming plaintiff's alleged injury is cognizable—and it is not—plaintiff is responsible for it. The requirement that voters provide an original signature was law in Texas before plaintiff built and rolled out its e-sign tool. *See* Tex. Elec. Code § 13.002(b); ROA.2358, 2360 (all sealed). Before the 2018 rollout, there was every indication that plaintiff's technology would cause "confusion" because several counties rejected plaintiff's proposal to integrate the app into their registration operations. ROA.2033, 2036, 2037-38, 2044, 2056 (all sealed). Indeed, some election officials even expressed concern to plaintiff's staff that the e-sign function violated Texas law. ROA.2459, 2468-70 (all sealed). Plaintiff was therefore aware of the existing law in Texas and rolled out its e-sign function knowing that it was, at best, legally questionable. Yet plaintiff refused to seek guidance from the Secretary of

State. ROA.2057 (sealed); *see also* ROA.2034-36 (sealed). Plaintiff could have avoided the "unmitigated disaster" of the 2018 rollout, *Vote.org*, 39 F.4th at 301, as well as the ensuing consequences to itself and Texas voters, if it had done so. Plaintiff's choice to turn off its technology in Texas is not traceable to defendants (or any of the named county defendants) for similar reasons. Any harm resulting from the rollout or plaintiff's failure to seek guidance is self-inflicted.

At any rate, plaintiff lacks standing because all the asserted harms occurred well before the allegedly unlawful event. According to plaintiff's own counsel, plaintiff purportedly challenges only "a single provision of [HB] 3107": the requirement that an applicant to register to vote submit "a copy of the original registration application containing the voter's original signature" in addition to a faxed application. ROA.2358 (sealed); Tex. Elec. Code § 13.143(d-2). But all of plaintiff's alleged injuries—turning off its technology, its inability to carry out its mission, and any time and energy spent devising new technology for Texas—occurred or began before HB 3107's passage in 2021. Act of May 28, 2021, 87th Leg., R.S., ch. 711, 2021 Tex. Sess. Law Serv. 1469; *see* ROA.2040-41, 2048, 2087 (all sealed). Any injury therefore is not traceable to the conduct plaintiff challenges.

## C.  Plaintiff cannot base its standing on the rights of Texas voters.

Even assuming plaintiff had shown a cognizable injury traceable to defendants, it has no standing because it has not shown that *its own* voting rights were infringed, and neither section 1971 nor section 1983 empowers plaintiff to vindicate the rights of Texas voters. "A plaintiff generally must assert [its] own legal rights and interests, not those of third parties." *McCormack*, 845 F.2d at 1341. Thus, even if plaintiff has

organizational standing, it must still "assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Danos*, 652 F.3d at 582 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Plaintiff has no members, ROA.2038-39 (sealed), and cannot itself vote. All its claims hinge on the allegation that Texas citizens have been deprived of their right to vote because they cannot use plaintiff's technology in "the most streamlined way possible." ROA.34-35, 2048 (sealed). But because those claims seek to assert the rights of Texans, plaintiff can only pursue them if the statutes under which it sues grant it standing to do so—and they do not.

Start with section 1983. "Every person" who deprives a U.S. citizen "or other person" of "any rights, privileges, or immunities secured by the Constitution and laws, shall be liable *to the party injured . . . .*" 42 U.S.C. § 1983 (emphasis added). Only those whose rights to vote have allegedly been infringed may pursue litigation against defendants under this section.[6] *Conn v. Gabbert*, 526 U.S. 286 (1999), is a good illustration of this principle. The Supreme Court found that a lawyer "clearly had no standing" to bring a section 1983 claim for an injury he suffered as a result of "the alleged infringement of the rights of his client," because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on

---

[6] As the Court noted in its stay opinion, the two cases in which courts allowed an organization to sue under section 1983 based on the infringement of another's rights did so without addressing this textual argument. 39 F.4th at 305 (first citing *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011), and then citing *Common Cause v. Thomsen*, 574 F. Supp. 3d 634 (W.D. Wis. 2021)).

the legal rights or interests of third parties." *Id.* at 292-93; *see also* David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45 (1982) (Section 1983 "plainly authorizes suit by anyone alleging that he has been deprived of rights under the Constitution or federal law, and by no one else.""). Likewise, section 1971, which focuses on "the right of any *individual* to vote in any election," does not grant statutory standing to sue for purported violations of a third party's right to vote. 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see also infra* Section II.A.

