No. 22-50536

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

VOTE.ORG,

*Plaintiff-Appellee,*

v.

JACQUELYN CALLANEN, ET AL.

*Defendants,*

v.

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY
GENERAL OF TEXAS; LUPE C. TORRES, IN HIS OFFICIAL CAPACITY AS
THE MEDINA COUNTY ELECTIONS ADMINISTRATOR; TERRIE
PENDLEY, IN HER OFFICIAL CAPACITY AS THE REAL COUNTY TAX
ASSESSOR-COLLECTOR,

*Intervenor-Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas

## BRIEF OF PLAINTIFF-APPELLEE VOTE.ORG

Uzoma N. Nkwonta
Christopher D. Dodge
Noah B. Baron
Alexander F. Atkins
Meaghan E. Mixon
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
(202) 968-4490

## CERTIFICATE OF INTERESTED PERSONS

I.    In the district court, this case is captioned as *Vote.org v. Callanen*, Case No. SA-21-CV-00659-JKP-HJB. In this Court, it is captioned as *Vote.org v. Paxton*, No. 22-50536.

II.    The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

III.    Counsel for Plaintiff-Appellee further certify under Federal Rule of Civil Procedure 26.1 that no organizational plaintiff has any parent corporation and no publicly held corporation owns 10% or more of stock in any organizational plaintiff.

### **Plaintiff-Appellee Vote.Org**

*The following attorneys have appeared on behalf of Vote.org either before this Court or in the District Court*:

Uzoma N. Nkwonta
Christopher D. Dodge
Noah B. Baron
Alexander F. Atkins
Meaghan E. Mixon
Joshua L. Harris (withdrawn)
Kathryn Yukevich (withdrawn)
Jonathan Hawley (withdrawn)
Joseph N. Posimato (withdrawn)
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600

Washington, D.C. 20002
(202) 968-4490

John R. Hardin (withdrawn)
Texas State Bar No. 24012784
PERKINS COIE LLP
500 North Akard Street, Suite 3300
Dallas, Texas 75201-3347
(214) 965-7700

James A. Rodman
Rodman Law Office
5608 Parkcrest Drive, Suite 200
Austin, TX 78731
(512) 581-0400

## Intervenor-Defendant-Appellant Ken Paxton (in his official capacity as the Attorney General of Texas)

*The following attorneys have appeared on behalf of Ken Paxton either before this Court or in the District Court*:

Cory A. Scanlon
Kathleen Hunker
Michael Abrams
Johnathan Stone
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
512-463-2120
Fax: 512-320-0667

## Intervenor-Defendant-Appellant Lupe C. Torres (in his official capacity as the Medina County Elections Administrator):

*The following attorneys have appeared on behalf of Lupe C. Torres either before this Court or in the District Court*:

Chad Ennis
Texas Secretary of State

1019 Brazos Street
Austin, TX 78701
512-472-2700
Fax: 512-472-2728

Chance D. Weldon
Munera Al-Fuhaid
Robert E Henneke
Autumn Hamit Patterson
Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701
512-472-2700

**<u>Intervenor-Defendant-Appellant Terrie Pendley (in her official capacity as the Real County Tax Assessor-Collector):</u>**

*The following attorneys have appeared on behalf of Terrie Pendley either before this Court or in the District Court*:

Chad Ennis
Texas Secretary of State
1019 Brazos Street
Austin, TX 78701
512-472-2700
Fax: 512-472-2728

Chance D. Weldon
Munera Al-Fuhaid
Robert E Henneke
Autumn Hamit Patterson
Texas Public Policy Foundation
901 Congress Avenue
Austin, TX 78701
512-472-2700

**Defendant Jacquelyn Callanen (in her official capacity as the Bexar County Elections Administrator):**

*The following attorneys have appeared on behalf of Jacquelyn Callanen either before this Court or in the District Court*:

Larry L. Roberson
Lisa V. Cubriel
Robert D. Green
Bexar County District Attorney's Office
101 W. Nueva
7th Floor
San Antonio, TX 78205-3030
(210) 335-2141
Fax: (210) 335-2773

**Defendant Bruce Elfant (in his official capacity as the Travis County Tax Assessor-Collector):**

*The following attorneys have appeared on behalf of Bruce Elfant either before this Court or in the District Court*:

Cynthia W. Veidt
Leslie W. Dippel
Sherine Elizabeth Thomas
Travis County Attorney's Office
PO Box 1748
Austin, TX 78767
(512) 854-2911
Fax: (512) 854-9316

**Defendant Remi Garza (in his official capacity as the Cameron County Elections Administrator):**

*The following attorneys have appeared on behalf of Remi Garza either before this Court or in the District Court:*

Daniel Nemecio Lopez
Cameron County
1100 E. Monroe Street

Brownsville, TX 78520
(956) 550-1345
Fax: (956) 550-1348

**<u>Defendant Michael Scarpello (in his official capacity as the Dallas County Elections Administrator):</u>**

Barbara S. Nicholas
Civil Division Administration Building, 5th Floor
500 Elm Street, Suite 6300
Dallas, TX 75202
(214) 653-6068
Fax: (214) 653-6134

Earl S. Nesbitt
WALTERS BALIDO & CRAIN L.L.P.
Meadow Park Tower
10440 North Central Expressway, Suite 1500
Dallas, TX 75231
(214) 749-4805
Fax: (214) 760-1670

Ben L Stool
Criminal District Attorney's Office of Dallas County, Texas
500 Elm Street
Suite 6300
Dallas, TX 75202
(214) 653-6234
Fax: (214) 653-6134

Dated: October 28, 2022          */s/ Uzoma N. Nkwonta*
                                 Uzoma N. Nkwonta
                                 *Counsel of Record for Plaintiff-Appellee Vote.org*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee does not object to oral argument if the Court believes it would be helpful to resolve this appeal.

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................1

ISSUES PRESENTED...............................................................4

STATEMENT OF THE CASE...................................................5

    I.    Factual Background..................................................5

        A.    Registering to vote in Texas. ....................................5

        B.    Processing of voter registration applications. .............6

        C.    Vote.org's efforts to register Texans and the State's response.....
................................................................................7

        D.    Vote.org's diversion of resources in response to the Wet Signature Rule.........................................................10

    II.    Procedural Background ..............................................11

SUMMARY OF ARGUMENT .......................................................13

STANDARD OF REVIEW ..........................................................16

ARGUMENT ........................................................................17

    I.    Vote.org has Article III standing.........................................17

        A.    The Wet Signature Rule has injured Vote.org by forcing it to divert resources from other programs. ......................17

        B.    Vote.org's injuries are traceable to enforcement of the Wet Signature Rule........................................................19

    II.    Vote.org is a proper plaintiff. ..........................................21

        A.    The Materiality Provision confers a cause of action enforceable by private plaintiffs under § 1983............................22

            1.    The Materiality Provision's rights-creating language is analogous to other statutes that confer an enforceable private right..................................................23

            2.    Legislative history further demonstrates that Congress intended to create a private right. ....................25

    3.    The Attorney General's enforcement authority does not supplant private enforcement of the Materiality Provision. ........................................................................26

  B.    The Materiality Provision may also be enforced directly under the Civil Rights Act because it evinces Congress's intent to provide a private remedy. ........................................................29

  C.    Vote.org may enforce the Materiality Provision under the Civil Rights Act as a party aggrieved by the Wet Signature Rule. ...30

  D.    Vote.org's statutory and constitutional claims are enforceable under § 1983 ..............................................................32

  E.    Even if the third-party standing requirements apply, Vote.org meets that test. ..........................................................36

III.    The Wet Signature Rule violates the Materiality Provision of the Civil Rights Act. ............................................................38

  A.    The instrument used to execute a signature is irrelevant to determining an applicant's qualification to vote. .....................38

  B.    Rejecting a voter registration application is a denial of the right to vote under the Materiality Provision. ...................................42

  C.    The Materiality Provision requires no showing of racial discrimination ............................................................44

IV.    The Wet Signature Rule unduly burdens the right to vote in violation of the First and Fourteenth Amendments. ...........................................47

  A.    The Wet Signature Rule burdens the right to vote. .................48

  B.    Intervenors fail to identify any sufficiently weighty state interest to justify the burden on the right to vote. .....................51

CONCLUSION ..........................................................................54

CERTIFICATE OF COMPLIANCE ........................................................55

CERTIFICATE OF SERVICE ..............................................................56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbey v. Castille*,
  712 F.3d 215 (5th Cir. 2013) ...............................................................52

*Alexander v. Sandoval*,
  532 U.S. 275 (2001)..............................................................24, 28, 29

*Allen v. State Bd. of Elections*,
  393 U.S. 544 (1969)...........................................................................27

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)...........................................................47, 49, 51, 52

*Anderson v. Morris*,
  636 F.2d 55 (4th Cir. 1980) ...............................................................52

*Anne Harding v. Cnty. of Dallas, Tex.*,
  948 F.3d 302 (5th Cir. 2020) ..............................................................16

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
  178 F.3d 350 (5th Cir. 1999) ........................................................14, 31

*Barilla v. City of Houston*,
  13 F.4th 427 (5th Cir. 2021) ...............................................................34

*Bartee v. Bartee*,
  No. 11-18-0017-CV, 2020 WL 524909 (Tex. Ct. App. Jan. 31,
  2020) ..................................................................................................53

*Bergland v. Harris*,
  767 F.2d 15511553(11th Cir. 1985) ...................................................49

*Brown v. Baskin*,
  78 F. Supp. 933 (D.S.C. 1948) ...........................................................25

*Broyles v. Texas*,
  618 F. Supp. 2d 661 (S.D. Tex. 2009)................................................46

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ................................................................. 47, 51

*Cannon v. Univ. of Chi.,*
  441 U.S. 677 (1979) ......................................................................... 23

*Carey v. Population Servs., Int'l,*
  431 U.S. 678 (1977) ......................................................................... 35

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018) (Gorsuch, J., dissenting) ................................ 1

*Cartagena v. Crew,*
  No. CV-96-3399 (CPS), 1996 WL 524394 (E.D.N.Y. Sept. 5,
  1996) ................................................................................................ 29

*Chapman v. King,*
  154 F.2d 460 (5th Cir. 1946) ........................................................... 25

*City of Rancho Palos Verdes v. Abrams,*
  544 U.S. 113 (2005) ......................................................................... 27

*City of Rome v. United States,*
  446 U.S. 156 (1980) ............................................................. 15, 45, 46

*Coggins v. Carpenter,*
  468 F. Supp. 270 (E.D. Pa. 1979) .................................................... 33

*Common Cause/Ga. v. Billups,*
  406 F. Supp. 2d 1326 (N.D. Ga. 2005) ............................................. 21

*Craig v. Boren,*
  429 U.S. 190 (1976) ............................................... 15, 21, 35, 36

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ......................................................................... 51

*In re Deepwater Horizon,*
  857 F.3d 246 (5th Cir. 2017) ........................................................... 37

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
  661 F.2d 328 (5th Cir. 1981) ........................................................... 35

*Dekom v. New York*,
   No. 12-cv-1318 (JS) (ARL), 2013 WL 3095010 (E.D.N.Y. June
   18, 2013) ..............................................................................................28, 29

*S.D. ex rel. Dickson v. Hood*,
   391 F.3d 581 (5th Cir. 2004) ...........................................................25

