No. 22-50536

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

VOTE.ORG,

Plaintiff-Appellee

v.

JACQUELYN CALLANEN, et al.,

Defendants

v.

KEN PAXTON, In His Official Capacity as the Attorney General of Texas; LUPE C. TORRES, In His Official Capacity as the Medina County Elections Administrator; TERRIE PENDLEY, In Her Official Capacity as the Real County Tax Assessor-Collector,

Intervenor Defendants-Appellants

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

_____

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF-APPELLEE ON THE ISSUES ADDRESSED HEREIN

_____

KRISTEN CLARKE
 Assistant Attorney General

TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 598-0243

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES

INTEREST OF THE UNITED STATES .................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE.................................................................3

    1.   *Statutory Background*............................................................3

    2.   *The Present Controversy* ......................................................4

SUMMARY OF ARGUMENT ...............................................................7

ARGUMENT

    I     PRIVATE PLAINTIFFS MAY ENFORCE THE
         MATERIALITY PROVISION ............................................ 8

    II    THE MATERIALITY PROVISION PROHIBITS ACTS
         BEYOND RACIAL DISCRIMINATION......................... 14

    III   THIS COURT SHOULD DECLINE INTERVENORS'
         ATTEMPTS TO RESTRICT THE MATERIALITY
         PROVISION..................................................................... 19

        A.   *Laws That Reject Registration Applications Deny The
            "Right To Vote" Under The Materiality Provision,
            Even If Applicants Can Try Again* ............................20

        B.   *States Cannot Define Away The Materiality Provision's
            Protections* ...............................................................23

        C.   *Fraud-Prevention Concerns Cannot Justify The Wet
            Signature Rule* ..........................................................27

**TABLE OF CONTENTS (continued):**                    **PAGE**

CONCLUSION ...........................................................................................30

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                                  **PAGE**

*Alexander* v. *Sandoval*, 532 U.S. 275 (2001) ............................................................8

*Allen* v. *State Bd. of Elections*, 393 U.S. 544 (1969)........................................ 12, 14

*Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ..........................25

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) .................................................. 9, 12-13

*Broyles* v. *Texas*, 618 F. Supp. 2d 661 (S.D. Tex. 2009),
        aff'd, 381 F. App'x 370 (5th Cir. 2010) .................................................. 15-16

*City of Boerne* v. *Flores*, 521 U.S. 507 (1997) ........................................................17

*City of Rome* v. *United States*, 446 U.S. 156 (1980) ................................................17

*D.O.* v. *Glisson*, 847 F.3d 374 (6th Cir. 2017) ........................................................10

*Diaz* v. *Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006).............................................25

*FCC* v. *NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003)...............................15

*Fitzgerald* v. *Barnstable Sch. Comm.*, 555 U.S. 246 (2009) ............................ 12-13

*Florida State Conf. of NAACP* v. *Browning*,
        522 F.3d 1153 (11th Cir. 2008) ............................................................. 19, 24

*Gonzaga Univ.* v. *Doe*, 536 U.S. 273 (2002).................................................... 8, 10-11

*Harper* v. *Virginia State Bd. of Elections*, 383 U.S. 663 (1966)...................... 22, 25

*Indiana Democratic Party* v. *Rokita*,
        458 F. Supp. 2d 775 (S.D. Ind. 2006),
        aff'd on other grounds *sub nom. Crawford* v. *Marion Cnty.
        Election Bd.*, 472 F.3d 949 (7th Cir. 2007),
        aff'd, 553 U.S. 181 (2008)...............................................................................16

**CASES (continued):** **PAGE**

*Intel Corp. Inv. Pol'y Comm.* v. *Sulyma*, 140 S. Ct. 768 (2020) .............................15

*Johnson* v. *Arteaga-Martinez*, 142 S. Ct. 1827 (2022)...........................................16

*Johnson* v. *Housing Auth. Of Jefferson Par.*, 442 F.3d 356 (5th Cir. 2006)...........11

*Kellogg* v. *Warmouth*, 14 F. Cas. 257 (C.C.D. La. 1872) .........................................3

*Kirksey* v. *City of Jackson*, 663 F.2d 659 (5th Cir. 1981) .......................................16

*Lane* v. *Wilson*, 307 U.S. 268 (1939).......................................................................22

*La Unión del Pueblo Entero* v. *Abbott*, No. 5:21-cv-0844,
    2022 WL 1651215 (W.D. Tex. May 24, 2022)....................................... 21-22

*Legacy Cmty. Health Servs., Inc.* v. *Smith*, 881 F.3d 358 (5th Cir. 2018) ..........9, 11

*Louisiana* v. *United States*, 380 U.S. 145 (1965) ....................................................22

*McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316 (1819).......................................17

*McKay* v. *Thompson*, 226 F.3d 752 (6th Cir. 2000) ..................................................9

*Migliori* v. *Cohen*, 36 F.4th 153, 159 (3d Cir. 2022),
    cert. granted, judgment vacated *sub nom. Ritter* v. *Migliori*,
    No. 22-30, 2022 WL 6571686 (S. Ct. Oct. 11, 2022) (mem.) ..... 9, 12, 24, 29

*Myers* v. *Anderson*, 238 U.S. 368 (1915) ...............................................................22

*Nevada Dep't of Hum. Res.* v. *Hibbs*, 538 U.S. 721 (2003)....................................19

*Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 557 U.S. 193 (2009)..........17

*Oregon* v. *Mitchell*, 400 U.S. 112 (1970)................................................................19

*Quarles* v. *United States*, 139 S. Ct. 1872 (2019) .......................................... 23, 27

*Reed* v. *Taylor*, 923 F.3d 411 (5th Cir. 2019)..........................................................10

**CASES (continued):**                                                    **PAGE**

*Romano* v. *Greenstein*, 721 F.3d 373 (5th Cir. 2013) ....................................... 10-11

*S.D. ex rel. Dickson* v. *Hood*, 391 F.3d 581 (5th Cir. 2004) ...................................11

*Schwier* v. *Cox*, 340 F.3d 1284 (11th Cir. 2003)........................................... *passim*

*Shelby Cnty.* v. *Holder*, 570 U.S. 529 (2013) ..........................................17