The exception to the general rule regarding third-party standing does not apply here. A plaintiff might be able to vindicate a third party's rights if (1) "the plaintiff himself has suffered a cognizable injury" and (2) "the third party for some reason cannot assert its own rights." *McCormack*, 845 F.2d at 1341. This is not such a case. Even if Vote.org had suffered a cognizable injury, the Texans whose rights it asserts can sue for any alleged deprivation of those rights on their own. Or organizations who have voters as members can sue and assert associational standing on behalf of those members. Litigation over elections and voting happens all the time, and Texas voters (and the organizations that count those voters as members) are more than capable of pursuing that litigation in their own right. Indeed, various groups challenged the original signature requirement in 2018. *Hughs*, 860 F. App'x at 877-78; *see also, e.g.*, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020) (challenge by individual voters to Texas law limiting vote-by-mail option to voters over 65).

Plaintiff has not alleged a cognizable injury, let alone one that arises from defendants' conduct. But even if it had organizational standing, it still cannot sue for

an alleged violation of Texans' voting rights under section 1971. The district court should have dismissed the case on this ground alone.

## II. The Original Signature Requirement Does Not Violate Section 1971 of the Civil Rights Act.

The district court was likewise wrong to conclude that plaintiff could bring a claim based on the materiality provision of section 1971, especially when that claim does not allege racial discrimination. ROA.517-18, 1792-93. Section 1971 of the Civil Rights Act does not create a private cause of action or a private right enforceable in a section 1983 suit. What is more, a section 1971 claim requires evidence of racial discrimination—but plaintiff does not provide such evidence or even allege that racial discrimination took place in this case.

Even if plaintiff could overcome those obstacles, the district court still should have rejected plaintiff's section 1971 claim. The court held that the original signature requirement is immaterial to determining voter qualifications and abridges the right to vote. ROA.1800-08. But plaintiff has not shown a single individual who was or will be denied the right to vote because of the original signature requirement. In fact, the opposite is true: the requirement does not deprive anyone of the right to vote, as it is part of an expansion of registration methods, and Texas law requires that registrants receive the opportunity to cure applications that lack an original signature. Moreover, an original signature is material in determining whether a person is qualified to vote because it both affirms voter eligibility and deters fraud.

### A.  Section 1971 does not create a private right of action.

Two decades ago in *Alexander v. Sandoval*, the Supreme Court eschewed "the *ancien regime*" that allowed courts to invent remedies to enforce a statute. 532 U.S. at 286-87. The Court made plain that "private rights of action to enforce federal law must be created by Congress." *Id.* at 286. Accordingly, courts can no longer "imply causes of action not explicit in the statutory text itself." *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (plurality op.).  Instead, courts may imply a private cause of action only if the statute (1) contains rights-creating language and (2) "displays an intent to create . . . a private remedy." *Sandoval*, 532 U.S. at 286.  The rights-creating language "must be phrased in terms of the persons benefitted" and "unambiguously confer[] [a] right." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 274, 283-84 (2002); *see Delancey v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009) ("Congress may choose to confer individual rights subject to private enforcement, but to do so the statute must 'speak with a clear voice' and 'unambiguous[ly]' confer those rights." (quoting *Gonzaga*, 536 U.S. at 280)). If the statute "focus[es] on the person regulated rather than the individuals protected," it does not indicate "an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289. And when ascertaining whether Congress intended to create a private remedy, an "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id.* at 290.

Plaintiff asserts a claim based on the materiality provision in section 1971, but that section does not show that Congress intended to confer a private right of action. Section 1971 expressly creates a cause of action for the U.S. Attorney General,

providing that "the Attorney General may institute . . . a civil action." 52 U.S.C. § 10101(c). This "express provision" of one enforcement method "suggests that Congress intended to preclude others," *Sandoval*, 532 U.S. at 290, not that Congress intended to create an implied private right of action in section 1971.

Furthermore, the materiality provision itself does not contain essential rights-creating language. Rather than focusing on the "persons benefitted"—which is necessary to confer a right, *see Gonzaga*, 536 U.S. at 284—the materiality provision focuses on the regulated person:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B). Because it "focus[es] on the person regulated," this statutory language does not indicate that Congress intended to create a private right to be free from requirements that are immaterial in determining voter qualifications. *See Sandoval*, 532 U.S. at 289. Without such a private right, plaintiff cannot enforce the materiality provision under section 1971 or even under section 1983. *Gonzaga*, 536 U.S. at 283 (rejecting the proposition that the Court's "cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983").[7]

---

[7] And even if the materiality provision created a private right, that right would be limited to individuals who have the right to vote. *See* 52 U.S.C. § 10101(a)(2)(B) ("No person acting under color of law shall . . . deny the right of any *individual* to vote . . . ." (emphasis added)). Section 1971 would therefore still not create a private

It is therefore unsurprising that multiple courts have concluded that the materiality provision in "[s]ection 1971 is enforceable by the Attorney General, not by private citizens." *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000); *see Dekom v. New York*, No. 12-CV-1318, 2013 WL 3095010, at *18 (E.D.N.Y. June 18, 2013) ("[T]he weight of authority suggests that there is no private right of action under Section 1971."), *aff'd*, 583 F. App'x 15, 17 (2d Cir. 2014) (concluding that "for the reasons stated by the district court in its well-reasoned and thorough decision . . . the amended complaint was properly dismissed for lack of jurisdiction and failure to state a claim"); *see also, e.g.*, *Spivey v. Ohio*, 999 F. Supp. 987, 996 (N.D. Ohio 1998); *McKay v. Altobello*, No. 96-3458, 1996 WL 635987, at *1-2 (E.D. La. Oct. 31, 1996).