*El Paso County v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ...........................................................18

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ......................................................34, 36

*Fed. Election Comm'n v. Akins*,
   524 U.S. 11 (1998)............................................................................31

*Fitzgerald v. Barnstable Sch. Comm.*,
   555 U.S. 246 (2009)....................................................................27, 28

*Fla. State Conf. of NAACP v. Browning*,
   522 F.3d 1153,1173 (11th Cir. 2008) ..............................................46

*Gilmore v. Amityville Union Free Sch. Dist.*,
   305 F. Supp. 2d 271 (E.D.N.Y. 2004) ..............................................29

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002)......................................................14, 22, 23, 24

*Good v. Roy*,
   459 F. Supp. 403 (D. Kan. 1978)......................................................28

*Grammer v. John J. Kame Reg'l Ctrs.-Glen Hazel*,
   570 F.3d 520 (3d Cir. 2009) .............................................................24

*Hang On, Inc. v. City of Arlington*,
   65 F.3d 1248 (5th Cir. 1995) ......................................................15, 35

*Hayden v. Pataki*,
   No. 00 CIV. 8586 (LMM), 2004 WL 1335921 (S.D.N.Y. June 14,
   2004) .................................................................................................29

*Indiana Democratic Party v. Rokita*,
   458 F. Supp. 2d 775 (S.D. Ind. 2006)...............................................47

*Jackson Women's Health Org. v. Dobbs*,
  945 F.3d 265 (5th Cir. 2019), *rev'd and remanded on other
  grounds*, 142 S. Ct. 2228 (2022)...........................................................35

*Johnson v. Hous. Auth. of Jefferson Par.*,
  442 F.3d 356 (5th Cir. 2006) ..............................................................25

*June Med. Servs. LLC. v. Russo*,
  140 S. Ct. 2103 (2020), *abrogated on other grounds by Dobbs v.
  Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ....................34

*Keene Corp. v. United States*,
  508 U.S. 200 (1993)..............................................................................45

*Kimel v. Fla. Bd. of Regents*,
  528 U.S. 62 (2000)................................................................................46

*Kirksey v. City of Jackson*,
  663 F.2d 659 (5th Cir. 1981) ...............................................................47

*La. ACORN Fair Hous. v. LeBlanc*,
  211 F.3d 298 (5th Cir. 2000) ...............................................................19

*La Union del Pueblo Entero v. Abbott*,
  5:21-CV-0844-XR, 2022 WL 1651215 (W.D. Tex. May 24, 2022).................44

*La Union del Pueblo Entero v. Abbott*,
  No. 5:21-CV-0844-XR, 2022 WL 3045657 (W.D. Tex. Aug. 2,
  2022) ....................................................................................................21

*Lepelletier v. F.D.I.C.*,
  164 F.3d 37 (D.C. Cir. 1999)...........................................................36, 37

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)...........................................................4, 31, 33, 36

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012).............................................................................32

*Mays v. LaRose*,
  951 F.3d 775 (6th Cir. 2020) ...............................................................49

*McKay v. Thompson,*
  226 F.3d 752 (6th Cir. 2000) .............................................................28

*Md. Shall Issue, Inc. v. Hogan,*
  971 F.3d 199 (4th Cir. 2020) ......................................................34, 36

*Melot v. Bergami,*
  970 F.3d 596 (5th Cir. 2020) .............................................................13

*Migliori v. Cohen,*
  36 F.4th 153 (3d Cir. 2022), *cert. granted, judgment vacated sub*
  *nom. Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct.
  11, 2022) ...................................................................................*passim*

*Monell v. Dep't of Soc. Servs. of City of New York,*
  436 U.S. 658 (1978)...........................................................................33

*Morris v. State,*
  928 S.W.2d 282 (Tex. App. 1996).....................................................20

*Morse v. Republican Party of Va.,*
  517 U.S. 186 (1996) (plurality opinion) ......................................27, 29

*NAACP v. City of Kyle,*
  626 F.3d 233 (5th Cir. 2010) ......................................................13, 18

*Ne. Oh. Coal. for the Homeless v. Husted,*
  No. 2:06-CV-896, 2016 WL 3166251 (S.D. Ohio June 7, 2016)......37

*Nnebe v. Daus,*
  644 F.3d 147 (2d Cir. 2011) ..............................................................33

*OCA-Greater Hous. v. Texas,*
  867 F.3d 604 (5th Cir. 2017) ......................................................18, 19

*Oregon v. Mitchell,*
  400 U.S. 112 (1970)........................................................................45, 46

*Pierce v. Soc'y of the Sisters,*
  268 U.S. 510 (1925)...........................................................................35

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
  748 F.3d 583 (5th Cir. 2014) ......................................................15, 35

*Powers v. Ohio,*
  499 U.S. 400 (1991)................................................................37

*Reliable Consultants, Inc. v. Earle,*
  517 F.3d 738 (5th Cir. 2008) .............................................35

*Russello v. United States,*
  464 U.S. 16 (1983)..............................................................45

*Schwier v. Cox,*
  340 F.3d 1284 (11th Cir. 2003) .................................*passim*

*Schwier v. Cox,*
  412 F. Supp. 2d 1266 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th
  Cir. 2006) ...........................................................................39

*Sec'y of State of Md. v. Joseph H. Munson Co.,*
  467 U.S. 947 (1984)............................................................34

*Singleton v. Wulff,*
  428 U.S. 106 (1976).............................................................37

*Smith v. Allwright,*
  321 U.S. 649 (1944).............................................................25

*Soltysik v. Padilla,*
  910 F.3d 438 (9th Cir. 2018) ...............................................52

*Stringer v. Pablos,*
  320 F. Supp. 3d 862 (W.D. Tex. 2018) .............................6, 7, 20, 39

*Teixeira v. Cnty. of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ...............................................34

*Tennessee v. Lane,*
  541 U.S. 509 (2004).............................................................46

*Tenth St. Residential Ass'n v. City of Dallas,*
  968 F.3d 492 (5th Cir. 2020) ...............................................18

*Tex. Democratic Party v. Hughs,*
  474 F. Supp. 3d 849 (W.D. Tex. 2020), *rev'd on other grounds by
  Tex. Democratic Party v. Hughs*, 860 F. App'x 874 (5th Cir. 2021)...........21, 30

*Tex. Democratic Party v. Hughs,*
  5:20-cv-00008-OLG (W.D. Tex. July 28, 2020), ECF No. 29 ..........................20

*Tex. Democratic Party v. Hughs,*
  997 F.3d 288 (5th Cir. 2021) ...............................................................................8

*Tex. League of United Latin Am. Citizens v. Hughs,*
  978 F.3d 136 (5th Cir. 2020) ..............................................................................51

*Tex. State LULAC v. Elfant,*
  No. 22-50690, 2022 WL 14782530 (5th Cir. Oct. 26, 2022) .....................17, 20

*Texas Democratic Party v. Hughs,*
  No. 20-50667 (5th Cir. Oct. 26, 2020) ...............................................................8

*Thompson v. N. Am. Stainless, LP,*
  562 U.S. 170 (2011)......................................................................................31, 32

*Transamerica Mortg. Advisors, Inc. v. Lewis,*
  444 U.S. 11 (1979) ..............................................................................................29

*United States v. Virginia,*
  518 U.S. 515 (1996)............................................................................................52

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
  535 U.S. 635 (2002)............................................................................................29

*Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan,*
  543 F. Supp. 198 (S.D. Tex. 1982) ....................................................................11

*Virginia v. Am. Booksellers Ass'n, Inc.,*
  484 U.S. 383 (1988)............................................................................................34

*Vote.org v. Callanen,*
  39 F.4th 297 (5th Cir. 2022) .....................................................................*passim*

*Wash. Ass'n of Churches v. Reed,*
  492 F. Supp. 2d 1264 (W.D. Wash. 2006) .........................................................40

*Young v. United Parcel Serv., Inc.,*
  575 U.S. 206 (2015)............................................................................................45

*Zimmerman v. City of Austin, Tex.*,
  881 F.3d 378 (5th Cir. 2018) .............................................................. 17

**Statutes**

20 U.S.C. § 1232g(b)(1) .................................................................... 24

20 U.S.C. § 1681(a) ........................................................................... 23

28 U.S.C. § 1291 .................................................................................. 4

28 U.S.C. § 2403(b) ........................................................................... 11

42 U.S.C. § 1973h .............................................................................. 27

42 U.S.C. § 1983 ........................................................................ *passim*

42 U.S.C. § 2000(d) ........................................................................... 23

52 U.S.C. §   10101 ........................................................................... 47

52 U.S.C. § 10101(a)(1) ................................................................... 45

52 U.S.C. § 10101(a)(2)(B) ....................................................... *passim*

52 U.S.C. § 10101(d) .......................................................14, 22, 27, 30

52 U.S.C. § 10101(d) ........................................................................ 21

52 U.S.C. § 10101(e) ................................................................... 41, 43

Civil Rights Act of 1957, Pub. L. No. 85-315, § 131 71 Stat. 634
  (1957) .................................................................................... *passim*

Civil Rights Act of 1964 ..................................................................... 1

Civil Rights Act § 101 ............................................................... *passim*

Tex. Bus. & Com. Code § 322.007(a) ............................................... 52

Tex. Bus. & Com. Code § 322.007(d) ............................................... 52

Tex. Elec. Code § 11.002 ............................................................... 5, 38

Tex. Elec. Code § 13.002(a) ............................................................... 5

Tex. Elec. Code § 13.002(b) ...........................................................5, 9, 19

Tex. Elec. Code § 13.072(c) ....................................................................41

Tex. Elec. Code § 13.074 .........................................................................41

Tex. Elec. Code § 13.143(d-2) .........................................................5, 9, 10

Tex. Elec. Code § 20.001 ...........................................................................5

Tex. Elec. Code § 20.066(a)(2) ...................................................................5

Tex. Health & Safety Code § 166.011 ......................................................53

Tex. Prop. Code § 12.0013 .......................................................................53

2021 Tex. Sess. Law Serv. Ch. 711 ..........................................................50

## Other Authorities

Fed. R. App. P. 27(d)(1) ...........................................................................55

Fed. R. App. P. 27(d)(2) ...........................................................................55

H.R. Rep. No. 85-291 (1957) ....................................................................25

Tex. Const., art. VI §§ 1-2 ........................................................................42

Tex. Const. art. VI, § 2 .......................................................................5, 38

**INTRODUCTION**

In an era where millions of Americans "use the Internet to do most everything," *Carpenter v. United States*, 138 S. Ct. 2206, 2262 (2018) (Gorsuch, J., dissenting), the Texas Legislature enacted a law (H.B. 3107) that requires applicants who submit their registration applications via fax to also mail their county registrar a physical copy of their application form, signed with an original, wet signature ("Wet Signature Rule" or "Rule"). This Rule creates yet another basis to reject voter registration applications—and another hurdle to make voter registration less accessible—despite election officials' repeated admission that they have no use for *wet* signatures. As the county registrars who enforce voter registration rules and process registration applications freely admitted below, election officials do not compare or inspect the signatures on applications forms before registering voters; they simply confirm that a signature—*any* signature—is present.