*Sixth Dist. of Afr. Methodist Episcopal Church* v. *Kemp*,
    574 F. Supp. 3d 1260 (N.D. Ga. 2021)..........................................21

*Smiley* v. *Holm*, 285 U.S. 355 (1932) ..........................................25

*Smith* v. *Allwright*, 321 U.S. 649 (1944) ..................................................3

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) ..............................................17

*Tanzin* v. *Tanvir*, 141 S. Ct. 486 (2020) ..................................................20

*Thrasher* v. *Illinois Republican Party*, No. 4:12-CV-4071,
    2013 WL 442832 (C.D. Ill. Feb. 5, 2013) ......................................16

*Wages & White Lion Invs., L.L.C.* v. *FDA*, 41 F.4th 427 (5th Cir. 2022)................6

*Wisniewski* v. *Rodale, Inc.*, 510 F.3d 294 (3d Cir. 2007)........................................10

**CONSTITUTION:**

U.S. Const. Amend. XV..........................................................................17

**STATUTES:**

Civil Rights Act of 1957
    Pub. L. No. 85-315, § 131(c), 71 Stat. 637-638 (1957) ...................................3

Civil Rights Act of 1960
    Pub. L. No. 86-449, § 601, 74 Stat. 90-92 (1960)............................................3

**STATUTES (continued):**                                              **PAGE**

Civil Rights Act of 1964
    Pub. L. No. 88-352, § 101, 78 Stat. 241-242 (1964) .......................................4

Enforcement Act of 1870
    Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140 .............................................3

52 U.S.C. 10101
    52 U.S.C. 10101(a)(1) ...............................................................3, 15
    52 U.S.C. 10101(a)(2)(B) ......................................................... *passim*
    52 U.S.C. 10101(a)(3)(A) .............................................................4, 20
    52 U.S.C. 10101(b) ......................................................................3, 15
    52 U.S.C. 10101(c) ............................................................. 1, 3, 12-13
    52 U.S.C. 10101(d) ....................................................................3, 13-14
    52 U.S.C. 10101(e) ................................................................. *passim*
    52 U.S.C. 10101(f) .............................................................................3
    52 U.S.C. 10101(g) .........................................................................14

Tex. Elec. Code Ann. § 13.001 (West 2022) ...........................................25

Tex. Elec. Code Ann. § 13.002(b) (West 2022) .......................................28

Tex. Elec. Code Ann. § 13.143(d-2) (West 2013) .....................................5

Tex. Elec. Code Ann. § 13.143(d-2) (West 2022) .....................................5

**LEGISLATIVE HISTORY:**

H.R. Rep. No. 291, 85th Cong., 1st Sess. (1957) ......................................... 3, 13-14

H.R. Rep. No. 914, 88th Cong., 1st Sess. (1963) .....................................4, 19

H.R. Rep. No. 914, Pt. 2, 88th Cong., 1st Sess. (1963)...........................18

*Literacy Tests and Voter Requirements in Federal and State Elections:*
    *Hearings Before the Subcomm. On Const. Rights of the Comm. on*
    *the Judiciary*, 87th Cong., 2d Sess. (1962).....................................18

**LEGISLATIVE HISTORY (continued):** **PAGE**

*Miscellaneous Proposals Regarding the Civil Rights of Persons Within
the Jurisdiction of the United States: Hearings Before Subcomm.
No. 5 of the H. Comm. on the Judiciary*, 88th Cong., 1st Sess. (1963).........18

**RULE:**

Fed. R. App. P. 29(a) ...............................................................................................2

**MISCELLANEOUS:**

Comm'n on C.R., Voting: 1961 Commission on Civil Rights Report, Book 1,
(1961) (1961 Commission Report),
https://www.crmvet.org/docs/ccr_61_voting.pdf.................................. 18, 27

*Random House Dictionary of the English Language* (1966) ..................................26

2 *New Century Dictionary of the English Language*
(H.G. Emery et al. eds. 1963) ......................................................................26

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 22-50536

VOTE.ORG,

Plaintiff-Appellee

v.

JACQUELYN CALLANEN, et al.,

Defendants

v.

KEN PAXTON, In His Official Capacity as the Attorney General of Texas; LUPE
C. TORRES, In His Official Capacity as the Medina County Elections
Administrator; TERRIE PENDLEY, In Her Official Capacity as the Real County
Tax Assessor-Collector,

Intervenor Defendants-Appellants

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

_____

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF-APPELLEE ON THE ISSUES ADDRSESED HEREIN

_____

**INTEREST OF THE UNITED STATES**

This case involves the Materiality Provision, Section 101 of the Civil Rights

Act of 1964, 52 U.S.C. 10101(a)(2)(B), which the Attorney General is charged

with enforcing, 52 U.S.C. 10101(c). Accordingly, the United States has a

significant interest in the proper interpretation of the Provision, including whether private plaintiffs also can enforce it.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES

1.  Whether private plaintiffs have a right of action to enforce the Materiality Provision.

2.  Whether the Materiality Provision prohibits acts beyond racial discrimination.

3.  Whether a law that rejects voter registration forms lacking wet ink signatures denies the "right to vote" as defined in 52 U.S.C. 10101.

4.  Whether the Materiality Provision applies to state-law requirements that do not determine whether someone meets the qualifications needed to vote.

5.  Whether theoretical fraud-prevention interests fail to render a procedural requirement material to qualifications when officials do not use the requirement to verify voters' identities.[1]

---

[1] The United States takes no position on any other issue in this case, including standing.

- 3 -

## STATEMENT OF THE CASE

*1.    Statutory Background*

What is now 52 U.S.C. 10101 traces its lineage to the Enforcement Act of 1870.  There, the Reconstruction Congress provided that any person otherwise qualified to vote "shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State  *  *  *  to the contrary notwithstanding." Act of May 31, 1870, ch. 114, § 1, 16 Stat. 140 (52 U.S.C. 10101(a)(1)).  Until 1957, the United States could enforce this law only via criminal prosecutions; private parties alone civilly enforced it, typically via suits brought under 42 U.S.C. 1983.  H.R. Rep. No. 291, 85th Cong., 1st Sess. 12, 15 (1957) (1957 House Report); see, *e.g.*, *Smith* v. *Allwright*, 321 U.S. 649, 650-651 & n.1 (1944); *Kellogg* v. *Warmouth*, 14 F. Cas. 257, 258 (C.C.D. La. 1872).