To be sure, other courts have held to the contrary, but their reasoning is flawed. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003); *Migliori v. Cohen*, 36 F.4th 153, 156-57 (3d Cir. 2022). For example, in *Schwier*, the Eleventh Circuit relied on a case from the repudiated *ancien regime* and on incomplete legislative history to conclude that section 1971's Attorney General enforcement provision did not indicate an intent to preclude private rights of action. 340 F.3d at 1294-95 (citing *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969)); *see Ziglar*, 137 S. Ct. at 1855 (plurality op.) (characterizing *Allen* as part of the "*ancien regime*"). *Schwier* noted that the Attorney General enforcement provision "was not added to § 1971 until 1957," that private parties had enforced section 1971 before 1957, and that nothing in the

---

right that plaintiff—an organization without members or voting rights—could enforce. *See supra* Part I.

committee report suggested that Congress "intended the provision granting the Attorney General authority to bring suit to foreclose the continued use of § 1983 by individuals." *Schwier*, 340 F.3d at 1295. But the materiality provision was not enacted until 1964, some seven years after the enforcement provision, so the legislative history cited by *Schwier* sheds no light on whether Congress intended private parties to be able to enforce that provision. *See* Title I of the Civil Rights Act of 1964, Pub. L. 88-352, § 101, 78 Stat. 241.

In any event, "legal context matters only to the extent it clarifies text," and the "search for Congress's intent" starts and ends "with the text and structure" of section 1971. *Sandoval*, 532 U.S. at 288. *Schwier* improperly discounted section 1971's structure when it found that the materiality provision's "focus" is "the protection of each individual's right to vote"—even though the provision makes the regulated person "the subject of the sentence." 340 F.3d at 1296. Moreover, the Third Circuit's analysis in *Migliori* was scant. That court agreed with the district court that "the Materiality Provision unambiguously confers a personal right," 36 F.4th at 159, but that holding bears little weight given that the defendants in that case conceded that the materiality provision created an individual right, *id.* at 165 & n.2 (Matey, J., concurring). Neither case follows *Sandoval* or demonstrates that the materiality provision includes rights-creating language or that section 1971 indicates an intent to authorize private suits.

## B. Plaintiff cannot prevail on a section 1971 claim absent evidence of racial discrimination.

Even if the materiality provision created a federal right that an organization could enforce, that right can be violated only by racially discriminatory requirements or practices. Section 1971 was passed as part of the Civil Rights Act and "enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." *Broyles*, 618 F. Supp. 2d at 697. To that end, the materiality provision "specifically targets the practice of requiring unnecessary information on voter registration forms with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential minority voters." *Thrasher v. Ill. Republican Party*, No. 4:12-cv-4071, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013); *see McKay*, 1996 WL 635987, at *1 (similar).

Courts have thus held that section 1971 only makes "racially motivated deprivations of rights" actionable. *Broyles*, 618 F. Supp.2d at 697 (citing *Kirksey v. City of Jackson*, 663 F.2d 659, 664-65 (5th Cir. 1981)); *see, e.g.*, *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006) (rejecting reliance on section 1971 when "[p]laintiffs ha[d] not alleged, much less prove[d], any discrimination based on race"); *Thrasher*, 2013 WL 442832, at *3 (dismissing section 1971 claim where plaintiff's claimed injury was "far afield of the actual harms the statute protects against: discrimination in the registration of voters"). *But see Migliori*, 36 F.4th at 162 n.56 ("[W]e cannot find that Congress intended to limit this statute to either instances of racial discrimination or registration.").

The statutory framework makes this clear. The first part of subsection (a) reiterates the Fifteenth Amendment's guarantee that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const., amend. XV. Section 1971's subsection (a)(1) provides:

> All citizens of the United States who are otherwise qualified by law to vote . . . shall be entitled and allowed to vote at all such elections, *without distinction of race, color, or previous condition of servitude*; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

52 U.S.C. § 10101(a)(1) (emphasis added). The second part of subsection (a), which contains the materiality provision, then elaborates on what state officials cannot do to undermine the right to vote on an equal basis. *See id.* § 10101(a)(2). Reading the materiality provision within its statutory context—as courts must*, Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466-67 (2017)—the provision thus prohibits States from relying on immaterial errors on registration applications to evade prohibitions on racial discrimination in voting. 52 U.S.C. § 10101(a)(2)(B).