The Civil Rights Act of 1964 prohibits the denial of the right to vote (and to register) "because of an error or omission on any record or paper relating to . . . registration," among other voting-related activities. 52 U.S.C. § 10101(a)(2)(B) ("Materiality Provision"). It protects against arbitrary barriers like the Wet Signature Rule that play no role in determining whether an applicant is qualified to vote, and Appellants barely dispute that the Rule is unrelated to an elector's qualifications as defined by the Texas Constitution. Even accepting Intervenor-Appellants' purported

justifications for the Rule—which consist of vague concerns about the "solemnity" of the registration process and voter fraud—the Materiality Provision does not permit a state to impose an immaterial registration requirement simply because it purportedly serves separate state interests.

This trivial requirement also imposes non-trivial burdens on Texans who are eligible—and therefore have the right—to register to vote but lack access to printers, are reliant on smartphones, and must obtain physical copies of the application form to fill out by hand and mail to their county registrar's office. Unrefuted evidence demonstrated that these burdens were particularly acute for young adults, low-income voters, and minorities. ROA.823-26, 828-33. Moreover, the district court's judgment that the Wet Signature Rule's burdens are constitutionally impermissible must be affirmed, given Intervenors' failure to explain how their purported interests in maintaining "solemnity" and combating voter fraud are advanced by demanding *wet*, rather than imaged, signatures. Indeed, any such explanation would be news to county registrars who agreed that the distinction is irrelevant for their purposes.

Intervenors-Appellants offer no credible defense of the Rule, instead mischaracterizing evidence to mount inaccurate attacks on Vote.org's activities. In their words, for instance, Travis County was "alarmed" by the quality of applications submitted via Vote.org, but in fact that county's registrar testified "there were very few" issues with these applications and "they were corrected." ROA.2222; *see also*

ROA.2218-19 (testifying Vote.org "repaired the problem").[1] Their allegation that Vote.org failed to fax certain applications to Dallas County is irrelevant to the Wet Signature Rule and ignores testimony that Vote.org stopped submitting applications only *after* the County notified Vote.org that the Secretary had instructed registrars to reject such applications without wet signatures. ROA.2472. In reality, thousands of voters successfully registered using Vote.org's application before the organization was forced to shut it down. ROA.278.

Apart from this mudslinging, Intervenors-Appellants have little to say about the need for *wet* signatures, opting to root their argument primarily on Article III and statutory standing. But here, too, unrefuted evidence and settled authorities soundly rebut Intervenors' position. The record shows Vote.org created a web application with an e-sign tool that allowed voters to fill out and sign voter registration forms by uploading an image of their signature, using nothing more than a smartphone; county registrars agreed to accept these applications; the Secretary's office drafted (and the Legislature enacted) a new law preventing the use of Vote.org's e-sign tool; and, as a result, Vote.org had to divert resources from specific programs to develop less-effective means of increasing voter turnout and political engagement among low-propensity voters. That injury is traceable to county officials' enforcement of the

---

[1] The materials contained within ROA.1927-3239 are appendices from summary judgment briefing. They were filed under seal below. *See* Br. for Appellants ("Br.") at 4 n.1.

Wet Signature Rule and will be redressed by enjoining it; county officials testified they would accept applications with imaged signatures but-for the Wet Signature Rule. ROA.2198, 2218; *see also* ROA.3060, 3082-83.

A clear majority of courts have also concluded the Materiality Provision is privately enforceable, and this Circuit has long recognized that litigants asserting § 1983 claims may vindicate the constitutional rights of third parties. Vote.org's lawsuit is consistent with that precedent and no prudential consideration warrants limiting its statutorily-authorized causes of action. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).

## JURISDICTIONAL STATEMENT

This court has jurisdiction under 28 U.S.C. § 1291 to review the final judgment entered in this case.

## ISSUES PRESENTED

1.      Whether Vote.org has Article III standing.

2.      Whether the Materiality Provision confers a private cause of action and whether Vote.org may assert that claim under the Civil Rights Act.

3.      Whether Vote.org has statutory standing under 42 U.S.C. § 1983 to assert its Materiality Provision and *Anderson-Burdick* claims.

4.      Whether the Wet Signature Rule violates the Materiality Provision.

5.      Whether the Wet Signature Rule unduly burdens the right to vote in

violation of the First and Fourteenth Amendments.

## STATEMENT OF THE CASE

## I.    Factual Background

### A.    Registering to vote in Texas.

In Texas, unless disqualified, a person "who is a citizen of the United States and who is a resident of this State shall be deemed a qualified voter." Tex. Const. art. VI, § 2; *see also* Tex. Elec. Code § 11.002.

To register, a voter's application "must be in writing and signed by the applicant," affirming that they meet the voter registration requirements; that the information they have provided is true and accurate; and that they understand there could be penalties for registering to vote with inaccurate information. Tex. Elec. Code § 13.002(b). Applications may be submitted by mail or in person by delivering the application to a county registrar or a volunteer deputy registrar, or through the Texas Department of Public Safety ("DPS"). Tex. Elec. Code §§ 13.002(a), 20.001. Applications submitted through DPS are signed with an "electronic signature." Tex. Elec. Code § 20.066(a)(2).

In 2013, Texas passed S.B. 910, which provided for transmission of voter registration applications by fax. ROA.1675-76. Such applications are deemed received on the date faxed if the applicant mails or delivers a paper application to their county registrar within four business days. Tex. Elec. Code § 13.143(d-2). S.B. 910 did not require voters to provide their original, or "wet," signature when

submitting their application and, at the time, "nothing in Texas law preclude[d] the use of electronic records and electronic signatures." *Stringer v. Pablos*, 320 F. Supp. 3d 862, 896 (W.D. Tex. 2018).

### B. Processing of voter registration applications.

Once an application is received, the country registrar reviews it to ensure the necessary information is present. ROA.1187, 1199, 1213, 1268, 1271, 1281, 1293 1806. Registrars do not use the signatures to identify anyone or to check for fraud during the registration process. ROA.1181, 1212, 1806, 1816-18. Nor do they inspect or compare signatures before adding the applicant to the voter rolls; they look at the signatures for only seconds to confirm that the form is signed. ROA.1271, 2710, 2887. Some Defendants admitted there is no "difference in purpose or function between a 'wet ink' signature and an electronic or imaged signature" and that a wet signature serves "no practical purpose." ROA.1314, 1372. Some cannot even tell the difference between imaged and wet signatures. ROA.2785-86, 2795, 3042.

Upon confirming the necessary information and signature are present, the registrar enters or scans the applicant's information into their computer system and saves an image of the signature. ROA.1289-90, 1807. Then, typically, they destroy the original application. ROA.1212, 1290. The applicant's information—but not any "wet" signature—is electronically transmitted to the Secretary's Office. ROA.1239, 1241, 1266-69, 1289-90, 1294. The Secretary's Office processes the application if

the essential information—such as the person's name, date of birth, and either social security number or driver's license number—is accurate. ROA.1238.

Only in the rarest of cases might a signature from a voter registration application be used *at all*—such as to verify the authenticity of a mail-in ballot by an Early Voting Ballot Board or Signature Verification Committee. ROA.1284, 1807, 2173, 2211. But these entities compare *digital images* of the signatures—not wet signatures—including electronic signatures from DPS applications. ROA.1254-55, 1284, 1807, 1819. And even then, the voter registration application signature is just one of many other potential comparators. ROA.1254. None of the parties below identified a single voter registration procedure or other efforts to determine a voter's eligibility that required the use of *wet*—as opposed to an imaged—signature.

### C.     Vote.org's efforts to register Texans and the State's response.

Vote.org is the largest 501(c)(3) nonprofit, nonpartisan voter registration and get-out-the-vote technology platform in the country. Vote.org uses technology to simplify political engagement, increase voter turnout, and strengthen democracy, ROA.1788, and works to support low-propensity voters, including racial and ethnic minorities and younger voters who tend to have lower voter-turnout rates. *Id.* It has helped millions of people across the country, and hundreds of thousands in Texas, register to vote. ROA.27.

In preparation for the 2018 elections, Vote.org invested significant resources in developing and launching a web application ("app") to help Texans complete their voter registration with only a smartphone, just as it had done successfully in Alaska, Colorado, the District of Columbia, Kansas, and South Carolina. ROA.2593-94, 2599, 2607. The app allowed registrants to enter information into a virtual voter registration form; sign the form by uploading an image of their signature into the app; review the signed application form; swear and affirm that they met the voter qualifications under Texas law; and then arrange to have the form printed, faxed, and mailed by a vendor to their county registrar. ROA.2592-94, 2624, 3138.

Because Texas has a decentralized election administration structure in which county registrars, not the Secretary, enforce registration rules, *see* Br. of Intervenor-Defendant-Appellant Texas Attorney General at 4, 21, *Texas Democratic Party v. Hughs*, No. 20-50667 (5th Cir. Oct. 26, 2020), Vote.org consulted with election officials in Bexar, Cameron, Dallas, and Travis Counties before launching its app *in those counties*. ROA.2612-14. "The Secretary plays no role" in such matters. *Tex. Democratic Party v. Hughs*, 997 F.3d 288, 291 (5th Cir. 2021).

The launch of Vote.org's app was not "marred by technical difficulties," as Intervenors claim. Br. 7. Travis County's registrar testified that the first batch of applications experienced "very few" technical issues and Vote.org immediately fixed those issues—the affected applications were resubmitted and accepted.

ROA.2219, 2222. Intervenors' claim that "at least 259 applications in Dallas County were not transferred," Br. 7, is also misleading—Dallas County's designee acknowledged Vote.org stopped sending applications once the Secretary announced that all applications without a wet signature would be rejected. ROA.2470-72. Ultimately, over 2,000 Texans registered to vote in 2018 using Vote.org's web application before the organization was forced to turn it off in Texas. ROA.2612. The editorial remark by a panel of this Court (the "Motions Panel") that "the pilot program was an unmitigated disaster," *Vote.org v. Callanen*, 39 F.4th 297, 301 (5th Cir. 2022), is unsupported by the record and ignores thousands of voters who were able to register using the app.

Even though nothing in § 13.002(b) mandated use of a wet signature, in October 2018, the Secretary issued a statement warning Texas voters that any "web site that misleadingly claims to assist voters in registering to vote online by simply submitting a digital signature is not authorized to do so." ROA.1789, 2576. Notwithstanding the Secretary's statement, at least one county remained willing to accept applications signed with Vote.org's e-sign tool up until the enactment of H.B. 3107. ROA.2198, 2218.

In 2021, Texas passed H.B. 3107, which for the first time "add[ed] the original, 'wet signature' requirement to Section 13.143(d-2)" of the Election Code ("Wet Signature Rule"). ROA.1789. Section 13.143(d-2) amended the registration-

by-fax option by requiring that the paper application mailed or delivered to the registrar "contain[] the voter's original signature." Tex. Elec. Code § 13.143(d-2). The Secretary's designee admitted the office drafted this provision for the Legislature to prevent the use of Vote.org's e-sign tool. ROA.2360. H.B. 3107 did not add a wet signature requirement to any other method of voter registration. Several county registrars indicated they will accept applications signed with imaged signatures if the law is enjoined. ROA.2198, 2218; *see also* ROA.3060, 3082-83.