The Civil Rights Act of 1957 added four subsections to Section 10101 and, for the first time, granted the Attorney General power to enforce it through civil suits.  Pub. L. No. 85-315, § 131(c), 71 Stat. 637-638 (52 U.S.C. 10101(b)-(d) and (f)).  Further amendment in 1960 authorized the Attorney General to bring pattern-or-practice claims for racial discrimination in voting.  Civil Rights Act of 1960, Pub. L. No. 86-449, § 601, 74 Stat. 90-92 (52 U.S.C. 10101(e)).

Section 101 of the Civil Rights Act of 1964 again amended the statute to "provide specific protections to the right to vote." H.R. Rep. No. 914, 88th Cong., 1st Sess. 19 (1963) (1963 House Report); see Pub. L. No. 88-352, § 101, 78 Stat. 241-242. Among the amendments is the Materiality Provision, which today states:

> No person acting under color of law shall  *  *  *  deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. 10101(a)(2)(B). The statute defines "vote" to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. 10101(a)(3)(A) and (e).

## 2.    *The Present Controversy*

a. Plaintiff Vote.org is a nonprofit technology platform. ROA.1788. In 2018, plaintiff developed a web app to facilitate voter registration in Texas. ROA.1789; Stay Op. 3.[2] The app prompted users for information and auto-filled it into the federal voter-registration form. ROA.1789. To sign the registration form, users signed a piece of paper, took a photo of it, and uploaded the photo to the app. ROA.1789. The app then sent the completed, signed form to two third-party

---

[2] "Stay Op." refers to the motions panel's stay opinion in this appeal. "Br." refers to intervenors' opening brief on appeal.

vendors; one faxed the form to the relevant county registrar and the other mailed the form to the same registrar.  ROA.1789; Stay Op. 3.

Plaintiff piloted its app in 2018 in four counties.  Stay Op. 3.  At that time, Texas law provided only that "a copy of [a faxed] registration application must be submitted by mail and be received by the registrar not later than the fourth business day after" receipt of the faxed form.  Tex. Elec. Code Ann. § 13.143(d-2) (West 2013).  Nonetheless, Texas Secretary of State Rolando Pablos deemed incomplete all forms submitted via Vote.org's app because they used electronic rather than "wet" ink signatures.  ROA.1789.  Registrars ceased accepting Vote.org's registration forms.  ROA.1789.

In 2021, the Texas Legislature amended its voter registration laws to codify Secretary Pablos's Wet Signature Rule.  ROA.1789.  Texas law now states that, for a registration submitted by fax "to be effective, a copy of the *original* registration application *containing the voter's original signature* must be submitted by personal delivery or mail" and received within four business days of the faxed form.  Tex. Elec. Code Ann. § 13.143(d-2) (West 2022) (emphases added).  Texas officials interpreted this law to require a "wet" ink signature, rather than a printed-out electronic signature.  See ROA.1789-1790.

b.  On July 8, 2021, plaintiff sued four county voter registrars under 52 U.S.C. 10101 and 42 U.S.C. 1983.  ROA.1787, 1790-1791.  Texas Attorney

- 6 -

General Ken Paxton and two other registrars successfully intervened as additional defendants.  ROA.10-11.  As relevant here, plaintiff alleged that the Wet Signature Rule violated the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. 10101(a)(2)(B).  ROA.1790.

c.  After several rounds of dispositive motions briefing, the district court granted summary judgment and a permanent injunction in favor of plaintiff. ROA.1787-1788.  The court held that plaintiff had a private cause of action to enforce the Materiality Provision.  ROA.1792; see ROA.517.  The court then determined that such a claim does not require proof of racial discrimination. ROA.1792-1793.  Next, the court held that the Wet Signature Rule "den[ies]" the "right to vote" under the Provision.  ROA.1800.  Finally, based on the summary judgment record, the court found that the Wet Signature Rule "is not material to determin[ing] whether a registrant is qualified to vote" and thus violates the Materiality Provision.  ROA.1808.

d.  Intervenors appealed and sought a stay pending appeal from this Court. Br. 9 n.3; Stay Op. 2.  A motions panel granted the stay.  Stay Op. 2.[3]

---

[3] The motion's panel's rulings do not bind the merits panel.  *Wages & White Lion Invs., L.L.C.* v. *FDA*, 41 F.4th 427, 439 & n.13 (5th Cir. 2022).

## SUMMARY OF ARGUMENT

This Court should hold that private plaintiffs may enforce the Materiality Provision, 52 U.S.C. 10101(a)(2)(B), and should reject extratextual arguments that would narrow its scope.

The district court rightly concluded that private plaintiffs may enforce the Materiality Provision. The Provision creates a personal right to vote regardless of immaterial errors or omissions in voting records or papers. Because the statute confers an individual right, that right is presumptively enforceable via Section 1983. That the Attorney General also has a cause of action to enforce the Provision cannot rebut that presumption.

The Materiality Provision also applies beyond racially discriminatory state regulations. In contrast to other subsections of Section 10101, the Provision's text says nothing about race and contains no racial-discrimination element. And this Court need not artificially narrow the Provision's scope to avoid a phantom constitutional concern—the Provision is proper Fifteenth Amendment legislation.

This Court should reject intervenors' remaining arguments for limiting the Materiality Provision's scope. First, state-law requirements deny the right to vote within the Provision's meaning if failure to meet them results in denial of a voter's registration, even if the State allows the voter to try again. Second, States cannot transform their procedural requirements into voter qualifications under the

Provision merely by mandating compliance with them.  Finally, theoretical fraud-prevention rationales cannot render a statute material where, as here, officials do not use the challenged statute for any fraud-prevention purposes.