This construction also avoids serious constitutional problems. *See Hersh v. United States*, 553 F.3d 743, 753-54 (5th Cir. 2008) ("Under the doctrine of constitutional avoidance, [w]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." (quotation omitted)). Because the materiality provision was enacted pursuant to the Fifteenth Amendment, it must be congruent and proportional "to the

injury to be prevented"—deprivation of the right to vote based on race—or it exceeds Congress's enforcement power. *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997); *see also United States v. Mississippi*, 380 U.S. 128, 138 (1965) ("Section 1971 was passed by Congress under the authority of the Fifteenth Amendment to enforce that Amendment's guarantee . . . ."). And the Supreme Court has repeatedly recognized that "action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose." *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality op.); *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997).  It is difficult to see how a blanket prohibition on all non-discriminatory registration requirements that are immaterial to qualifications to vote meets the congruent-and-proportional test.

## C.  The original signature requirement does not deprive anyone of the right to vote and is material to determining whether an individual is qualified to vote under Texas law.

Proving a violation of the materiality provision requires plaintiff to show that (1) the challenged requirement had "the effect of 'deny[ing]' an individual 'the right to vote,'" and (2) the "error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *Ritter v. Migliori*, 142 S. Ct. 1824, 1824-25 (2022) (Alito, J., dissenting from denial of application for stay) (quoting 52 U.S.C. § 10101(a)(2)(B)). Plaintiff did not and cannot make either showing.

### 1.    The requirement does not deprive anyone of the right to vote.

Plaintiff failed to identify a single individual who was denied the right to vote or who would be denied the right because of the original signature requirement. ROA.1657-58. Nor can plaintiff even posit a hypothetical situation in which the original signature requirement would result in an individual being deprived of the right to vote. This is so for three reasons.

*First*, the original signature requirement is part of an expansion of voter-registration methods, so it cannot be understood as curtailing voting rights. Prior to 2013, Texans did not have the option of faxing voter-registration applications (and subsequently sending a hard copy of the application with the registrant's original signature) to ensure they met the registration deadline. *Supra* pp. 5-6. The subsequent codification of the original signature requirement is best understood as legislative fine-tuning of the expansion of voter-registration options. Because providing an additional method of registration makes it easier—not harder—to vote, a requirement tied to this additional registration option does not make it harder to vote, much less deprive an individual of the right to vote altogether. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-08 (1969) (reasoning that "absentee statutes, which are designed to make voting more available to some groups . . . do not themselves deny appellants the exercise of the franchise"); *Tex. League of United Latin Am. Citizens v. Hughs* (*LULAC*), 978 F.3d 136, 144-45 (5th Cir. 2020) (explaining that a limit on an expansion of opportunities to vote absentee did not abridge voting rights).

*Second*, Texas law has a mandatory cure provision that ensures the original signature requirement will not abridge the right to vote. If a registration application is

rejected as incomplete because it lacks an original signature, "the registrar *shall* deliver written notice of the reason for the rejection." Tex. Elec. Code § 13.073(a) (emphasis added). The applicant then has ten days from receiving notice to cure his application, which allows him to be considered registered as of the date of the original, incomplete application. *Id.* § 13.073(c). Accordingly, "[v]oters that submit their applications via fax and mistakenly mail a copy without a wet signature are given a second bite at the apple." *Vote.org*, 39 F.4th at 306. This means that Texans have the opportunity to fix the "error or omission" on the registration application—the lack of an original signature—which prevents the signature requirement from causing any qualified Texan to be deprived of his right to vote. *Cf. United States v. Ward*, 345 F.2d 857, 862 (5th Cir. 1965) (allowing a registrar to reject an application where the applicant "refuses to sign the oath (or affirmation) after being specifically requested to sign the oath and being shown by the registrar or his agent where to sign").

*Third*, any Texan's inability to vote related to the original signature requirement would be a forfeiture of the right to vote, not a deprivation. Texans have ample means of registering to vote, *see supra* pp. 3-6; Tex. Elec. Code §§ 13.002(a), 13.038, 20.001, 20.031; ROA.1959-60, 2308 (all sealed), so a person need not choose to fax the registration application at all. *See Vote.org*, 39 F.4th at 306 ("[N]o applicant *must* comply with the wet signature requirement—there are plenty of alternative means to register."). And if the prospective voter chooses to fax the registration application but fails to mail the original copy with an original signature, that person has an opportunity to fix the mistake so he can still register in time to vote in the upcoming election. *See id.*; Tex. Elec. Code § 13.073. If the original signature requirement or the

rules governing a different registration method are not met, "the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from denial of application for stay). In those circumstances, a "person acting under color of law" did not "deny the right of any individual to vote." 52 U.S.C. § 10101(a)(2)(B). Instead, that individual forfeited the right by refusing to comply with the rules. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021) ("Casting a vote . . . requires compliance with certain rules.").