### D.    Vote.org's diversion of resources in response to the Wet Signature Rule.

The Wet Signature Rule frustrated Vote.org's operations in Texas where it is no longer able to use its e-sign tool, and must redirect its staff's time and attention to pursue other, less-effective methods of assisting applicants with the voter registration process. ROA.2042-44. For example, Vote.org entered a partnership with Nextdoor, a neighborhood-based social media platform, to help registrants find nearby printers. ROA.1233-34, 2043-44. While useful, this partnership fails to fully redress the loss of Vote.org's e-sign tool because helping someone "find out if their neighbor has a printer or not . . . is way less effective than the literally two minutes it could take using . . . the app[.]" ROA.1234

Moreover, forging that partnership took "time, energy, and resources" that could have been used elsewhere. ROA.1234. It is undisputed that Vote.org diverted resources, including staff time, from other key initiatives, such as "HBCU

programs[,] college programs[, and] youth influencer programs[,]" as well as its campaign "to [promote] election day as a holiday" ROA.2615. Its efforts to create a streamlined voter registration process in other states have also suffered. *Id*.

## II.    Procedural Background

On July 8, 2021, shortly after the Wet Signature Rule was enacted, Vote.org brought this lawsuit against election officials in Bexar, Cameron, Dallas, and Travis Counties ("County Defendants"), alleging the Rule violates § 101 of the Civil Rights Act and the First and Fourteenth Amendments. Texas Attorney General Ken Paxton, as well as Lupe C. Torres and Terrie Pendley—election officials in Medina and Real Counties—intervened to defend the Wet Signature Rule.[2]

The district court denied motions to dismiss filed by Intervenors and the Cameron County registrar, concluding Vote.org had standing and sufficiently pled its claims. ROA.276-80, 513-18. The district court further held that there was no "support for Defendants' contention that Plaintiff's [§ 101] claim fails because it does not allege racial discrimination," ROA.517-18.

On June 17, 2022, the district court granted summary judgment for Vote.org, explaining that the Wet Signature Rule "violates Section [101] of the Civil Rights

---

[2] The Attorney General intervened under 28 U.S.C. § 2403(b) which permits him "argument on the question of [the] constitutionality" of the Wet Signature Rule. He may not be heard on any other issue. *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 543 F. Supp. 198, 215 n.17 (S.D. Tex. 1982).

Act and violates the First and Fourteenth Amendments of the U.S. Constitution by placing an undue burden on Texas citizens' right to vote." ROA.1788. The court noted that Texas "attempts to change the focus" by "arguing in general terms of the 'signature' requirement," even though Vote.org challenged only the requirement that the signature be "wet." ROA.1817. The court found, based on deposition testimony, that "Defendants admit[ted] they do not use a wet signature . . . to determine a voter's qualification to vote" or "for identity verification purposes" and that any subsequent fraud investigation would rely upon scanned versions of the signatures, not "wet" signatures. ROA.1817-19 (citing ROA.1266, 1268-69, 1289-90, 1294, 2136, 2207-09, 2353, 2355, 3065). The Wet Signature Rule could not overcome any level of scrutiny because "Texas does not present any valid justification for imposing the Wet Signature Rule nor does it show how the Wet Signature Rule supports or fulfills its asserted interests." ROA.1819

Intervenors appealed and the Motions Panel granted a temporary stay pending appeal. *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022). In contrast to the district court's factual findings, the Motions Panel concluded—based in large part on a skewed recitation of the record—that Intervenors showed a likelihood of success on the merits but acknowledged that it must leave full consideration of these issues to the Merits Panel. *See id*. at 303 n.2, 305 n.5.

## SUMMARY OF ARGUMENT

**1.**    Vote.org has Article III standing because undisputed record evidence shows the Wet Signature Rule forces it to divert resources from specific programs to less-effective means of increasing voter turnout and political engagement, which "perceptibly impaired" Vote.org's mission in Texas and in other states. *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). Vote.org's injury is not self-inflicted—prior to the Wet Signature Rule, nothing in Texas law required registrants to submit a "wet" signature on their application, and Vote.org's harm will be redressed by enjoining the Rule.

**2.**    The Materiality Provision may be enforced by private parties. *See, e.g.*, *Migliori v. Cohen*, 36 F.4th 153, 159 (3d Cir. 2022), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022);[3] *Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003). The provision guarantees "the right of any individual to vote" without being subject to immaterial errors or omissions on a registration form, 52 U.S.C. § 10101(a)(2)(B), precisely the sort of rights-conferring language Congress uses to grant private rights that are enforceable under § 1983. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). That the Materiality Provision is also enforceable by the Attorney General does not supplant

---

[3] The Supreme Court's vacatur of *Migliori* as moot makes its reasoning no less persuasive. *See Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) (finding persuasive a "thoughtful opinion" that was "vacated as moot on rehearing").

private remedies—nothing in the statute makes the Attorney General's enforcement exclusive and the Supreme Court has *repeatedly* found similar statutes privately enforceable under § 1983. *See Schwier*, 340 F.3d at 1294-95.

**3.**     Vote.org may also enforce its Materiality Provision claim directly under the Civil Rights Act, which grants jurisdiction over "proceedings instituted" by a "party aggrieved." 52 U.S.C. § 10101(d). Such language reflects a congressional desire to "extend standing under the [statute] to the maximum allowable under the Constitution." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999) ("*ACORN*"). Vote.org's claim—which seeks to remedy its own harm by obtaining relief for its users—falls within the Materiality Provision's broad zone of interests and it is therefore a proper claimant.

Section 1983 further permits Vote.org to assert *both* its Materiality Provision and *Anderson-Burdick* claims. Intervenors and the Motions Panel errantly suggest that only a party that suffers a deprivation of federally-protected rights may sue under that law. That misreads the statute's text, which requires only that state actors who deprive federally-protected rights be liable to a "party injured"—nothing restricts the pool of claimants to such parties. To the contrary, extensive Supreme Court and Fifth Circuit precedent has held that parties with Article III standing may assert § 1983 claims to vindicate the constitutional or statutory rights of third parties in various contexts. *See*, *e.g.*, *Craig v. Boren*, 429 U.S. 190, 195 (1976); *Planned*

*Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014); *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995). These rulings are irreconcilable with the Motions Panel's conclusion that § 1983 "precludes an action premised on the deprivation of another's rights." *Vote.org*, 39 F.4th at 304.

4.      The Wet Signature Rule violates the Materiality Provision because the method by which a signature is entered has no bearing on a registrant's qualifications. Intervenors do not dispute—and the County Defendants conceded—that it is irrelevant whether a signature appears as an image or in wet ink, yet under the Wet Signature Rule, an application signed with an imaged signature must be denied. The only rationales offered by Intervenors—vague references to "solemnity" and fraud deterrence—have no basis in the record. In any event, states may not evade the Materiality Provision and justify immaterial voting requirements by pointing to an interest *other* than its qualifications to vote.

Intervenors' request that this Court graft an intentional racial discrimination requirement onto the Materiality Provision should likewise be rejected. Nothing in the statute imposes such a requirement, and Congress has authority under both the Fifteenth and Fourteenth Amendments to enact such legislation. *City of Rome v. United States*, 446 U.S. 156, 175 (1980).

5.      The Wet Signature Rule is unconstitutional for similar reasons. The

district court correctly found it imposes more than *de minimis* burdens that disproportionately affect certain classes of voters, particularly younger and lower-income voters who are unlikely to own printers. Intervenors offer only *post hoc* rationalizations for the Rule, ignoring the Secretary's concession that it was drafted to target Vote.org. These justifications fail. Intervenors cannot—without resort to unsupported speculation—explain how a *wet* signature requirement that county registrars deem irrelevant would deter fraud or promote "solemnity," which is not an interest that can justify any infringement on constitutional rights.

## STANDARD OF REVIEW

"On summary judgment . . . questions of law are reviewed *de novo*, while questions of fact are reviewed for clear error." *Anne Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 306-07 (5th Cir. 2020) (citing *NAACP v. Fordice*, 252 F.3d 361, 364-65 (5th Cir. 2001)). "A finding is clearly erroneous if the 'reviewing court is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). "By contrast, a finding is not clearly erroneous simply because the reviewing court 'is convinced that it would have decided the case differently.'" *Id.*

## ARGUMENT

### I.    Vote.org has Article III standing.

#### A.    The Wet Signature Rule has injured Vote.org by forcing it to divert resources from other programs.

Vote.org invested considerable resources into developing its app to advance its voter registration goals in Texas. ROA.2593-94, 2599, 2607. The Secretary's Office admitted it drafted H.B. 3107 specifically to prevent the use of Vote.org's technology, ROA.2360, prohibiting Texas election officials from accepting copies of faxed application forms affixed with imaged signatures, ROA.1245-46. As a result, Vote.org has been diverting its limited resources to less effective (and less efficient) means of increasing turnout and political engagement, which are critical to its mission. ROA.2582-2608, 2644; *see also Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir. 2018) (holding that "changing one's campaign plans or strategies in response to an allegedly injurious law can itself be a sufficient injury to confer standing.").

For example, in response to the Wet Signature Rule, Vote.org launched a partnership with Nextdoor to help voters locate printers in their neighborhoods. ROA.2610-11, 2615, 2645, 2654-55. This was "a direct response to the defendant[s'] challenged actions," *Tex. State LULAC v. Elfant*, No. 22-50690, 2022 WL 14782530, at *4 (5th Cir. Oct. 26, 2022), that Vote.org would not have undertaken if voters could have continued using its e-sign tool. ROA.2610-11, 2615, 2645,

2654-55. And Vote.org diverted these additional resources from other mission-critical efforts, including youth influencer recruitment, college and HCBU programs, and efforts to organize companies to give employees time off to vote. ROA.2615-16.

Vote.org has identified specific projects that it had to put on hold or otherwise curtail in response to the Wet Signature Rule, and this harm is ongoing. *City of Kyle*, 626 F.3d at 238; *see also OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 555 (1992)). This diversion of "significant resources to counteract the defendant's conduct," has "perceptibly impaired" Vote.org's ability to pursue its mission and as such "it has suffered an injury under Article III." *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (quoting *City of Kyle*, 626 F.3d at 238).

Intervenors ignore this undisputed record evidence and instead put misplaced reliance on *El Paso County v. Trump*, 982 F.3d 332, 346 (5th Cir. 2020), and similar cases. Br. 16-17. But *El Paso County* turned on the organization's reliance on a "vague" and "conclusory" declaration and the plaintiff failed to demonstrate a connection between its "only concrete diversion of resources" and the challenged policy. *Id.* at 344. Vote.org, however, provided detailed testimony from its CEO regarding the harm to Vote.org, including (in contrast to *El Paso County*) "particular projects that suffered." *Id.*; *see also* ROA.2610-11, 2615, 2645, 2654-55. This distinguishes the case from Intervenors' other authority as well. *See City of Kyle*,

626 F.3d at 238-39 (noting plaintiffs did "not explain[] how [its] activities . . . differ[ed] from [its] routine lobbying activities" and "only conjectured that the resources . . . devoted to the revised ordinances could have been spent on other unspecified [] activities"); *La. ACORN Fair Hous. v. LeBlanc,* 211 F.3d 298, 305 (5th Cir. 2000) (similar).

That Vote.org's *nationwide* "expenses were greater in 2018, when it rolled out the app," Br. 18 (citing ROA.2011-12), is irrelevant. The Wet Signature Rule forced Vote.org to pursue "an undertaking that consumed its time and resources in a way that" those resources "*would not have been spent* absent the Texas law," thereby "perceptibly impair[ing]" Vote.org's ability "get out the vote" among its users. *OCA*, 867 F.3d at 612 (emphasis added). As explained, Vote.org was forced to pursue less-effective efforts to enhance voter turnout and political engagement—like its initiative with Nextdoor—that diverted resources from other projects, ROA.2582-83, 2645, because the Wet Signature Rule directly stymied its ability to streamline the registration application process in Texas via its app. That suffices for standing. *OCA*, 867 F.3d at 612.