## ARGUMENT

## I

## PRIVATE PLAINTIFFS MAY ENFORCE THE MATERIALITY PROVISION

Private plaintiffs may sue under Section 1983 to enforce the Materiality Provision.  Intervenors ignore this fact and argue instead that private parties lack an implied cause of action, relying on *Alexander* v. *Sandoval*, 532 U.S. 275, 286 (2001).  In so doing, intervenors overlook the distinctions between these two sources of rights.  Under either the implied-right-of-action or Section 1983 inquiry, courts "must first determine whether Congress *intended to create a federal right*."  *Gonzaga Univ.* v. *Doe*, 536 U.S. 273, 283 (2002).  To establish an implied right of action, plaintiffs must "show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'"  *Id.* at 284 (quoting *Sandoval*, 532 U.S. at 286).  By contrast, where a statute creates a federal right, plaintiffs enjoy a presumption of enforcement under Section 1983 that defendants must rebut.  *Ibid.*  Because the Provision creates a personal right to vote, and because intervenors fail to rebut the presumption that such a right is privately enforceable, this Court should join the Eleventh Circuit in holding that private plaintiffs may sue to

enforce that right under Section 1983.  See *Schwier* v. *Cox*, 340 F.3d 1284, 1297

(11th Cir. 2003).[4]

1.  The Materiality Provision creates a personal right to vote.  "To determine

whether a particular statute gives rise to a federal right," *Legacy Cmty. Health

Servs., Inc.* v. *Smith*, 881 F.3d 358, 371 (5th Cir. 2018), this Court relies on the

three-factor test articulated in *Blessing* v. *Freestone*, 520 U.S. 329 (1997):

(1) whether Congress "intended that the provision in question benefit the plaintiff";

(2) whether "the right assertedly protected by the statute is not so 'vague and

amorphous' that its enforcement would strain judicial competence"; and

(3) whether the statute "unambiguously impose[s] a binding obligation on the

States." *Legacy Cmty. Health Servs.*, 881 F.3d at 371 (quoting *Blessing*, 520 U.S.

at 340-341).  The Materiality Provision meets these standards because it prohibits

state actors from denying "the *right* of *any individual* to vote" on specified

grounds.  52 U.S.C. 10101(a)(2)(B) (emphases added).  The Provision neither

"speaks only in terms of institutional policy and practice" nor has a merely

---

[4]  The Third Circuit also recently held that private plaintiffs may enforce the Materiality Provision under Section 1983.  See *Migliori* v. *Cohen*, 36 F.4th 153, 159 (2022), cert. granted, judgment vacated *sub nom. Ritter* v. *Migliori*, No. 22-30, 2022 WL 6571686 (S. Ct. Oct. 11, 2022) (mem.).  Though later vacated as moot, *Migliori*'s substantive analysis remains persuasive.  The only other circuit to address this issue never discussed Section 1983, merely stating without elaboration that the Materiality Provision "is enforceable by the Attorney General, not by private citizens."  *McKay* v. *Thompson*, 226 F.3d 752, 756 (6th Cir. 2000).

- 10 -

"aggregate focus." *Romano* v. *Greenstein*, 721 F.3d 373, 378 (5th Cir. 2013) (alteration omitted) (quoting *Gonzaga*, 536 U.S. at 288). It explicitly references a right and just as explicitly grants that right on an individualized basis, meeting the first *Blessing* factor. And the Provision's clear, mandatory language easily meets the second and third *Blessing* factors, which the intervenors do not contest or even mention.

Intervenors instead assert (Br. 26) that the Materiality Provision cannot give rise to a personal right because Congress framed it as an active-voiced prohibition on state actors rather than as a passive-voiced statement about what rights voters cannot be denied. But relying solely on a statute's grammatical subject to determine its focus would privilege a few "words standing alone" at the expense of the "surrounding structure and other contextual cues that illuminate meaning." *Reed* v. *Taylor*, 923 F.3d 411, 415 (5th Cir. 2019). After all, Congress's choice of voice "might have more to do with Congress's writing style than its intent." *Wisniewski* v. *Rodale, Inc.*, 510 F.3d 294, 302 n.19 (3d Cir. 2007). Courts therefore have not "consider[ed] Congress's use of the passive voice a reliable guide to its intent to create personal rights." *Ibid.*; see *D.O.* v. *Glisson*, 847 F.3d 374, 379 (6th Cir. 2017); *Schwier*, 340 F.3d at 1296.

This Court has rejected attempts "to distinguish the import of" active-voiced directions to States "from the 'No person shall' language  *  *  *  held up in

- 11 -

*Gonzaga* as the prototypical rights-creating language." *S.D. ex rel. Dickson* v. *Hood*, 391 F.3d 581, 603 (5th Cir. 2004) (citation omitted). It has found numerous statutes to create personal rights despite being directed to regulated parties. See, *e.g.*, *Legacy Cmty. Health Servs.*, 881 F.3d at 371-372; *Romano*, 721 F.3d at 378-379; *Johnson* v. *Housing Auth. Of Jefferson Par.*, 442 F.3d 356, 363 (5th Cir. 2006). The Materiality Provision is no different. While "[t]he subject of the sentence is the person acting under color of state law," the "focus of the text is nonetheless the protection of each individual's right to vote." *Schwier*, 340 F.3d at 1296. The Provision clearly creates a personal right.

2. Because plaintiff asserted its cause of action under Section 1983, intervenors err in asking whether the Materiality Provision itself "indicates an intent to authorize private suits." Br. 28. "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284. Hence, the relevant question is not whether plaintiff has shown that the Provision creates a private remedy, but rather whether intervenors can "meet [their] burden of showing that 'Congress specifically foreclosed a remedy under § 1983.'" *Romano*, 721 F.3d at 377 (citation omitted).

Intervenors have not met that burden. They have not even attempted to show that the Provision "expressly" denies private parties a Section 1983 remedy. *Gonzaga*, 536 U.S. at 284 n.4. Nor could they—no such language exists.

- 12 -

Likewise, intervenors have not "ma[d]e the difficult showing" that the statute

contains a "carefully tailored scheme" inconsistent with Section 1983 remedies.

*Blessing*, 520 U.S. at 346 (citation omitted).  Again, there is none.

Instead, intervenors argue (Br. 25-26) that by including a right of action for

the Attorney General, see 52 U.S.C. 10101(c), Congress precluded a right of action

for private plaintiffs.  Not so.  See *Migliori*, 36 F.4th at 161-162; *Schwier*, 340 F.3d

at 1296.  Congress added these "specific references to the Attorney General" not to

displace private enforcement, but rather "to give the Attorney General power to

bring suit to enforce what might otherwise be viewed as 'private' rights."  *Allen* v.