### 2. The requirement is material to determining voter qualifications under Texas law.

In assessing whether the omission of an original signature is "material in determining whether such individual is qualified under State law to vote," courts must necessarily look to state law. 52 U.S.C. § 10101(a)(2)(B). To be a qualified voter under Texas law, a person must be 18 or older, a United States citizen, a resident of Texas, and a non-felon (subject to certain exceptions), and must not have been determined by a court to be mentally incapacitated. Tex. Elec. Code § 11.002(a)(1)-(5). Furthermore, a person must be "a registered voter," *id.* § 11.002(a)(6), which requires, among other things, a person to submit a registration application "in writing and signed by the applicant," *id.* § 13.002(b); *see id.* § 13.143(d-2).

Thus, "[i]n Texas, an individual is qualified to vote only if she is registered and to register via fax she must comply with the wet signature rule," which in turn means that "to be qualified to vote she must mail her application to the county registrar with a wet signature." *Vote.org*, 39 F.4th at 307. The omission of an original signature

when registering via fax and mail is thus "material in determining whether [an] individual is qualified under State law to vote," 52 U.S.C. § 10101(a)(2)(B)—that is, without an original signature, a person is not a qualified voter under state law. Accordingly, the requirement necessarily cannot violate the materiality provision regardless of whether a court believes it serves a strong state interest. After all, the materiality provision "does not address" whether a state's voter-qualification requirements serve an important interest, but simply "leaves it to the States to decide which voting rules should be mandatory." *Ritter*, 142 S. Ct. at 1826 (Alito, J., dissenting from denial of application for stay).

But even if an original signature were not necessary to make someone a qualified voter, it would still be material in determining whether a person is otherwise qualified to vote. For starters, an original signature affirms that an applicant meets the other qualifications for voting in Texas. On Texas's registration application, the requirements to be an eligible voter in Texas appear immediately above the signature box, along with a warning that providing false information to register is a criminal offense. ROA.1958, 2374 (all sealed). By requiring applicants to physically sign the application form, the State can have confidence that applicants know the requirements to be a qualified voter and have affirmed they meet those qualifications. ROA.2214, 2373-75, 2377 (all sealed); *see also Vote.org*, 39 F.4th at 306. Thus, the original signature requirement helps the registrar determine whether the applicant meets the other qualifications to vote under Texas law, which makes it material for purposes of section 1971.

An original signature is also material because it deters voting fraud. Requiring a prospective voter to physically sign the registration application directly below a warning that the applicant is subject to criminal perjury charges for lying impresses on applicants the importance of providing truthful information and deters fraud. ROA.2374-75 (sealed). That, in turn, provides further assurance that applicants are indeed qualified to vote under Texas law if they are providing original signatures and risking criminal penalties for dishonesty.

Unsurprisingly, several courts have held that similar requirements—both those relating to a voter affirming he or she is qualified to vote and those that deter fraud—are material. For example, other courts have concluded that requiring applicants to affirm information showing they are qualified to vote under state law does not violate the materiality provision even if they must affirm that information multiple times or by different methods. *See, e.g.*, *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1211-13 (S.D. Fla. 2006) (holding that it is not immaterial to require applicants to both check boxes to confirm qualifying characteristics and to sign an oath affirming they are qualified); *Org. for Black Struggle v. Ashcroft*, No. 2:20-CV-04184-BCW, 2021 WL 1318011, at *5 (W.D. Mo. Mar. 9, 2021) (finding a signature and other requirements to be material); *cf. Hoyle v. Priest*, 265 F.3d 699, 704-05 (8th Cir. 2001) (concluding that a requirement that "protects the state and citizens against both fraud and caprice" is material). By contrast, requirements that have been characterized as immaterial, such as requiring an applicant "to list the exact number of months and days in his age," *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995), or to use a particular

"color of ink," *Diaz*, 435 F. Supp. 2d at 1213, are unlike the original signature requirement and do not serve the same interests.