**B.      Vote.org's injuries are traceable to enforcement of the Wet Signature Rule.**

Vote.org's injuries are traceable to the Wet Signature Rule and thus not self-inflicted. Before H.B. 3107, the Election Code required *only* that the application be "signed by the applicant," Tex. Elec. Code § 13.002(b), but said nothing of a *wet*

signature. *Stringer*, 320 F. Supp. 3d at 896 ("[N]othing in Texas law that preclude[d] the use of electronic records and electronic signatures" and it was "undisputed that Texas [wa]s already using voter registration signatures in electronic form"); *see also Tex. Democratic Party v. Hughs*, 5:20-cv-00008-OLG (W.D. Tex. July 28, 2020), ECF No. 29 (same); *Morris v. State*, 928 S.W.2d 282, 285 (Tex. App. 1996) (holding Texas courts do not "presume the Legislature did a 'vain thing' by enacting surplusage").

Indeed, the Secretary testified that the Rule was *drafted specifically* to frustrate the use of Vote.org's app. ROA.2360 (testifying Vote.org's app was the "particular genesis" of the Wet Signature Rule). Several county registrars indicated they would accept applications signed with Vote.org's app but for H.B. 3107. ROA.2198, 2218, 3060, 3082-83. Other registrars acknowledged that it is the Wet Signature Rule that precludes them from accepting voter registration applications completed with Vote.org's app. ROA.1307, 1334, 1367, 1394. It is these county officials—not the Secretary—who enforce the challenged law. ROA.1289-90, 1294. Vote.org's injuries thus stem directly from the Wet Signature Rule alone and will be remediated by its enjoinment. *Cf. Elfant*, 2022 WL 14782530, at *3.[4]

---

[4] The Motions Panel suggested it was "dubious" as to Vote.org's standing but "le[ft] these issues to the merits panel." *Vote.Org*, 39 F.4th at 303 n.2. That conclusion did not address the record evidence, including unrefuted testimony that, but-for the Rule, several County Defendants would resume accepting applications completed with Vote.org's app.

## II.    Vote.org is a proper plaintiff.

Intervenors make several arguments that Vote.org had no right to assert its claims, but in each, they invite the Court to break from established precedent. The Materiality Provision expressly confers a cause of action on any "party aggrieved," which includes Vote.org. 52 U.S.C. § 10101(d) And courts have repeatedly found that § 1983 authorizes similar suits by private plaintiffs like Vote.org.[5] Intervenors' (and the Motions Panel's) suggestion that § 1983 "precludes an action premised on the deprivation of another's rights," *Vote.org*, 39 F.4th at 304, ignores the long line of Fifth Circuit and Supreme Court precedent recognizing that parties with Article III standing may assert § 1983 claims that vindicate another party's rights. Nor do prudential considerations bar Vote.org's claim: in analogous contexts, courts have "uniformly" found that service providers or "vendors" may "resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig*, 429 U.S. at 195 (collecting cases). The same is true here.

---

[5] *See, e.g., Migliori*, 36 F.4th at 162; *Schwier*, 340 F.3d at 1294-97; *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2022 WL 3045657, at *30 (W.D. Tex. Aug. 2, 2022); *Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 859, 860 (W.D. Tex. 2020), *rev'd on other grounds by Tex. Democratic Party v. Hughs*, 860 F. App'x 874 (5th Cir. 2021); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1371 (N.D. Ga. 2005).

**A.      The Materiality Provision confers a cause of action enforceable by private plaintiffs under § 1983.**

Private litigants can enforce federal laws when Congress intends to create a federal right, and a statute demonstrates such intent when "its text [is] phrased in terms of the persons benefited." *Gonzaga*, 536 U.S. at 274. The plain language of the Materiality Provision does exactly that.

The statute protects "the right of any individual to vote in any election" by prohibiting denial of that right based on "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting" that is "immaterial to that person's qualification to vote." 52 U.S.C. § 10101(a)(2)(B). Thus, "the focus of the [Materiality Provision's] text is . . . the protection of each individual's right to vote," *Schwier*, 340 F.3d at 1298, and it "places all citizens qualified to vote at the center of its import[.]" *Migliori*, 36 F.4th at 159 (cleaned up). Section 10101(d), which authorizes suits in federal district courts "without regard to whether the party aggrieved shall have exhausted" any remedies provided by law, confirms that the statute contemplates claims by private plaintiffs. *Migliori*, 36 F.4th at 160; *Schwier*, 340 F.3d at 1296 (explaining this language was intended to "remove[] procedural roadblocks to suits" by private litigants). And it is well settled that "[o]nce the plaintiff demonstrates that the statute confers rights on a particular class of persons, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 274.

### 1. The Materiality Provision's rights-creating language is analogous to other statutes that confer an enforceable private right.

The Materiality Provision's text parallels rights-conferring language from other statutes courts have found confer an enforceable private right. *Gonzaga*, 536 U.S. at 284. For example, Title IX commands that "*No person* in the United States *shall*, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a) (emphases added); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 699 (1979) (concluding Title IX confers enforceable private right). Similarly, Title VI provides that "*No person* in the United States *shall* on the ground of race, color, or national origin . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphases added); *Cannon*, 441 U.S. at 699 (concluding Title VI confers enforceable private right). The Materiality Provision adopts a similar "No person . . . shall" formulation which, like Titles IX and VI, targets "the denial of rights to individuals." *Schwier*, 340 F.3d at 1291, 1296.

In contrast, the Materiality Provision's text is materially distinguishable from statutes held *not* to confer individual federal rights. In *Gonzaga*, for instance, the Supreme Court held that the nondisclosure provisions of the Family Educational Rights and Privacy Act ("FERPA") are not enforceable through § 1983, *see* 536 U.S. at 287, because that provision lacks the individual focus found in the statutes

discussed above. It states: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents to any individual, agency, or organization." 20 U.S.C. § 1232g(b)(1). In other words, the nondisclosure provision concerns "institutional policy and practice" and has an "aggregate" focus, *Gonzaga*, 536 U.S. at 288, whereas the Materiality Provision centers on "the right of any individual to vote" and bars state actors from denying that right. 52 U.S.C. § 10101(a)(2)(B).[6]

It makes no difference that the subject of the provision is the "person" barred from violating individual rights, as Intervenors suggest. Br. 26. The inquiry into the text's "focus" looks not merely to "[t]he subject of the sentence," *Schwier*, 340 F.3d at 1296, but instead to whether "[t]he plain purpose of the[] provision[] is to protect rights afforded to individuals." *Grammer v. John J. Kame Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 530 (3d Cir. 2009) (finding it immaterial the statute was framed in terms of "responsibilities imposed on the state"). Thus, this Court has found that federal statutes confer private rights enforceable under § 1983 even when the subject

---

[6] In *Sandoval* the Supreme Court found that § 602 of Title VI did not confer any federally-enforceable rights. *Alexander v.* Sandoval, 532 U.S. 275, 288 (2001). Section 602 instructs federal agencies "to effectuate the provisions of [§ 601] . . . by issuing rules, regulations, or orders of general applicability," and thus "focuses neither on the individuals protected . . . but on the agencies that will do the regulating." *Id.* at 289. It makes no reference to any individual right being protected; the Materiality Provision does.

of a provision was the regulated state actor, and not the right-holder. *See S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 604 (5th Cir. 2004) (finding provision regulating "state plan for medical assistance" established private right); *cf. Johnson v. Hous. Auth. of Jefferson Par.*, 442 F.3d 356, 360, 363 (5th Cir. 2006) (finding provision requiring payments to landlords conferred private right on tenants). The Materiality Provision's reference to a "*right of any individual* to vote" makes clear its purpose is to protect individual rights. 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

### 2. Legislative history further demonstrates that Congress intended to create a private right.

Finally, legislative history confirms what the Materiality Provision's text makes clear. Private plaintiffs routinely enforced provisions of the Civil Rights Act without controversy after its enactment. *See, e.g.*, *Smith v. Allwright,* 321 U.S. 649 (1944); *Chapman v. King*, 154 F.2d 460 (5th Cir. 1946); *Brown v. Baskin*, 78 F. Supp. 933 (D.S.C. 1948). In 1957, Congress passed an amendment titled "To Provide Means of Further Securing and Protecting the Right To Vote," which granted the Attorney General power to enforce the act. Civil Rights Act of 1957, Pub. L. No. 85-315, § 131 71 Stat. 634, 637 (1957). That title echoed the statutory purpose identified by the Judiciary Committee: to "provide means of *further* securing and protecting the civil rights of persons within the jurisdiction of the United States," recognizing that "section 1983 . . . has been used [by private actors] to enforce . . . section [10101]." H.R. Rep. No. 85-291 (1957) (emphasis added).

The Attorney General confirmed as much, testifying that the 1957 amendment was "not taking away the right of the individual to start his own action . . . . Under the laws amended if this program passes, *private parties will retain the right they have now to sue in their own name.*" Civil Rights Act of 1957: Hearings on S. 83 Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 85th Cong. 73, 203, 1; 60-61, 67-73 (1957) (emphasis added).

Nothing in the statute's text or history suggests the Attorney General's powers were intended to supplant private enforcement. As the Eleventh Circuit concluded, the Judiciary Committee's report on the amendment "demonstrates an intense focus on protecting the right to vote and does not support the conclusion that Congress meant merely to substitute one form of protection for another." *Schwier*, 340 F.3d at 1295 (citing H.R. Rep. No. 85-291).

And while Intervenors stress that the Attorney General may enforce the Materiality Provision, that is *not* an "express" prohibition on private enforcement. *See Migliori*, 36 F.4th at 160-61 (noting "the Attorney General's enforcement authority is not made exclusive").

### 3.    The Attorney General's enforcement authority does not supplant private enforcement of the Materiality Provision.

Nor is the Attorney General's enforcement power a "comprehensive enforcement scheme" incompatible with private enforcement. The Supreme Court has *repeatedly* found "that other sections of the Voting Rights Act . . . could be

enforced by a private right of action, even though those sections also provide for enforcement by the Attorney General." *Schwier*, 340 F.3d at 1294 (citing 42 U.S.C. §§ 1973c, 1973h); *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969); *Morse v. Republican Party of Va.*, 517 U.S. 186, 116 (1996) (plurality op.).