*State Bd. of Elections*, 393 U.S. 544, 555 n.18 (1969) (discussing near-identical

provision of Voting Rights Act and citing Section 10101 case).

Regardless, the existence of a public remedy cannot rebut the presumption in

favor of applying Section 1983.  Instead, it is "the existence of a more restrictive

*private* remedy for statutory violations" that draws "the dividing line between

those cases in which we have held that an action would lie under § 1983 and those

in which we have held that it would not."  *Fitzgerald* v. *Barnstable Sch. Comm.*,

555 U.S. 246, 256 (2009) (emphasis added; citation omitted); see *Migliori*, 36

F.4th at 162.  The *Blessing* Court rejected an argument similar to intervenors' for

this reason, holding that the government's purported "authority to sue for specific

- 13 -

performance" was not an "administrative enforcement arsenal" that could displace Section 1983.  520 U.S. at 348.

The Materiality Provision does not contain a "more restrictive" private remedy.  *Fitzgerald*, 555 U.S. at 256.  On the contrary, Section 10101(d) provides district courts with "jurisdiction of proceedings instituted pursuant to this section" and states that they "shall exercise the same without regard to whether *the party aggrieved* shall have exhausted any administrative or other remedies that may be provided by law."  52 U.S.C. 10101(d) (emphasis added).  Congress added this provision to overturn cases holding that plaintiffs must exhaust state-law remedies before bringing civil rights suits.  1957 House Report 10-12.  Congress instead sought to require courts to exercise jurisdiction "regardless of whether or not *the party thereto* shall have any administrative or other remedies provided by law."  *Id.* at 12 (emphasis added).  Congress's text mirrors its purpose.  This subsection's reference to "the party aggrieved" rather than only to "the United States," and its language releasing plaintiffs from exhaustion requirements, clearly contemplate private enforcement.  See *Schwier*, 340 F.3d at 1296; compare 52 U.S.C. 10101(c) (authorizing suits by the Attorney General without imposing any exhaustion

- 14 -

requirement for Section 10101(d) to remove).  Private parties therefore may sue

under Section 1983.[5]

## II

## THE MATERIALITY PROVISION PROHIBITS ACTS BEYOND RACIAL DISCRIMINATION

1.  Intervenors next argue (Br. 29-31) that the Materiality Provision applies

only to racially discriminatory laws.  Even the barest look at the statutory language

refutes this claim.  The Provision prohibits any "person acting under color of law"

from "deny[ing] the right of any individual to vote in any election because of an"

immaterial "error or omission on any record or paper relating to any application,

registration, or other act requisite to voting."  52 U.S.C. 10101(a)(2)(B).  Nowhere

does the Provision's text so much as mention race, much less suggest that racial

discrimination is required to trigger its application.  Rather, it provides a broader

_____

[5]  Indeed, Section 10101(d)'s express language may eliminate the need even
to rely on Section 1983.  See *Allen*, 393 U.S. at 555 n.18.  Moreover, while the
Court need not reach the question, text, history, and precedent prove that private
plaintiffs also have an implied right of action under the Materiality Provision itself.
For instance, when Congress intended to withhold any of Section 10101's
enforcement procedures from private parties, it said so in the statute.  Compare 52
U.S. 10101(d) (jurisdiction over all "proceedings instituted pursuant to this
section," without exhaustion requirements for any "party aggrieved"), with 52
U.S.C. 10101(e) (pattern-or-practice claim only available in cases "instituted
pursuant to subsection (c)"); 52 U.S.C. 10101(g) (three-judge court in certain
"proceeding[s] instituted by the United States").  Likewise, when Congress added
federal enforcement authority for Section 10101, it recognized—and did nothing to
alter—a three-quarter-century long history of private enforcement.  See 1957
House Report 12; *Schwier*, 340 F.3d at 1295.

limitation on state or local actions that deny anyone's right to vote based on immaterial errors or omissions.

Statutory context buttresses this plain-text reading. A neighboring provision, 52 U.S.C. 10101(a)(1), *does* mention race, mandating that otherwise-qualified voters "shall be entitled and allowed to vote * * * without distinction of race, color, or previous condition of servitude." Likewise, 52 U.S.C. 10101(e) limits pattern-or-practice claims to circumstances in which people are "deprived on account of race or color of any right or privilege secured by subsection (a)." Courts "generally presume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *Intel Corp. Inv. Pol'y Comm.* v. *Sulyma*, 140 S. Ct. 768, 777 (2020) (citation and alteration omitted).

Indeed, Section 10101(a)(1) already covers the waterfront of direct racial discrimination in voting, and had done so for 94 years before Congress added the Materiality Provision. As a ban on racial discrimination in voting "is already explicitly achieved by *another* portion of" the same statute, restricting the Provision to discriminatory laws would "render[]" it "superfluous." *FCC* v. *NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 307 (2003).

For their contrary argument, intervenors rely principally—and incorrectly—on *Broyles* v. *Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), aff'd, 381 F.

App'x 370 (5th Cir. 2010). *Broyles* suggested that a prior Fifth Circuit decision, *Kirksey* v. *City of Jackson*, 663 F.2d 659 (5th Cir. 1981), had "reasoned that" the Provision "is 'coterminous with the Fifteenth Amendment'" and that *Kirksey* had therefore held that it only prohibits intentional racial discrimination. *Broyles*, 618 F. Supp. 2d at 697. But *Broyles* mixed up its statutes. As the district court correctly noted, *Kirksey* was talking about Section 2 of the Voting Rights Act (VRA), not the Materiality Provision of the Civil Rights Act. ROA.517; see *Kirksey*, 663 F.2d at 664-665. And unlike Section 2, the Materiality Provision is not written in racial terms.[6]

2. Intervenors assert briefly (Br. 30-31) that applying the Materiality Provision beyond racial discrimination would pose constitutional difficulties. But constitutional avoidance finds no purchase where, as here, the proposed limiting construction is not a "plausible construction of the text." *Johnson* v. *Arteaga-Martinez*, 142 S. Ct. 1827, 1833 (2022). And even if it were, no avoidance is necessary, because the Provision validly enforces the Fifteenth Amendment.