Moreover, an imaged signature submitted via web app is insufficient to serve these interests. "Physically signing a voter registration form and thereby attesting, under penalty of perjury, that one satisfies the requirements to vote carries a solemn weight that merely submitting an electronic image of one's signature via web application does not." *Vote.org*, 39 F.4th at 308. And because an applicant using plaintiff's app is submitting a free-floating signature—unlike a physical signature that is affixed directly below the list of requirements to be an eligible voter and the perjury warning—registrars cannot have the same confidence that applicants know the requirements to be a qualified voter and have affirmed they meet those qualifications. ROA.2025, 2377-78 (all sealed). Indeed, a registrar cannot trust that the signature was even provided in relation to a registration application if the registrant used Vote.org's app. For example, someone could take a picture of a person's signature on any document and then use that signature to fill out a registration application on the app without that person's consent or knowledge. ROA.2377-78 (sealed). And the poor quality of the imaged signatures that Vote.org provided to county registrars, with many of the electronic signatures blacked out or otherwise illegible, ROA.1962, 2457, 2471 (all sealed), also demonstrates that original signatures are material to determining a voter's qualifications.

\* \* \*

For all these reasons, the district court's conclusion that the original signature requirement violates section 1971 should be reversed.

### III. The Original Signature Requirement Does Not Violate the Constitution.

The parties and the district court agreed that the *Anderson-Burdick* framework applies to plaintiff's First and Fourteenth Amendment claims, ROA.1811-12, but diverged on whether the original signature requirement survives review under that standard. The *Anderson-Burdick* mode of analysis originated when the Supreme Court recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson*, 460 U.S. at 788 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But state election codes, which "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affect[]—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson*, 460 U.S. at 788.

To balance those competing interests, courts "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *Anderson*, 460 U.S. at 789). Then, courts "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule." *Id.* (quoting *Anderson*, 460 U.S. at 789). Finally, courts weigh the "character and magnitude of the asserted injury" against the "precise interests put forward by the State," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

at 387-88 (quoting *Burdick*, 504 U.S. at 434). When a state election law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788.

### A. The original signature requirement does not burden voters.

As the Court has already observed, "one strains to see how [the original signature requirement] burdens voting at all." *Vote.org*, 39 F.4th at 308. When the Legislature enacted HB 3107 in 2021, it refined legislation from 2013 that had provided, for the first time, a right to submit registration forms via fax. *Supra* pp. 5-6. Thus, as a whole, HB 3107 helps expand the methods that Texans can use to register to vote; it does not take anything away from anybody.

This Court's decision in *LULAC* is instructive. At the height of the COVID-19 pandemic, Governor Abbott issued a proclamation allowing voters to deliver a mail-in ballot anytime until Election Day, rather than only on Election Day itself. 978 F.3d at 140. But due to concerns that certain counties wanted to set up multiple delivery locations, which would threaten election uniformity and integrity, the Governor released a subsequent proclamation specifying that mail-in ballots could be delivered to only one designated location per county. *Id.* Various voters and groups objected to that follow-on proclamation. But this Court rejected those challenges and explained that "the proclamation is part of the Governor's *expansion* of opportunities to cast an absentee ballot in Texas well beyond the stricter confines of the Election Code." *Id.* at 144.

That reasoning maps neatly onto these facts. Properly considered, HB 3107's language requiring "the voter's original signature" does not burden voters at all. It helps them: it is part of the Legislature's expansion of the opportunity to register to vote. Like the proclamations at issue in *LULAC*, HB 3107 makes sense only when considered in connection with SB 910. In tandem, those two pieces of legislation ensured that voters could submit registration forms via fax, but also adopted the security measures that the Legislature found necessary to protect this new method from abuse.

The district court analyzed the original signature requirement in a vacuum, ROA.1810-11, but *LULAC* makes clear that such a narrow focus constitutes error. In *LULAC*, the Court observed that the district court's analysis of the one-delivery-location rule "fails to account for the numerous ways Texans can vote early or absentee in the November 3 election." *LULAC*, 978 F.3d at 145. The same is true here— the district court failed to consider the numerous ways that citizens can register to vote, including through DPS, designated assistants, direct mail, deputy registrars, designated voter-registration agencies, and personal delivery. Tex. Elec. Code §§ 13.002(a), 13.003, 20.001, 20.122. The combination of those options renders plaintiff's *Anderson-Burdick* claim a non-starter. Indeed, this Court's analysis in *LULAC* was consistent with the Supreme Court's later reasoning in *Brnovich*, in which the Court rejected a Voting Rights Act challenge to a precinct-voting requirement partly because the burdens caused by that requirement were "modest" in light of the State's "political processes" as a collective whole. 141 S. Ct. at 2344. Here, the undisputed record evidence shows that registering to vote in Texas is easy, and

registering via fax is just one method among many that a voter might choose. For example, roughly 97% of the voting-age population is registered to vote in Travis County, and Bexar County utilizes some 2,000 deputy registrars to assist in the County's voter registration efforts. ROA.2158-62, 2288 (all sealed).