There is also nothing *comprehensive* about enforcement by the United States alone. Enforcement of the Act would be "severely hampered" if left solely to the Attorney General. *Allen*, 393 U.S. at 556; *see also Morse*, 517 U.S. at 230 (similar). In the "very few instances" where courts have found an enforcement scheme incompatible with private actions, they "placed primary emphasis on the nature and extent of that statute's remedial scheme," which typically encompasses some "administrative exhaustion requirement" or "notice provisions." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 253, 255 (2009) (finding Title IX enforceable through § 1983 despite availability of agency enforcement). In other instances, the statute at issue provided "a more restrictive private remedy for statutory violations." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005). But the Materiality Provision contains neither an administrative exhaustion requirement nor a narrower *private* remedy. *See Migliori*, 36 F.4th at 160, 162. Indeed, Congress expressly waived any requirement to exhaust "any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d). The statute's express authorization to "file directly in court" without precondition "stand[s] in stark

contrast to the 'unusually elaborate,' 'carefully tailored,' and 'restrictive' enforcement schemes" found in statutes deemed to preclude enforcement under § 1983. *Fitzgerald*, 555 U.S. at 255.[7]

These authorities severely undermine *McKay v. Thompson*'s cursory analysis of the Civil Rights Act's enforcement scheme, on which Intervenors rely. 226 F.3d 752, 756 (6th Cir. 2000). *McKay* simply concluded that the Materiality Provision "is enforceable by the Attorney General, not by private citizens," *id.*, but failed to grapple with court decisions that *repeatedly* found private causes of action in statutes that are enforceable by the United States and eschewed *any* analysis of the Materiality Provision's rights-conferring language. The under-developed analysis in *McKay*—and every case cited by Intervenors—traces back to a 1978 district court decision that in two perfunctory sentences found no private cause of action. *See Schwier*, 340 F.3d at 1294 (tracing *McKay* back to *Good v. Roy*, 459 F. Supp. 403, 405-06 (D. Kan. 1978)). The limited analyses in these rulings simply reinforce the conclusion reached by most courts to address this issue: the Materiality Provision confers private rights, which can be enforced under § 1983.[8]

---

[7] The provision in *Sandoval* contained the sort of "elaborate" agency enforcement rules that "tend to contradict a congressional intent to create privately enforceable rights." 532 U.S. at 290. There is no similar scheme in the Civil Rights Act.

[8] *Dekom v. New York*, No. 12-cv-1318 (JS) (ARL), 2013 WL 3095010, at *18 (E.D.N.Y. June 18, 2013), says only that "the weight of authority suggests that there is no private right of action under Section 1971," citing to *McKay* and two district

**B.   The Materiality Provision may also be enforced directly under the Civil Rights Act because it evinces Congress's intent to provide a private remedy.**

The text, structure, and history of the Civil Rights Act, as well as the circumstances of its enactment, also provide "affirmative evidence" that Congress intended to supply a private remedy. *Sandoval*, 532 U.S. at 293 n.8; *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979) ("*TAMA*"). For one, the statute establishes jurisdiction for any "proceedings instituted" by a "party aggrieved" to enforce the law. *See also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 (2002) (finding a provision permitting "[a]ny party aggrieved" to "bring an action" "reads like the conferral of a private right of action" (citation omitted)); *Morse*, 517 U.S. at 233 (similar). But the circumstances of enactment further reveal Congress's desire to provide a private remedy: Private litigants obtained equitable remedies under the Civil Rights Act for decades before Congress amended the statute to provide for enforcement by the Attorney General. *Schwier*, 340 F.3d at 1295.

---

court decisions. *Id.* Those underlying decisions merely state that section 1971 "does not provide for a private right of action by individuals." *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004); *see also Hayden v. Pataki*, No. 00 CIV. 8586 (LMM), 2004 WL 1335921, at *5 (S.D.N.Y. June 14, 2004) (same); *Cartagena v. Crew*, No. CV-96-3399 (CPS), 1996 WL 524394, at *3 n.8 (E.D.N.Y. Sept. 5, 1996) (same). They each rely on the perfunctory holding first reached in *Roy* or its progeny.

Congress was aware of this when it amended the statute and made clear that the Attorney General's additional enforcement authority merely supplemented the existing rights of private litigants, a view the Attorney General shared. Even "[a]fter the 1957 amendment . . . private plaintiffs continued to bring their own causes of action under other provisions of the Act, including the Materiality Provision of 1964." *Hughes*, 474 F. Supp. 3d at 858 (collecting cases). This longstanding history of private enforcement, undisturbed by intervening amendments, confirms the existence of a private remedy—and private cause of action—under the Materiality Provision.

### C. Vote.org may enforce the Materiality Provision under the Civil Rights Act as a party aggrieved by the Wet Signature Rule.

As discussed, *supra* Argument § I.A; Statement § I.D, the Wet Signature Rule directly impairs Vote.org's ability to advance its mission by prohibiting the use of its app as designed and requiring it to divert resources from other critical programs to support voter registration efforts in Texas.

Section 101 contemplates a cause of action for such injuries. Subsection (d) expressly recognizes that federal district courts have jurisdiction over actions to enforce the law "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d). And the use of the term "aggrieved person" or "party aggrieved" indicates Congress's intent "to extend standing under the [statute] to the maximum

allowable under the Constitution." *ACORN*, 178 F.3d at 363; *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19 (1998).

The Supreme Court has also "interpreted Congress's use of person aggrieved . . . to have evidenced 'a congressional intention to define standing as broadly as permitted by Article III of the Constitution.'" *ACORN*, 178 F.3d at 363 (quoting *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1972)). Likewise, "several circuit courts have interpreted the term 'person aggrieved,' an almost identical term to ["party aggrieved"], to have eliminated prudential standing requirements in the context of other federal laws, thus allowing any plaintiff meeting Article III standing requirements to sue under the law." *Id.* at 364 (collecting cases).

When applied to the Materiality Provision, the same broad understanding of the phrase "party aggrieved" also reveals Congress's intent to grant a cause of action to any injured parties and authorizes organizations like Vote.org to bring suit. *Lexmark*, 572 U.S. at 127. Congress could have granted jurisdiction, for example, over "proceedings instituted" by any "individuals seeking to vote," but instead chose a term that courts have interpreted to permit enforcement by the broadest array of plaintiffs. Congress also left the term undefined, which this Court found weighs in favor of applying its broad historical understanding. *See ACORN*, 178 F.3d at 363.

To be sure, Vote.org's claim must still fall "within the zone of interests sought to be protected by" the Materiality Provision. *Thompson v. N. Am. Stainless, LP*, 562

U.S. 170, 178 (2011). But that standard "is not meant to be especially demanding," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012), and requires only that a claim not be "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Thompson*, 562 U.S. at 178 (quoting *Clarke v. Sec. Indus. Assn.*, 479 U.S. 388, 399-400 (1987)). Vote.org's claim—which seeks relief from injuries caused by imposing an immaterial voting qualification on its users—cuts to the core of the Materiality Provision and its promise to "parties aggrieved."

### D.    Vote.org's statutory and constitutional claims are enforceable under § 1983.

Vote.org also has statutory standing under § 1983, which provides a remedy against state actors who cause "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Both Intervenors and the Motions Panel wrongly insist this provision limits the scope of permissible plaintiffs to the parties whose constitutional or federal statutory rights were violated—*i.e.*, the voters themselves. *See* Br. 22-23; *Vote.org*, 39 F.4th at 304-05. But the statutory text says no such thing: it provides only that liability or relief must flow from the state actors sued to the "party injured." Nothing in § 1983 forecloses *suits* by organizations like Vote.org to enforce the constitutional or statutory rights of individual voters. In other words, a plaintiff need not be "the

object of the conduct allegedly in violation of 42 U.S.C. § 1983" to assert a claim. *Coggins v. Carpenter*, 468 F. Supp. 270, 282 (E.D. Pa. 1979); *see also Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).

The class of plaintiffs authorized to bring § 1983 claims should be determined not by the prudential limitations against third-party standing that Intervenors attempt to smuggle into the statute's text, but instead by assessment of the statute's "zone of interests," to determine whether the "legislatively conferred cause of action encompasses" Vote.org's claim. *Lexmark*, 572 U.S. at 127. After all, courts cannot limit a cause of action that Congress created merely because prudence dictates. *Id*.

Section 1983 "provide[s] a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 700-01 (1978); *see also id*. at 685 (finding "Congress. . . intended to give a broad remedy for violations of federally protected civil rights."). During debate on this provision, Rep. Shellabarger—the draftsman of the law—explained "how the courts would and should interpret" it: "liberally and beneficently" and afforded the "largest latitude consistent with the words employed" because it is a statute "meant to protect and defend and give remedies for their wrongs *to all the people*." *Id.* at 684 (emphasis added). Vote.org's claims not only redress its own injuries but also protect its ability to facilitate its users' exercise of

their federally-protected rights; thus, it clearly fall within § 1983's broad zone of interests.

Intervenors' attempt to restrict the class of permissible § 1983 plaintiffs to injured voters themselves is irreconcilable with long-standing precedent from this Circuit, the Supreme Court, and other courts around the country. For example, when Chicago enacted an ordinance banning firing ranges within the city, the Seventh Circuit found that a supplier of firing-range facilities could bring a § 1983 claim asserting the Second Amendment rights of its potential customers. *See Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011). Other circuits have reached similar conclusions. *See, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017); *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020). The same is true in the First Amendment context, where examples of § 1983 claims vindicating constitutional rights of third parties abound. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (finding in § 1983 claim that "litigants are permitted to challenge a statute not because their own rights of free expression are violated," but to protect the rights of "others not before the court") (cleaned up); *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 957-58 (1984); *Barilla v. City of Houston,* 13 F.4th 427, 434 n.4 (5th Cir. 2021). The Supreme Court has also "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations." *June Med. Servs.*

*LLC. v. Russo*, 140 S. Ct. 2103, 2118 (2020), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). This Court has repeatedly reached the same conclusion. *See Planned Parenthood of Greater Tex. Surgical Health Servs.*, 748 F.3d at 589 (finding physicians could bring claims based on rights of patients); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 275 (5th Cir. 2019) (similar), *rev'd and remanded on other grounds*, 142 S. Ct. 2228 (2022). And it has done so in non-abortion contexts too. *See Hang On, Inc.*, 65 F.3d at 1252 (permitting business to assert § 1983 claim alleging ordinance violated First, Fourth, and Fourteenth Amendment rights of its patrons); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (similar); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 334 (5th Cir. 1981) (similar).

Further, it is well-settled that "vendors and those in like positions have been *uniformly* permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function" through § 1983 actions. *Craig*, 429 U.S. at 195 (emphasis added); *accord Carey v. Population Servs., Int'l*, 431 U.S. 678, 683 (1977) (permitting out-of-state mail-order company to challenge New York law on behalf of purchases of contraceptives); *Pierce v. Soc'y of the Sisters,* 268 U.S. 510 (1925) (holding school's interest in preserving its own business permitted it to assert constitutional rights of students); *see also Hang On, Inc.*, 65 F.3d at 1252 (citing *Craig*, 429 U.S. at 195).

These rulings are irreconcilable with the Motions Panel's conclusion that § 1983 "precludes an action premised on the deprivation of another's rights." *Vote.org*, 39 F.4th at 304. Vote.org is "in like position" to a vendor that has been deprived of making its "function"—the e-sign tool of its app—available to its users, depriving those users of federally-protected rights. *Craig*, 429 U.S. at 195. Like the firing-range supplier in *Ezell* that sought to vindicate its potential customers' constitutional rights under § 1983, Vote.org is injured by a ban on its product or service, and is thus "permitted to 'act[] as [an] advocate[] of the rights of third parties who seek access to' its service[]." 651 F.3d at 696 (quoting *Craig*, 429 U.S. at 195); *see also Lepelletier v. F.D.I.C.*, 164 F.3d 37 (D.C. Cir. 1999) (holding "a vendor who is prevented from selling [its] product to third parties by any unlawful regulation may challenge that regulation . . . "on the basis of the vendor-vendee relationship alone").