---

[6] Intervenors' other cases are no more persuasive. One erroneously relied on Section 10101's purpose and Fifteenth-Amendment foundation, without even discussing its text. *Indiana Democratic Party* v. *Rokita*, 458 F. Supp. 2d 775, 839 & n.106 (S.D. Ind. 2006), aff'd on other grounds *sub nom. Crawford* v. *Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), aff'd, 553 U.S. 181 (2008). The other merely rejected an attempt "to apply the statute to the inner workings and negotiations of a state political party convention." *Thrasher* v. *Illinois Republican Party*, No. 4:12-CV-4071, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013).

- 17 -

The Fifteenth Amendment prohibits citizens' right to vote from being "denied or abridged  *  *  *  on account of race" and provides that Congress "shall have the power to enforce" the Amendment "by appropriate legislation." U.S. Const. Amend. XV. Contrary to intervenors' assertions (Br. 30-31), the "congruence and proportionality" standard applicable to Fourteenth Amendment legislation, see *City of Boerne* v. *Flores*, 521 U.S. 507, 520 (1997), does not apply to the Fifteenth Amendment. Rather, Fifteenth Amendment legislation remains subject to the rationality standard articulated in *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819). See *Northwest Austin Mun. Util. Dist. No. One* v. *Holder*, 557 U.S. 193, 204 (2009) (expressly declining to resolve parties' dispute over whether *City of Boerne* or *McCulloch* controlled); *Shelby Cnty.* v. *Holder*, 570 U.S. 529, 556 (2013) (invalidating VRA's coverage formula only after finding that Congress's justification was "irrational"). Under this deferential test, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina* v. *Katzenbach*, 383 U.S. 301, 324 (1966). These means may extend beyond bans on intentional discrimination. See *City of Rome* v. *United States*, 446 U.S. 156, 177 (1980).

However, the Materiality Provision easily passes muster under both the *McCulloch* and *City of Boerne* tests. Evidence before Congress indicated that "[a]mong the devices most commonly employed" to prevent Black voters from

- 18 -

registering was "applying more rigid standards of accuracy to Negroes than white[]
[registrants], thereby rejecting Negro applications for minor errors or omissions."
H.R. Rep. No. 914, Pt. 2, 88th Cong., 1st Sess. 5 (1963) (additional views of Rep.
McCulloch et al.).  Indeed, "[t]estimony show[ed] that * * * registrars will
overlook minor misspelling errors or mistakes in age or length of residence of
white applicants, while rejecting a Negro application for the same or more trivial
reasons." *Ibid.*  Congress also had before it a 1961 Commission on Civil Rights
report documenting widespread denials of Black applicants' registration forms for
immaterial errors—such as failing to correctly compute age in years, months, and
days—as well as a list of voting rights cases brought by the Department of Justice
for similar discriminatory practices.[7]

Congress properly determined that this crisis necessitated a general
prohibition on denying the right to vote for immaterial errors or omissions.
Particularly since Congress's "previous legislative attempts" to solve this "difficult
and intractable problem" through prohibitions on racial discrimination "had

---

[7] See Comm'n on C.R., Voting:  1961 Commission on Civil Rights Report,
Book 1, 54-57, 59, 66, 86, (1961) (1961 Commission Report), https://www.crmvet.
org/docs/ccr_61_voting.pdf; *Miscellaneous Proposals Regarding the Civil Rights
of Persons Within the Jurisdiction of the United States:  Hearings Before
Subcomm. No. 5 of the H. Comm. on the Judiciary*, 88th Cong., 1st Sess. 951,
1099, 1380 (1963) (referencing practices in 1961 Commission Report); *Literacy
Tests and Voter Requirements in Federal and State Elections:  Hearings Before the
Subcomm. On Const. Rights of the Comm. on the Judiciary*, 87th Cong., 2d Sess.
515-522 (1962) (Department's list of cases).

failed." *Nevada Dep't of Hum. Res.* v. *Hibbs*, 538 U.S. 721, 737 (2003) (citation

and alteration omitted) (discussing gender discrimination); see 1963 House Report

19; *Florida State Conf. of NAACP* v. *Browning*, 522 F.3d 1153, 1173 (11th Cir.

2008) (noting that "[s]tatutes enacted in 1870, 1871, 1957, and 1960" were

"unsuccessful").  Indeed, the Supreme Court unanimously upheld Congress's

nationwide ban on literacy tests for similar reasons—even though such tests were

not per se unconstitutional and the ban contained no race-discrimination

requirement.  See *Oregon* v. *Mitchell*, 400 U.S. 112, 118 (1970) (opinion of Black,

J.).

### III

### THIS COURT SHOULD DECLINE INTERVENORS' ATTEMPTS TO RESTRICT THE MATERIALITY PROVISION

This Court should reject three additional arguments that intervenors (Br. 32-

36) and the stay panel (Stay Op. 11-13) have made about the Materiality

Provision's scope.  First, the statute's definition of "vote" encompasses registration

methods, and the Provision does not excuse denying the right to register simply

because rejected applicants can try to register again.  Second, States cannot evade

the Materiality Provision's reach just by mandating that voters meet whatever

procedural requirements the State prefers to register or vote.  And third, simply

invoking hypothetical fraud-prevention interests cannot render a procedural

requirement material, particularly where, as here, ample evidence proves that the requirement serves no such purpose.

A.　*Laws That Reject Registration Applications Deny The "Right To Vote" Under The Materiality Provision, Even If Applicants Can Try Again*

Intervenors assert that the Wet Signature Rule does not implicate the "right to vote" because applicants receive notice of any rejected registration form and a time-limited opportunity to cure the error.  Br. 32-33.  The stay panel agreed, positing that otherwise "an individual's failure to comply with *any* registration requirement would deprive that person of the right to vote," which would "prove[] too much."  Stay Op. 11.  These arguments ignore both the statute's definition of "vote" and the practical implications of such a ruling on denied applicants.