But even if the Court were to consider the fax registration option in isolation instead of as one selection among many, the burden on voters is still quite slight. Signature requirements are a familiar aspect of modern life. Asking for a signature from a citizen registering to vote is not a serious inconvenience. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (holding that a system analyzing voters' signatures imposed "only a minimal burden"). And this burden is equally shared and non-discriminatory. *See Anderson*, 460 U.S. at 788. All Texans registering to vote must provide a signature. The burden of mailing a registration form is not severe; it is the same burden that voters who submit ballot applications to vote by mail, and then who use that method to vote, comply with frequently. Tex. Elec. Code §§ 84.001, 84.002(c).

The district court reasoned that the original signature requirement "renders the [fax] option identical to the option of submitting a voter registration postcard" because "the registrant must have a printer and must pay for postage or pay for transportation." ROA.1813. But that reasoning ignores the most salient benefit of faxing the registration form: the effective date of the submission is the day the fax is transmitted, not the day the mail version is placed in the mail. Tex. Elec. Code § 13.143(d-2). That distinction may be the difference between a voter's application being accepted or rejected. Consider a voter who forgets to put his registration

postcard in the mail on the last day of the registration period. Under section 13.143(d-2), he could still fax the form in that day (until midnight) and ensure his registration is timely submitted.

Moreover, in the election-law context, the Supreme Court has instructed courts to look at the difficulty of complying with the law rather than the potential consequences of failing to comply. In *Crawford v. Marion County Election Board*, for example, the failure to possess voter identification could have resulted in disenfranchisement, but the Court did not consider it a severe burden that mandated strict scrutiny. 553 U.S. 181, 202-03 (2008) (plurality op.). Instead, it considered how burdensome it was to obtain voter identification. *Id.* at 198-200. Similarly, a cut-off date to request an absentee ballot could disenfranchise voters who miss the deadline, but the burden of timely requesting an absentee ballot is "minimal." *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020). So too here. Any burden of complying with the original signature requirement is minimal—particularly in light of the multiple ways that Texas citizens can already register.

## B. The original signature requirement serves compelling state interests.

"Texas 'indisputably has a compelling interest in preserving the integrity of its election process.'" *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 239 (5th Cir. 2020); *see also, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring). Inaccuracies in voter registration are a serious problem: "[i]t has been estimated that 24 million voter registrations in the

United States—about one in eight—are either invalid or significantly inaccurate." *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018). "Any corruption in voter registration affects a state's paramount obligation to ensure the integrity of the voting process and threatens the public's right to democratic government." *Steen*, 732 F.3d at 394. Accordingly, Texas has a weighty "interest in preventing voter registration fraud," *id.* at 394-95, and other conduct that frustrates the operation of the electoral process.

The original signature requirement advances the State's interests in multiple respects. It guarantees that registrants attest to meeting the qualifications to vote. ROA.2374 (sealed). Early-voting ballot boards and signature verification committees might compare the voter's original signature to signatures given later in the electoral process (for example, when submitting an application to vote by mail) if the authenticity of the registration or corresponding ballot is in question. Tex. Elec. Code § 87.027; Tex. Sec'y of State, Election Advisory No. 2022-08 (Jan. 28, 2022), sos.texas.gov/elections/laws/advisory2022-08.shtml (last visited September 28, 2022); ROA.2132, 2134-35, 2322, 2373, 2375-76, 2380, 2389, 2498 (all sealed); *see Richardson*, 978 F.3d at 225-26 (explaining how signatures are compared to ensure the validity of a mailed-in ballot). In addition, Texas authorities investigating election-related offenses involving signature misappropriation may also examine signatures on file with county officials. *E.g.*, ROA.2134-35 (sealed). And the physical attestation impresses upon the registrant the seriousness of the act that submitting an electronic image of a signature through a web app does not. *Vote.org*, 39 F.4th at 308; *see* ROA.1958 (copy of a physical voter registration form for Texas voters, which

contains a space for signature immediately above the attestation that "giving false information to procure a voter registration is perjury, and a crime under state and federal law"), 2374 (all sealed); *supra* Section II.C.

The district court discounted those interests. The court faulted the State for allowing voters to use electronic signatures in other circumstances—for example, when an individual renews his driver's license through DPS. ROA.1817. That comparison is inapt. The State is confident in the reliability and security of DPS's keypad software. ROA.2343-44 (sealed) (explaining the process by which the Secretary of State's office receives registrations from DPS), 2377 (sealed) (testimony of Director of Elections that "I know that whenever the DPS electronically captures the signature on their capture device, that the—they are read those three statements," referring to those statements affirming eligibility to vote). The same cannot be said for software developed by outside parties. *Supra* pp. 6-8 (describing the problems with Vote.org's software rollout).