### E.    Even if the third-party standing requirements apply, Vote.org meets that test.

Because § 1983 encompasses Vote.org's claims, Intervenors' and the Motions Panel's reliance on prudential standing requirements is erroneous. *See Lexmark*, 572 U.S. at 128 (acknowledging courts "cannot limit a cause of action that Congress has created merely because 'prudence' dictates"); *Md. Shall Issue, Inc.*, 971 F.3d at 216 (acknowledging consensus that vendor-vendee relationship is sufficient "regardless of whether a vendor's customers are hindered in bringing their own claims."). But

Vote.org also meets the traditional third-party standing requirements anyway. For one, Vote.org has a close relationship with its users, which is analogous to a "vendor-vendee relationship," *Lepelletier*, 164 F.3d at 43-44, and is further shown by "the identity of interests between the parties" concerning the Wet Signature Rule. *Id.* at 44. Intervenors provide no reason to doubt that Vote.org will "act as an effective advocate for" its users. *In re Deepwater Horizon*, 857 F.3d 246, 252–53 (5th Cir. 2017). The underlying rights Vote.org seeks to vindicate are "inextricably bound up" with Vote.org's mission—helping people register to vote. *Singleton v. Wulff*, 428 U.S. 106, 111 (1976).

Intervenors argue that Vote.org's users "can sue for any alleged deprivation of those rights." Br. 23. This argument fails because it disregards the "hinderance" some applicants face in asserting their rights, given the "small financial stake involved and the economic burdens of litigation." *Powers v. Ohio*, 499 U.S. 400, 411, 415 (1991). Unrebutted expert testimony shows the Wet Signature Rule disproportionately impacts low-income individuals who are uniquely hindered from advancing litigation. ROA.831-33; *cf. Ne. Oh. Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *25 (S.D. Ohio June 7, 2016) (finding hindrance where third parties in question "suffer[ed] disproportionately from" social problems and had "limited financial resources"). The fact that "[l]itigation over

elections and voting happens all the time," Br. 23, does not eliminate the hinderance faced by Vote.org's users.

## III. The Wet Signature Rule violates the Materiality Provision of the Civil Rights Act.

Much like their arguments before the district court, Intervenors offer no plausible justification that could bring the Wet Signature Rule in compliance with the Civil Rights Act. Undisputed evidence below established that the Wet Signature Rule plays no role in determining an applicant's eligibility to vote; county officials responsible for enforcing the Wet Signature Rule confirmed that they do not rely on the type of signature entered on the application to determine a voter's eligibility; and Intervenors' dubious and conjectural explanations for demanding *wet* signatures remain untethered to voter qualifications, reinforcing the district court's conclusion that the Rule violates the Materiality Provision.

### A. The instrument used to execute a signature is irrelevant to determining an applicant's qualification to vote.

In Texas, unless otherwise disqualified, a person "who is a citizen of the United States and who is a resident of this State shall be deemed a qualified voter." Tex. Const. art. VI, § 2; Tex. Elec. Code § 11.002. How an applicant signs their registration application—whether in wet ink or digitally—is irrelevant to these requirements. It is undisputed that neither Intervenors nor the other County Defendants use an applicant's wet signature to determine the applicant's

qualification to vote. They review applications only to confirm the requisite information and a signature are present. ROA.1199, 1268, 1271, 1293, 1806, 2136, 2320. And the Secretary does not register voters, nor does the office even see the signature let alone use it to determine the voter's eligibility. ROA.1266-67, 1269, 1289-90, 1294, 2353.

Both the Secretary and the County Defendants have conceded that an imaged signature would serve the same purposes a "wet" signature does. The Secretary previously admitted that "electronic signatures comply with signature requirements under the NVRA" and that it "never uses physical, manual, or wet ink handwritten signatures on paper for voter registration purposes." *Stringer*, 320 F. Supp. 3d at 899. Several County Defendants agreed there is no "difference in purpose or function between a 'wet ink' signature and an electronic or imaged signature" and that a wet signature otherwise serves no meaningful purpose. ROA.1314, 1372.

Intervenors cannot save the Wet Signature Rule by claiming it helps "deter[] voting fraud." Br. 36. Not only did they "provide no evidence or support for [their] argument," ROA.1804, courts have repeatedly rejected the notion that the Materiality Provision is concerned with any state interest—including voter fraud—other than ascertaining a person's qualification to vote. *Migliori*, 36 F.4th at 163 ("[W]hatever sort of fraud deterrence or prevention this requirement may serve, it in no way helps the Commonwealth determine whether a voter's age, residence,

citizenship, or felony status qualifies them to vote."); *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (similar); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270 (W.D. Wash. 2006) (similar).

Intervenors' remaining arguments are thinner still. They collect cases suggesting that the *existence* of a signature is important, *see* Br. 36, but none holding that the type of signature, or the instrument used to provide the signature, is material. Vote.org has never suggested that a signature should not be required at all. This lawsuit challenged a rule requiring original signatures—to be entered by hand, in wet ink—and Intervenors fail to explain why imaged or electronic signatures commonly used by Texans and state agencies alike (ROA.1193) do not suffice.

Intervenors' purported "solemnity" interest fares no better. Whether an applicant finds the act of signing an application solemn is irrelevant to their qualification to vote. Further, Intervenors' "solemnity" argument ignores the record, suggesting (without evidence) that applicants who sign with pen and paper are more likely to read and appreciate the application's admonitions regarding voter qualifications and perjury. That is speculation supported by nothing in the record, nor is there any way of knowing the level of seriousness with which an applicant reviews these portions of the application, or if they even review them at all—before signing with a wet signature. There is however unrefuted evidence that, as designed,

Vote.org's app *requires* voters to review these requirements and to "swear and affirm" that they are "eligible to register to vote in Texas" before Vote.org processes their application. ROA.2594, 3138. Even if the "solemnity" with which a person registers bore on their qualification to vote—and it does not—Intervenors failed to show the Rule advances that interest.[9]

Finally, Intervenors contend that a wet signature is material because "without an original signature" a person cannot register in Texas and thus "is not a qualified voter under Texas law," Br. 35; but this circular reasoning misreads the Civil Rights Act. The Materiality Provision targets the use of immaterial errors or omissions to "deny the right of any individual to *vote*," 52 U.S.C. § 10101(a)(2)(B) (emphasis added), and the statute defines "vote" to include "registration or other action required by State law prerequisite to voting," *id.* § 10101(e). Thus, by its plain text, the Materiality Provision's protections extend not just to the act of depositing a ballot, but also to the registration process itself. As discussed, *see supra* Statement § I.B, neither county officials nor the Secretary rely on the type of signature entered on a voter registration form in determining eligibility. Texas may not deny an individual the ability to register because of immaterial errors or omissions under Section 101

---

[9] Intervenors contend that imaged signatures are often not of sufficient quality to permit review by registrars. Br 37. That ignores testimony that registrars simply review applications to ensure the *presence* of a signature, ROA.1293, and that separate statutory authority permits registrars to reject applications they deem to be illegible. Tex. Elec. Code §§ 13.072(c), § 13.074.

any more than it can deny the right to cast a ballot. *See* 52 U.S.C. 10101 §§ (a)(2)(B), (f); *see also Schwier*, 439 F.3d at 1286 (affirming that registration requirement violated Materiality Provision even though registration is listed as a qualification for voting under Georgia law).[10]

Ultimately, Intervenors' argument boils down to the radical notion that Texas's registration requirements cannot violate the Materiality Provision because registration is a qualification for voting. Putting aside the errors of law embedded in that theory, *see supra* n.10, accepting Intervenors' argument—along with the Motions Panel's suggestion (in dicta) that the Materiality Provision may be "tied to only voter registration specifically," 39 F.4th at 305 n.6—would mean the Materiality Provision cannot be enforced at all in Texas. Both theories are wrong, and this Court should not interpret federal law, and the Civil Rights Act especially, in a manner that renders it meaningless.

### B.     Rejecting a voter registration application is a denial of the right to vote under the Materiality Provision.

The Wet Signature Rule denies the right to vote because if an applicant does not comply with it, their registration application will be denied and they accordingly cannot vote. ROA.1283-84. Indeed, under the Materiality Provision's broad

---

[10] The Texas Constitution also undermines Intervenors' argument. While it acknowledges that registration is a pre-requisite to voting, the Constitution defines "qualified voter" based solely on the individual's age, citizenship, residency, mental capacity, and status as a convicted felon. Tex. Const., art. VI §§ 1-2.

definition of "vote"—which incorporates "all action necessary to make a vote effective including . . . registration"—rejecting an applicant's registration itself triggers liability, even apart from any subsequent effort to cast a ballot.

Intervenors contend the Rule does not deny the right to vote because: (1) registration-by-fax was part of an expansion of registration methods;[11] (2) rejected applicants are notified and offered a chance to cure; and (3) the availability of other registration methods means a person who fails to cure their application, in effect, chooses not to vote. Br. 32-34. But it is no defense under the Materiality Provision to say that an applicant may simply choose to comply with an illegal registration requirement immaterial to their qualification to vote or may seek out an alternative method of registering. *See Schwier*, 439 F.3d at 1286. Federal law bars disqualifying a person from voting because of their failure to comply with a requirement immaterial to their qualification—precisely what the Wet Signature Rule does.

That applicants may cure their applications by acquiescing to the Wet Signature Rule is also irrelevant and does not vindicate the law. For one, denial of a registration application itself violates the Materiality Provision. *See* 52 U.S.C. § 10101(e) (defining "vote" to include "registration or other action required by State

---

[11] Neither case cited by Intervenors on this point concerned the Materiality Provision, and neither suggests states may condition registering to vote on a requirement immaterial to a person's qualification to vote. *See* Br. 32 (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-08 (1969); *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 144-45 (5th Cir. 2020)).

law prerequisite to voting"). And any individual who submits their application by fax but fails to comply with the Wet Signature Rule—whether through the initial application or the cure process—is denied the right to vote. "Section 101 provides that state actors may not deny the right to vote based on errors or omissions that are not material; it does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes." *La Union del Pueblo Entero v. Abbott*, 5:21-CV-0844-XR, 2022 WL 1651215, at *21 (W.D. Tex. May 24, 2022).

Nor does the opportunity to cure guarantee that all voters will, in fact, ultimately be able to vote. Many applicants—and particularly those without printers—will find it burdensome, or will not have sufficient time, to cure their applications and ultimately will not do so. *See infra* Argument § IV. Such voters would have successfully registered to vote but for the Wet Signature Rule.

**C.    The Materiality Provision requires no showing of racial discrimination.**

Intervenors ask this Court to add an intentional race discrimination element to claims under the Materiality Provision, which makes no mention of race at all. 52 U.S.C. § 10101(a)(2)(B); *see Migliori*, 36 F.4th at 163 n.56 (rejecting argument that Materiality Provision requires showing of racial discrimination because "the text of the provision does not mention racial discrimination"). Their demand violates well-established rules of statutory interpretation because inserting a racial discrimination

requirement into the Materiality Provision renders the words "*any* individual" meaningless. And the Supreme Court has instructed that statutes must be interpreted so that "no clause is rendered superfluous, void, or insignificant." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 226 (2015) (cleaned up).