The Materiality Provision does not rely on a colloquial conception of the "right to vote," or on courts' definition of the phrase for constitutional purposes. Rather, the statute itself defines "the word 'vote'" to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting."  52 U.S.C. 10101(a)(3)(A) and (e). Since Section 10101 defines "vote" to include the entire voting process, including registration, "that addition to the plain meaning controls."  *Tanzin* v. *Tanvir*, 141 S. Ct. 486, 490 (2020).  The Provision thus prohibits state actors from "deny[ing] the right of any individual to [*register*] in any election" because of a paperwork error "relating to any application, registration, or other act" that "is not material in

determining whether" the applicant "is qualified under State law to [register]."  52

U.S.C. 10101(a)(2)(B).

Because the Wet Signature Rule requires registrars to reject faxed

registration applications for failure to include a wet signature, it violates the

Provision's statutorily-defined right to vote.  It does not matter that the State

provides an opportunity to cure:  The statute "does not say that state actors may

initially deny the right to vote based on errors or omissions that are not material as

long as they institute cure processes." *La Unión del Pueblo Entero* v. *Abbott*, No.

5:21-cv-0844, 2022 WL 1651215, at *21 (W.D. Tex. May 24, 2022); see *Sixth

Dist. of Afr. Methodist Episcopal Church* v. *Kemp*, 574 F. Supp. 3d 1260, 1282

(N.D. Ga. 2021) (similar).  A denial occurs at the first rejection, whatever happens

afterward.  And even with a cure process, the fact remains that no applicant can

register or vote unless she ultimately can provide a copy of her application with a

wet signature.  As the district court noted, "[e]ven if the registrant has the

opportunity to cure any deficiencies, a registrant who is unable to print or provide

postage for the form or one who is unable to personally deliver the form will not be

registered to vote, and therefore, cannot vote."  ROA.1801.

Nor does the theoretical option of registering a different way absolve state

officials who prevent people from registering by fax based on immaterial errors.

Particularly since some voters may not be able to register any other way

(ROA.1801), or would miss a registration deadline if their initial faxed registration is rejected. Once Texas decided to offer registration-by-fax, it was obliged to follow federal law—including the Materiality Provision—in offering that option. See *Harper* v. *Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966); cf. *La Unión del Pueblo Entero*, 2022 WL 1651215, at 21 n.20 (rejecting argument that Provision "only protects the right to vote in person, not by mail").

Moreover, failure to comply with registration requirements like the Wet Signature Rule denies some voters' right to vote even under intervenors' cramped reading. The "right of registration" is both "a prerequisite to," and inextricably intertwined with, the "right to vote." *Myers* v. *Anderson*, 238 U.S. 368, 376-377 (1915). This is why restrictions on *registration* have long been viewed as denying the right to *vote*. See, *e.g.*, *Louisiana* v. *United States*, 380 U.S. 145, 150, 152-153 (1965); *Lane* v. *Wilson*, 307 U.S. 268, 275-276 (1939). Indeed, were refusal to accept a voter's registration application *not* considered a denial of the right to vote under the Materiality Provision, the Provision's reference to errors or omissions on "any application" or "registration" would make little sense. 52 U.S.C. 10101(a)(2)(B).

It is not this natural reading but rather intervenors' atextual, narrow one that "proves too much." Stay Op. 11. If the ability to cure an error by submitting a second, corrected registration form could negate the Materiality Provision, then no

barrier before the close of voter registration *ever* would violate the Provision, because theoretically voters always could complete a registration form correctly another time. Even the precise practices that Congress passed the Provision to eliminate—such as registrars' refusals to register Black voters for incorrectly calculating their age in months and days, or putting information in the wrong spot on their forms—would not trigger the statute's protections. See p. 18 & n.7, *supra*. "That result not only would defy common sense, but also would defeat Congress' stated objective" of entirely eliminating such errors as a barrier to voters' ability to register and vote. *Quarles* v. *United States*, 139 S. Ct. 1872, 1879 (2019). "We should not lightly conclude that Congress enacted a self-defeating statute." *Ibid.*

B.    *States Cannot Define Away The Materiality Provision's Protections*

Intervenors also argue (Br. 34-35)—and the stay panel agreed (Stay Op. 13)—that because compliance with the Wet Signature Rule is required to register, it must be material. That reading turns the Materiality Provision on its head. It would let States control the content of a federal statute, simply by adding procedural requirements to their state codes. In reality, however, the Provision sets a federal standard for reviewing States' voting-related paperwork mandates, measuring them against only a small number of state voter qualifications.

The Materiality Provision prevents States from "requiring unnecessary information for voter registration" and then using errors or omissions in providing

that information as "an excuse to disqualify potential voters." *Schwier*, 340 F.3d at 1294. For a state law or official's action to violate the Provision, it must (1) deny the right of "any individual" to vote in an election, as defined by the statute, (2) for an "error or omission," (3) on a "record or paper," (4) "relating to any application, registration, or other act requisite to voting," and (5) that is not "material in determining whether" that "individual is qualified under State law to vote in such election." 52 U.S.C. 10101(a)(2)(B). The principal inquiry is whether the state-law error—here, providing a copy of a digitally-uploaded signature rather than a wet ink signature—is material to determining whether a voter is qualified.

To answer this question, a court first must identify the State's voter qualifications, as determined at the stage of the voting process at which the error or omission occurs, such as eligibility requirements to register or to vote by absentee ballot. See, *e.g.*, *Migliori*, 36 F.4th at 156; *Schwier*, 340 F.3d at 1297. Second, the court must determine which of these qualifications the challenged rule or action purportedly enforces, and how. Third, the court must "ask[] whether, accepting the error *as true and correct*, the information contained in the error is material to determining the eligibility of the applicant." *Browning*, 522 F.3d at 1175. The court ultimately must determine whether the voter's error or omission in meeting the challenged requirement would, as a practical matter, change officials'

determination of whether the applicant meets whichever voter qualifications the requirement purportedly enforces.

Crucially, the Materiality Provision distinguishes between the few prerequisites that one must meet to be "qualified" to vote and the many additional procedural requirements that merely enforce, measure, or confirm those underlying qualifications.  52 U.S.C. 10101(a)(2)(B).  The category of qualifications is limited to certain substantive characteristics, like age and citizenship, that are "germane to one's ability to participate intelligently in the electoral process."  *Harper*, 383 U.S. at 668; see Tex. Elec. Code Ann. § 13.001 (West 2022).  All other regulations— including those around "registration" and "counting of votes," *Smiley* v. *Holm*, 285 U.S. 355, 366 (1932)—fall outside that category.  While such procedural requirements might help officials enforce the States' qualifications, they do not themselves *become* voter qualifications simply because state law mandates them. See, *e.g.*, *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013) (distinguishing between setting qualifications and "obtaining the information necessary to enforce" those "qualifications").

So, too, whether one is "qualified" under the Materiality Provision turns on whether one possesses characteristics such as age, citizenship, and residence, not whether one "fail[s] to follow needlessly technical instructions, such as the color of ink to use in filling out the form."  *Diaz* v. *Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D.

Fla. 2006); see *Schwier*, 340 F.3d at 1297.  Materiality thus turns on whether an error or omission actually affects "whether such individual is qualified under State law to vote," 52 U.S.C. 10101(a)(2)(B), not merely on whether it violates a state-law requirement.[8]

Intervenors' contrary interpretation would nullify the Materiality Provision. If any procedural requirement a legislature imposes becomes a voter qualification, then errors or omissions in meeting *any* aspect of state election law automatically would be material to determining whether the voter was qualified.  No denial of the right to vote could violate the Provision.  Though the Provision applies solely to errors or omissions "on any record or paper," intervenors' interpretation would allow States to deny the right to vote for the minutest errors on the clearest examples of such papers—such as voter "registration[s]" and mail ballot "application[s]"—because any error necessarily would violate state procedural rules around filling out the forms.  52 U.S.C. 10101(a)(2)(B).

---

[8]  Contemporaneous definitions of "qualified" confirm this understanding. See, *e.g.*, 2 *New Century Dictionary of the English Language* 1443 (H.G. Emery et al. eds. 1963) ("Furnished with qualities; also, possessed of qualities or accomplishments which fit one for some function or office; having qualifications required by law or custom."); *Random House Dictionary of the English Language* 1174 (1966) (second definition) ("[H]aving the qualities, accomplishments, etc., required by law or custom for getting, having, or exercising a right, holding an office, or the like.").

Indeed, under intervenors' interpretation, the Materiality Provision would not have covered the very mechanisms of vote denial that Congress passed the Provision to override.  For instance, while the Louisiana Constitution allowed anyone age 21 or over to vote at the time, it also required registrants to list their age not only in years but also in days and months.  See 1961 Commission Report 56.  Congress sought to prohibit registrars from refusing to register voters merely for incorrectly calculating the days and months of their age.  See p. 18 & n.7, *supra*.  Yet if every requirement that States set to register or vote were deemed a "qualification," then errors in calculating even the days of one's age would be material to determining voter qualifications, and so would fall outside the Provision's reach.  Congress did not enact such "a self-defeating statute."  *Quarles*, 139 S. Ct. at 1879.

C.    *Fraud-Prevention Concerns Cannot Justify The Wet Signature Rule*

Finally, both intervenors (Br. 35-37) and the stay panel (Stay Op. 12, 15) have relied on various theoretical anti-fraud rationales to justify the Wet Signature Rule.  These rationales lack merit.  The Materiality Provision's text provides for no burden-interest balancing or affirmative defenses.  Procedural requirements pass muster under the Provision only if they are "material in determining whether" voters are "qualified"—whatever other freestanding rationales States may provide. 52 U.S.C. 10101(a)(2)(B).  Anti-fraud measures like voter-ID or signature-

matching requirements can meet this test, if they determine would-be registrants'
or voters' qualifications indirectly by verifying their identities.  But they must be
*needed* for this purpose—duplicative or irrelevant requirements, by definition, are
not material.  And the factual record in this case proved that the wet-ink form of a
signature plays no role in verifying Texas voters' identities.  Intervenors' *post hoc*
invocation of fraud cannot render the Rule material.

Intervenors' arguments often conflate the Wet Signature Rule with a more
generalized requirement to provide a signature at all.  Br. 35-37.  As the district
court noted, however, plaintiff challenges only the requirement that registrants-by-
fax also mail or hand-deliver copies of the registration form with a *wet* signature.
ROA.1801-1802.  It does not challenge Texas's general requirement that
applications "be in writing and signed."  Tex. Elec. Code Ann. § 13.002(b) (West
2022).  Providing a copy of the registration form with a wet signature that was
digitized and then printed, instead of with the wet signature itself, makes no
material difference when determining if applicants are qualified to register and
vote.  See ROA.1801-1808.

Texas's decision to accept digitized signatures on registration forms
completed at Texas Department of Public Safety (DPS) offices, as well as on vital
documents like contracts or divorce decrees, undercuts intervenors' claim that
provision of a wet signature aids in verifying applicants' identity, improving their

information's accuracy, or solemnizing the registration submission process.
ROA.1802-1803; cf. *Migliori*, 36 F.4th at 163.  Testimony from election officials
confirmed that the Wet Signature Rule does not serve these purposes.  Rather than
being used to "check for 'fraud' or to verify identity during the registration
process," registrars testified that signatures are examined only for legibility and to
confirm that the registration form itself is complete.  ROA.1805-1806.  Then, no
matter the method of registration, registrars send *electronic* versions of voters'
information and signatures to the Secretary of State for verification against DPS
records.  ROA.1806.  Even when conducting criminal fraud investigations,
officials use scanned images of signatures, not the original "wet" versions, as
comparators.  ROA.1807.  These facts show that the Wet Signature Rule is not
material to determining voters' qualifications.

- 30 -

## CONCLUSION

This Court should hold that private plaintiffs may enforce the Materiality

Provision and reject intervenors' calls to narrow its scope.

<div style="margin-left: 50%">

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

</div>

**CERTIFICATE OF SERVICE**

I certify that on November 2, 2022, I electronically filed the foregoing

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF

PLAINTIFF-APPELLEE ON THE ISSUES ADDRESSED HEREIN with the

Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by

using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

# CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE ON THE ISSUES ADDRESSED HEREIN:

(1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6472 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point Times New Roman font.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
  Attorney

Date:  November 2, 2022