Relatedly, the district court concluded that defendants did not offer sufficient evidence that the original signature requirement prevents election fraud, again relying on reasoning this Court has repudiated. ROA.1816. In *LULAC*, the district court "demanded evidence of 'actual examples of voter fraud' justifying the centralization of mail ballot delivery locations." 978 F.3d at 147. But such evidence "has never been required to justify a state's prophylactic measures to decrease occasions for vote fraud or to increase the uniformity and predictability of election administration." *Id.* Indeed, the Supreme Court has advised that "[l]egislatures . . . should be permitted

to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986).

Finally, the district court reasoned that "[a]t no time is an original, wet signature used to conduct a voter fraud investigation." ROA.1807. But that statement is belied by the district court's separate finding that investigatory officials use "a scanned image of the registration signatures." ROA.1807. The State had a reasonable basis to think that those images would be superior to the types of picture images gathered by third-party web apps. After all, many of the applications submitted through plaintiff's web app in 2018 lacked signatures that could be used for the purposes identified above and set out in the Election Code. The State has a compelling interest in ensuring that it has broad access to information that may deter and detect fraud. *Crawford*, 553 U.S. at 191; *Brnovich*, 141 S. Ct. at 2340. The original signature requirement furthers that interest.

\* \* \*

Legislatures, rather than courts, are best equipped to determine the particular risks associated with electronic submission of signatures. The "Federal Constitution gives states, not federal courts, 'the ability to choose among many permissible options when designing elections,'" and courts do not "'lightly tamper' with that authority." *Thompson v. DeWine*, 976 F.3d 610, 620 (6th Cir. 2020) (per curiam) (quoting *Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020)). Plaintiff did not meet its weighty obligation to show that the original signature requirement runs afoul of the First or Fourteenth Amendments.

## IV. The District Court Did Not Properly Balance the Equities.

To succeed with a claim for permanent injunctive relief, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

For all the reasons explained above, plaintiff has not established any injury, let alone an irreparable one. *Supra* Part II. And the balance-of-hardships and public-interest factors counsel decisively against a permanent injunction. "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). And the State has a fundamental obligation to enact clear and uniform voting laws to ensure "fair and honest" elections, to bring "order, rather than chaos, [to] the democratic process[]," and ultimately to allow the vote to be fully realized. *Storer*, 415 U.S. at 730.

The permanent injunction in this case upsets those crucial interests. It undermines the statewide uniformity of the Election Code. *See* Tex. Elec. Code § 31.003 (requiring the Secretary of State to "obtain and maintain uniformity in the application, operation, and interpretation of this code"). The injunction cannot apply statewide, both because the Texas Attorney General is a party solely for the limited purpose of defending the constitutionality of the statute, 28 U.S.C. § 2403(b); Fed. R. Civ. P. 5.1(c), and because the Attorney General does not enforce the original

signature requirement, *see* Tex. Elec. Code §§ 13.071, 13.072 (requiring the registrar to review and take action on a voter's registration application). That means the injunction applies only to the four counties that plaintiff initially sued and the two intervenor counties who joined the case as defendants. Haphazard enforcement of the Code threatens to cause substantial confusion in future election cycles.

The Court must also consider whether the injunction disserves the public. It does. The harm that plaintiff identifies is the inability to use its specific type of registration technology, which has never been legal in Texas, as a more convenient tool for achieving its national voter-registration goals. But in the one instance in which plaintiff's application was live, things went badly awry. Thus, there is no guarantee that voters would even want to use plaintiff's platform or be able to do so. And no Texas voters came forward in this suit to express support for, or a desire to use, plaintiff's web app to register to vote. So whatever plaintiff's interest, it must give way to the irreparable harm the injunction inflicts on the public interest in the integrity of the ballot. *Cf. Veasey*, 870 F.3d at 391; *Ashcroft*, 978 F.3d 603, 609 ("Prohibiting the State from enforcing a statute properly passed as part of its broad authority to regulate elections, particularly where the State has shown a strong likelihood that the statute is not constitutionally infirm, would irreparably harm the State.").

## Conclusion

The district court's judgment should be reversed.

Respectfully submitted.

Robert Henneke
General Counsel

Chance Weldon
Director of Litigation

/s/ Autumn Hamit Patterson
Autumn Hamit Patterson
Senior Attorney
apatterson@texaspolicy.com

Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2200
Facsimile: (512) 472-2728

Attorneys for Intervenor Defend-
ants-Appellants Lupe C. Torres
and Terrie Pendley

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Judd E. Stone II
Solicitor General

/s/ Michael R. Abrams
Michael R. Abrams
Assistant Solicitor General
Michael.Abrams@oag.texas.gov

Kathleen Hunker
Special Counsel

Sara B. Baumgardner
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Intervenor Defendant-
Appellant Ken Paxton, Attorney
General of Texas

## CERTIFICATE OF SERVICE

On September 28, 2022, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Michael R. Abrams
MICHAEL R. ABRAMS

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,976 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Michael R. Abrams
MICHAEL R. ABRAMS