Intervenors point to a different clause in Section 101 that prohibits racial discrimination, 52 U.S.C. § 10101(a)(1), but this undermines their interpretation of the Materiality Provision where such language is absent. When Congress "includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993). Had Congress intended to restrict the Materiality Provision to instances of racial discrimination, "it presumably would have done so expressly as it did in the immediately [preceding] subsection[.]" *Russello v. United States*, 464 U.S. 16, 23 (1983).

Nor is the Materiality Provision constrained by the Fifteenth Amendment, which Congress has "broad power to enforce[.]" *City of Rome*, 446 U.S. at 175. The Supreme Court has upheld under the Fourteenth *and* Fifteenth Amendment a non-racial prohibition on literacy tests. *Oregon v. Mitchell*, 400 U.S. 112 (1970). That prohibition was permissible because "Congress could rationally have determined that these provisions were appropriate methods of attacking the perpetuation of earlier, purposeful racial discrimination, regardless of whether the practices they

prohibited were discriminatory only in effect." *City of Rome*, 446 U.S. at 176-77 (discussing *Oregon*, 400 U.S. at 112).

Just as Congress can prohibit literacy tests under the Fifteenth Amendment because they "unduly lend themselves to discriminatory application, either conscious or unconscious," *Oregon*, 400 U.S. at 216 (op. of Harlan, J.), it can prohibit deprivations of the right to vote due to immaterial omissions regardless of discriminatory intent because of the history of "state and local government[s] tactics of using . . . burdensome registration requirements to disenfranchise African-Americans." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153,1173 (11th Cir. 2008).

The Materiality Provision is equally supportable under the Fourteenth Amendment where Congress's enforcement authority is not limited to matters of racial discrimination. *See Tennessee v. Lane*, 541 U.S. 509, 518 (2004). Congress may use that authority to deploy "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Id*. In doing so, Congress may also "prohibit[] a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000).

Intervenors' countervailing authority misreads this settled precedent. *Broyles v. Texas*, 618 F. Supp. 2d 661 (S.D. Tex. 2009), concluded that the Materiality

Provision is limited to intentional racial discrimination claims solely based on this Court's holding in *Kirksey v. City of Jackson*, 663 F.2d 659 (5th Cir. 1981). *Kirksey* held that "section 2 of the Voting Rights Act is coterminous with the fifteenth amendment," *id.* at 664-65; but *Broyles* incorrectly (and without explanation) expanded that conclusion to the *entirety* of 52 U.S.C. § 10101, thereby conflating Section 2, which *expressly* bars abridgment of the right to vote "on account of race," with the Materiality Provision, which imposes no such requirement. *Indiana Democratic Party v. Rokita* likewise relied exclusively upon Section 2 cases (including *Kirksey*) or those dealing with other statutes *expressly* imposing a racial discrimination component. 458 F. Supp. 2d 775, 839 n.106 (S.D. Ind. 2006). Intervenors (and the cases they cite) provide no sound basis for requiring proof of racial discrimination in Materiality Provision claims.

## IV. The Wet Signature Rule unduly burdens the right to vote in violation of the First and Fourteenth Amendments.

Like all restrictions on voter registration, the Wet Signature Rule "inevitably affects" the right to vote. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). As such, the Court must "weigh[] 'the character and magnitude of the asserted injury' . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). The Wet Signature Rule cannot be justified by any

legitimate—let alone compelling—state interest and thus fails constitutional scrutiny.

### A.    The Wet Signature Rule burdens the right to vote.

The Wet Signature Rule imposes a more than minimal burden on voters because it substantially restricts methods of voter registration, leading to "decreased registration attempts and fewer successful registrations." ROA.948. It means that voters registering by fax must print and sign their registration form, which entails a variety of additional steps. ROA.1813. These hurdles make the exercise of the franchise more difficult. *See* ROA.3070 (testifying the Wet Signature Rule "makes it harder to register to vote," especially for people who need to use an electronic signature); *see also* ROA.818-19.

Many Texans, for instance, cannot print documents at home, which in turn requires them to acquire printed application forms from another party. According to the Census Bureau's American Community Survey, 26 percent of Cameron County residents are smartphone dependent—they do not own laptops or desktops, and therefore are unlikely to be able to print applications without assistance. ROA.830. In some counties in Texas, as many as 60 percent of households rely *exclusively* on smartphones. *Id*. The district court's finding that the Wet Signature Rule "unduly burdens Texas citizens' fundamental right," ROA.1819, was supported by significant evidence and is entitled to deference.

While the Motions Panel discounted the Rule's burden because it "only affects the small subset of voter registration applicants that elect to register via fax," *Vote.org*, 39 F.4th at 308, the Supreme Court has cautioned that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789. Rather than simply declare a burden as minimal and the State's regulatory interests as sufficient, *Anderson-Burdick* requires that courts "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments," and then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789; *see also Bergland v. Harris*, 767 F.2d 15511553 (11th Cir. 1985). In doing so, courts must also "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789.

There is no question that the Wet Signature Rule applies only to voters submitting paper applications by fax. ROA.1236 (acknowledging that voters who register at DPS provide electronic signatures). "All binding authority to consider the burdensome effects of disparate treatment on the right to vote has done so from the perspective of only affected electors—not the perspective of the electorate as a whole." *Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020). The Motions Panel erred by dismissing the Rule's burden based on its assessment of the entire electorate and

disregarding the Rule's impact on prospective registrants who do not own printers: young adults, low-income voters, and minority voters. ROA.823-37.

Intervenors' arguments suffer from similar flaws. It is not true that the burden is "equally shared and non-discriminatory," as unrebutted expert testimony established. ROA.1142, 1154-60. And Intervenors serially conflate the burden imposed by requiring signatures generally (which Vote.org does not challenge) with the regulation at issue, which requires a specific type of signature. Further, Intervenors' insistence that the Rule was part of an *expansion* of registration options in S.B. 910—a nearly decade-old law—is false. The Wet Signature Rule was enacted as part of H.B. 3107 just last year, and far from expanding registration options for Texas voters, H.B. 3107 *narrowed* S.B. 910's fax submission procedures by mandating that the applicant provide "a copy of the *original* registration application *containing the voter's original signature*." 2021 Tex. Sess. Law Serv. Ch. 711 (H.B. 3107) (text added by amendment emphasized).

Vote.org does not challenge S.B. 910, and Intervenors may not rely on a nearly decade-old law to defend a separate piece of legislation for which it offers no persuasive justification. *LULAC* is not to the contrary. It concerned two COVID-19 emergency decrees from the Governor issued within 66 days of one another during the COVID-19 pandemic, which this Court concluded "must be read together to

make sense." *Hughs*, 978 F.3d at 141, 145. The same is not true of H.B. 3107 and S.B. 910, which were enacted *eight years* apart and are both intelligible on their own.

In sum, both the Motions Panel's and Intervenors' disregard of the burdens imposed by the Wet Signature Rule misapply the governing standards and effectively bypass the "hard judgment" the *Anderson-Burdick* test "demands." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008).

### B. Intervenors fail to identify any sufficiently weighty state interest to justify the burden on the right to vote.

The State's purported interests—protecting electoral integrity and preserving the "solemnity" of voter registration—bear little relation to the Wet Signature Rule and cannot justify it. In applying this test, the Court must consider "the legitimacy and strength of each" asserted interest and "the extent to which those interests make it necessary to burden" the right to vote. *Anderson*, 460 U.S. at 789. The "rigorousness" of that inquiry depends on the extent of the burden. *Burdick*, 504 U.S. at 434. If the burden is "severe," then "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But even if the burden is "slight," it "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191. The Wet Signature Rule falls short under either standard.

As a threshold matter, Intervenors' asserted interests, which appear to have been "invented *post hoc* in response to litigation," are insufficient to justify the statute. *United States v. Virginia*, 518 U.S. 515, 533 (1996). These purported interests do not "make it necessary" to burden the right to vote, *Anderson*, 460 U.S. at 789, because they have no connection to the challenged law. *See*, *e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 447 (9th Cir. 2018) (finding interest insufficient where means did not "advance that goal"); *Anderson v. Morris*, 636 F.2d 55, 58 (4th Cir. 1980) (similar). Even under the most deferential review, "[a] hypothetical rationale, even *post hoc*, cannot be fantasy." *Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

Unrebutted expert testimony established that "the wet signature rule does not make voter rolls more accurate or elections more secure." ROA.837. Intervenors presented no evidence otherwise. ROA.1816-17. In fact, Texas law accepts, and even *requires* recognition of, electronic signatures in almost any other context. *E.g.*, Tex. Bus. & Com. Code § 322.007(a), (d). And no party uses signatures at any point in the registration process to detect or prevent voter fraud. *See supra* Statement § I.B. Country registrars have no training on how to inspect signatures anyway. ROA.1256-1258, 1272, 1298.

Intervenors' only response is that election officials "might" use wet signatures as exemplars in future investigations. Br. 43. That theory depends on a series of hypotheticals regarding how a voter registers; how they subsequently vote; and

assumes their registration signature will somehow become relevant to a fraud investigation. Such speculation fails to justify the burden imposed by the Rule.

Further still, imaged signatures advance election integrity no less than a wet signature. Vote.org's platform uses digitized versions of an applicant's handwritten signature; any application submitted using Vote.org's platform would therefore provide an exemplar signature. And anyone who might later "use" the signature would be hard-pressed to tell the difference because nearly every county examines these signatures digitally, not physically on paper. *See* ROA.1254-55, 1284, 1807, 1819.

Intervenors' interest in "solemnity" likewise does not carry their burden, and the Motions Panel erred in concluding—based on no evidence at all—that "[p]hysically signing a voter registration form" carries a "solemn weight" that applying an imaged signature does not. *Vote.org*, 39 F.4th at 308. Intervenors provide no authority suggesting that vague and subjective concepts of "solemnity" constitute a significant state interest, nor do they provide any explanation or record support for *how* a wet signature makes registering to vote more "solemn." And Texas does not impose this requirement in other important contexts, where it accepts electronic or digital signatures. *See* Tex. Health & Safety Code § 166.011 (executing an advance health directive); *Bartee v. Bartee*, No. 11-18-0017-CV, 2020 WL 524909, at *3 (Tex. Ct. App. Jan. 31, 2020) (signing a divorce decree); Tex. Prop.

Code § 12.0013 (closing on real property). Regardless, even a sincerely held desire

for solemn occasions cannot justify burdens on the constitutional right to vote.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be affirmed.

Dated: October 28, 2022                    Respectfully submitted,

                                           */s/ Uzoma N. Nkwonta*
                                           Uzoma N. Nkwonta
                                           Christopher D. Dodge
                                           Noah B. Baron
                                           Alexander F. Atkins
                                           Meaghan E. Mixon
                                           **ELIAS LAW GROUP LLP**
                                           10 G Street NE, Suite 600
                                           Washington, D.C. 20002
                                           Telephone: (202) 968-4490
                                           unkwonta@elias.law
                                           cdodge@elias.law
                                           nbaron@elias.law
                                           aatkins@elias.law
                                           mmixon@elias.law

                                           *Counsel for Plaintiff*
                                           *Vote.org*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits of Fed. R. App. P. 27(d)(2) because this document contains 12,816 words, excluding parts exempted the Rules.

This document complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

                                           */s/ Uzoma N. Nkwonta*
                                           Uzoma N. Nkwonta

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that counsel for the Intervenor-Defendants-Appellants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta