No. 22-50536

# In the United States Court of Appeals for the Fifth Circuit

Vote.org,

*Plaintiff-Appellee,*

*v.*

Jacquelyn Callanen, et al.

*Defendants,*

*v.*

Ken Paxton, In His Official Capacity as the Attorney General of Texas; Lupe C. Torres, In His Official Capacity as the Medina County Elections Administrator; Terrie Pendley, In Her Official Capacity as the Real County Tax Assessor-Collector,

*Intervenor Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## REPLY BRIEF FOR APPELLANTS

*(Counsel Listed on Inside Cover)*

Robert Henneke
General Counsel

Chance Weldon
Director of Litigation

Autumn Hamit Patterson
Senior Attorney
apatterson@texaspolicy.com

Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

Counsel for Intervenor Defendants-
Appellants Lupe C. Torres and Terrie
Pendley

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Judd E. Stone II
Solicitor General

Michael R. Abrams
Assistant Solicitor General
Michael.Abrams@oag.texas.gov

Kathleen T. Hunker
Special Counsel

Sara B. Baumgardner
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Intervenor Defendant-
Appellant Ken Paxton, Attorney
General of Texas

# Table of Contents

Page(s)

Table of Authorities ................................................................................. ii

Introduction ......................................................................................... 1

Argument ............................................................................................ 2

    I.   Plaintiff Lacks Standing. ............................................................ 2

        A.  Plaintiff has not shown a diversion of resources distinct from its normal operations ....................................................... 2

        B.  Plaintiff's injury, if any, is not traceable to HB 3107. ............ 4

        C.  Section 1983 precludes plaintiff from basing its standing on the rights of Texas voters. ............................................ 6

    II.  The Original Signature Requirement Does Not Violate Section 1971. ........................................................................................ 9

        A.  Plaintiff does not have a private right of action. ................... 9

        B.  Plaintiff cannot prevail on a section 1971 claim absent evidence of racial discrimination. ...................................... 13

        C.  The original signature requirement does not deprive anyone of the right to vote and is material to whether an individual is a qualified voter ................................................................ 15

    III.  The Original Signature Requirement Does Not Violate the Constitution. ........................................................................... 18

Conclusion .......................................................................................... 24

Certificate of Service ........................................................................... 25

Certificate of Compliance ................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Adkins v. Silverman,*
  899 F.3d 395 (5th Cir. 2018) .................................................................11

*Alexander v. Sandoval,*
  532 U.S. 275 (2001).............................................................................11

*Allen v. Cooper,*
  140 S. Ct. 994 (2020) ..........................................................................13

*Allen v. State Board of Elections,*
  393 U.S. 544 (1969) ............................................................................11

*Ark. State Conference NAACP v. Ark. Bd. of Apportionment,*
  586 F. Supp. 3d 893 (E.D. Ark. 2022)...................................................11

*Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health &*
  *Mental Retardation Ctr. Bd. of Trs.,*
  19 F.3d 241 (5th Cir. 1994) .................................................................. 3

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
  178 F.3d 350 (5th Cir. 1999) ............................................................ 2, 5

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021) ...................................................................... 10

*Carey v. Population Servs. Int'l,*
  431 U.S. 678 (1977) ......................................................................... 7, 8

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ...................................................................... 13, 14

*City of Mobile v. Bolden,*
  446 U.S. 55 (1980) ..............................................................................13

*City of Rancho Palos Verdes v. Abrams,*
  544 U.S. 113 (2005)........................................................................... 12

*Clingman v. Beaver,*
  544 U.S. 581 (2005) .......................................................................... 20

*Coon v. Ledbetter,*
  780 F.2d 1158 (5th Cir. 1986) ............................................................ 6

*Craig v. Boren,*
  429 U.S. 190 (1976)......................................................................... 7, 8

*Crawford v. Marion County Election Board*,
　553 U.S. 181 (2008) ............................................................ 18, 19, 20

*Ctr. for Biological Diversity v. EPA*,
　937 F.3d 533 (5th Cir. 2019) ............................................................ 3

*Danos v. Jones*,
　652 F.3d 577 (5th Cir. 2011) ............................................................ 6

*In re Deberry*,
　945 F.3d 943 (5th Cir. 2019) ........................................................... 11

*Def. Distributed v. U.S. Dep't of State*,
　121 F. Supp. 3d 680 (W.D. Tex. 2015) .............................................. 7

*Delancey v. City of Austin*,
　570 F.3d 590 (5th Cir. 2009) .......................................................... 10

*Duncan v. Johnson-Mathers Health Care, Inc.*,
　2010 WL 3000718 (E.D. Ky. July 28, 2010) .................................... 10

*El Paso County v. Trump*,
　982 F.3d 332 (5th Cir. 2020) ......................................................... 3, 4

*Evanston Ins. Co. v. Mid-Continent Cas. Co.*,
　909 F.3d 143 (5th Cir. 2018) .......................................................... 21

*Ezell v. City of Chicago*,
　651 F.3d 684 (7th Cir. 2011) ......................................................... 8, 9

*Gonzaga Univ. v. Doe*,
　536 U.S. 273 (2002) ................................................................... 10, 11

*Grammer v. John J. Kame Reg'l Ctrs.-Glen Hazel*,
　570 F.3d 520 (3d Cir. 2009) .......................................................... 10

*Hang On, Inc. v. City of Arlington*,
　65 F.3d 1248 (5th Cir. 1995) ......................................................... 7, 8

*La. ACORN Fair Housing v. LeBlanc*,
　211 F.3d 298 (5th Cir. 2000) ......................................................... 3, 4

*League of Latin Am. Citizens v. Abbott*,
　2022 WL 1631301 (W.D. Tex. May 23, 2022) .................................. 3, 5

*Lemons v. Bradbury*,
　538 F.3d 1098 (9th Cir. 2008) ....................................................... 18

*Lepelletier v. FDIC*,
　164 F.3d 37 (D.C. Cir. 1999) ......................................................... 7, 8

*Liptak v. Ramsey County*,
　2016 WL 5349429 (D. Minn. Sept. 23, 2016) ................................. 10

iii

*In re Lopez,*
    897 F.3d 663 (5th Cir. 2018) .................................................13

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................... 4

*Mays v. LaRose,*
    951 F.3d 775 (6th Cir. 2020) ............................................ 20

*Md. Shall Issue, Inc. v. Hogan,*
    971 F.3d 199 (4th Cir. 2020) ............................................. 8

*Migliori v. Cohen,*
    36 F.4th 153 (3d Cir. 2022) .............................................. 9

*Migliori v. Lehigh Cnty. Bd. of Elections,*
    2022 WL 802159 (E.D. Pa. Mar. 16, 2022) .........................11

*Morse v. Republican Party of Virginia,*
    517 U.S. 186 (1996) .........................................................11

*Munro v. Socialist Workers Party,*
    479 U.S. 189 (1986) ........................................................ 22

*NAACP v. City of Kyle,*
    626 F.3d 233 (5th Cir. 2010) ............................................. 3

*Oregon v. Mitchell,*
    400 U.S. 112 (1970) ........................................................ 14

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925)...................................................... 7, 8

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott,*
    748 F.3d 583 (5th Cir. 2014) ............................................. 8

*Powers v. Ohio,*
    499 U.S. 400 (1991) ...................................................... 6, 7

*Reno v. Bossier Par. Sch. Bd.,*
    520 U.S. 471 (1997)........................................................13

*Richardson v. Texas Secretary of State,*
    978 F.3d 220 (5th Cir. 2020).....................................*passim*

*Ritter v. Migliori,*
    142 S. Ct. 1824 (2022) ................................................ 15, 16

*Schwier v. Cox,*
    340 F.3d 1284 (11th Cir. 2003)......................................... 9

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ....................................................... 14

iv

*Stringer v. Pablos,*
  320 F. Supp. 3d 862 (W.D. Tex. 2018) ...............................................16
*Stringer v. Whitley,*
  942 F.3d 715 (5th Cir. 2019) .............................................................16
*Tennessee v. Lane,*
  541 U.S. 509 (2004) ...........................................................................13
*Tenth St. Residential Ass'n v. City of Dallas,*
  968 F.3d 492 (5th Cir. 2020) ............................................................. 3
*Tex. League of United Latin Am. Citizens v. Hughs,*
  978 F.3d 136 (5th Cir. 2020) ................................................20, 21, 22
*Tex. State LULAC v. Elfant,*
  No. 22-50690, 2022 WL 14782530 (5th Cir. Oct. 26, 2022) ......................1, 4, 5
*United States v. Bonilla-Mungia,*
  422 F.3d 316 (5th Cir. 2005) ............................................................ 14
*United States v. Mississippi,*
  380 U.S. 128 (1965) ...........................................................................13
*United States v. Ward,*
  345 F.2d 857 (5th Cir. 1965) .............................................................15
*Veasey v. Abbott,*
  13 F.4th 362 (5th Cir. 2021) ............................................................ 14
*Veasey v. Abbott,*
  830 F.3d 216 (5th Cir. 2016) (en banc) ............................................ 22
*Vote.org v. Callanen,*
  39 F.4th 297 (5th Cir. 2022) ...................................................*passim*
*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) .......................................................................11

**Constitutional Provisions, Statutes, and Rules:**

Tex. Const. art. VI, § 2(a) .....................................................................16
20 U.S.C. § 1681(a) .............................................................................. 10
42 U.S.C.:
  § 1983 .............................................................................*passim*
  § 2000d ....................................................................................... 10
52 U.S.C.:
  § 10101(a) ....................................................................................13
  § 10101(a)(1) ...............................................................................13

§ 10101(a)(2) ............................................................................13

§ 10101(a)(2)(B).............................................................. 10, 12, 16

§ 10101(a)(3) ............................................................................13

§ 10101(b) ................................................................................13

§ 10101(c)................................................................................. 12

§ 10101(d) ................................................................................ 12

§ 10101(e) ................................................................................ 12

§10101(g) ................................................................................. 12

Pub. L. No. 85-315, § 131(d), 71 Stat. 637 ........................... 12

Tex. Elec. Code:

§ 11.002(a)(6) ..........................................................................16

§ 13.002(a) .............................................................................. 20

§ 13.003 ................................................................................... 20

§ 20.001 .................................................................................. 20

§ 20.122 .................................................................................. 20

§ 31.003 ..................................................................................... 5

Fed. R. Evid. 201(b) .............................................................. 21

**Other Authorities:**

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41
(1982) ...................................................................................... 7

*Nextdoor and Vote.org Team Up to Help Neighbors Get the Vote Out*,
Nextdoor Blog (Aug. 25, 2020).......................................... 5

Tex. Sec'y of State, *November 2020 Voter Registration Figures*,
https://www.sos.state.tx.us/elections/historical/nov2020.shtml.................... 21

Tex. Sec'y of State, *November 2022 Voter Registration Figures*,
https://www.sos.state.tx.us/elections/historical/nov2022.shtml ................... 21

The Civil Rights Act of 1964: Legislative History; Pro and Con Arguments
(Paul M. Downing, ed. 1965)……………………………………..….17

# Introduction

Plaintiff claims that HB 3107's original signature requirement makes Texas's voter registration process more onerous. The record tells a different story. Plaintiff does not provide evidence of even one voter who was unable to complete registration because of the requirement. That alone should dispel any notion that HB 3107 offends the Civil Rights Act or the Constitution.

But as defendants explained in their opening brief, plaintiff lacks standing, so the Court cannot reach the merits of those questions. The Court's organizational standing precedents require plaintiff to show that HB 3107 "perceptibly impaired" the organization's mission by requiring a diversion of "significant resources" to counteract the law's effects. *Tex. State LULAC v. Elfant*, No. 22-50690, 2022 WL 14782530, at *3 (5th Cir. Oct. 26, 2022). The only specific project that plaintiff claims it diverted resources to—a partnership with a social media platform called Nextdoor—launched a year *before* HB 3107 was enacted to assist voters around the country. The outlay of resources to a nationwide voting outreach effort is insufficient to establish an injury directly traceable to HB 3107.

Even if plaintiff could surmount its Article III standing problems, plaintiff still has not shown a violation of its personal constitutional rights. Plaintiff's attempt to sidestep section 1983's textual command and maintain standing based on a vendor-vendee relationship theory is unavailing. Vote.org offers its web app free of charge. Its users' inability to access its app is not the kind of financial harm that could buttress a viable third-party standing argument.

Nor has plaintiff shown it can maintain a section 1971 claim. Plaintiff has no private right under the materiality provision that it can enforce and, even if it did, plaintiff failed to allege, much less prove, that the original signature requirement has a racially discriminatory intent or effect. On the merits, the original signature requirement (1) is material to determining whether individuals are qualified to vote under state law and (2) does not deny anyone's right to vote or register.

Finally, plaintiff barely defends the district court's holding that HB 3107 violates the First and Fourteenth Amendments. Plaintiff does not attempt to show that HB 3107 injures all or even most Texas voters. A disagreement with how Texas has chosen to combat voter fraud does not amount to a constitutional infirmity.

HB 3107 was an uncontroversial election bill that sailed through the Texas Legislature by a combined vote of 177-0. ROA.3150-52. This Court does not lightly cast aside duly enacted state statutes governing elections, and plaintiff and its amici offer no reason for the Court to do so here.

### ARGUMENT

## I.  Plaintiff Lacks Standing.

### A.  Plaintiff has not shown a diversion of resources distinct from its normal operations.

Like all plaintiffs invoking federal jurisdiction, Vote.org must show an injury in fact. *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). The only theory that plaintiff advances in that regard (at 17) is that the "wet signature rule has injured Vote.org by forcing it to divert resources from other programs."

Any other arguments supporting its standing are forfeited. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019).

An organization has standing in its own right when its "ability to pursue its mission is 'perceptibly impaired' because it has 'diverted significant resources to counteract the defendant's conduct'" and that diversion is "concrete and demonstrable." *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500-01 (5th Cir. 2020) (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)). But the "[m]ere redirection of resources in response to another party's actions does not supply standing; after all, there is 'no legally[]protected interest in *not* expending" resources. *League of Latin Am. Citizens v. Abbott*, 2022 WL 1631301 at *5 (W.D. Tex. May 23, 2022) (quoting *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994)).

Plaintiff has not shown how engaging in alternative efforts to "increas[e] turnout and political engagement," Vote.org Br. 17, perceptibly impairs its mission. *See, e.g.*, *City of Kyle*, 626 F.3d at 238; ROA.2587, 2607 (describing Vote.org's mission); *El Paso County v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) ("[E]fforts fall[ing] within the general ambit of [plaintiff's] normal operations . . . [do] not satisfy the requirements of standing."). An organization cannot list its normal activities and declare, without more, that it has diverted resources from those activities. *See La. ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305-06 (5th Cir. 2000). But that is exactly what plaintiff has done here. *Compare* Vote.org Br. 10-11 (insisting that plaintiff "diverted resources, including staff time, from other key initiatives" like college and youth influencer programs, "as well as its campaign 'to [promote] election day as a

holiday'"), *with* ROA.2615 (listing the same as plaintiff's routine activities). Plaintiff must demonstrate diversion *concretely*—especially at the summary-judgment stage. *Elfant*, 2022 WL 14782530, at *3, *4 n.4. If plaintiff has actually "pursue[d] 'an undertaking that consumed its time and resources'" (at 19), it was plaintiff's responsibility—not defendants'—to put evidence to that effect in the record. *See* Defendants' Br. 18 (Vote.org's actual expenses were greater in 2018, when it rolled out the app, than its budgeted expenses for 2021). And even if plaintiff is correct (at 17) that these other "means of increasing turnout and political engagement" are inefficient, it cites no authority for the novel notion that an organization is injured whenever it cannot further its mission in the exact way it wishes. *See El Paso County*, 982 F.3d at 343-44.

### B. Plaintiff's injury, if any, is not traceable to HB 3107.

Even assuming plaintiff's alleged diversion of resources could constitute an Article III injury (and it cannot), that injury is not traceable to the conduct plaintiff challenges. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An organizational plaintiff must show that a diversionary injury "result[ed] from counteracting the effects of the defendant's actions." *LeBlanc*, 211 F.3d at 305. But any diversion must respond to the challenged action *specifically*: It is not fairly traceable to defendants if the diversion responded to defendants' conduct *and other factors. Elfant*, 2022 WL 14782530 at *4-5.

HB 3107 did not cause plaintiff's purported injuries. Plaintiff's creation of the web app and any corresponding expenses did not counteract the original signature requirement, as any resources spent on the project would have been diverted well

before the "unmitigated disaster" of the 2018 rollout, *Vote.org v. Callanen*, 39 F.4th 297, 301 (5th Cir. 2022), let alone before the passage of HB 3107. To the extent plaintiff alleges that the ongoing nonuse of its app constitutes a diversionary injury, it could have avoided this problem in 2018 if it had consulted the Secretary of State to determine if the app complied with Texas law. *See id.*; Tex. Elec. Code § 31.003; *Fowler*, 178 F.3d at 358. Vote.org is no different than the group that cannot "obtain judicial review of otherwise non-justiciable claims simply by . . . drafting a mission statement and then suing on behalf of the . . . extremely interested organization," *Abbott*, 2022 WL 1631301 at *5.

Under *Elfant*, plaintiff's partnership with Nextdoor is not traceable to defendants' challenged conduct, either. "[A]n organizational plaintiff must show it diverted resources 'as a direct result of' the challenged law—not as a result of the challenged law" and other unrelated circumstances. 2022 WL 14782530, at *4 (quoting *Fowler*, 178 F.3d at 360). Plaintiff asserts (at 17) that it partnered with Nextdoor "to help voters locate printers in their neighborhoods" as a "direct response" to Texas's passage of HB 3107. But the groups launched their partnership in 2020 as a response to the COVID-19 pandemic and as part of a broader effort to assist voters across multiple jurisdictions. *See* ROA.1521 (citing *Nextdoor and Vote.org Team Up to Help Neighbors Get the Vote Out*, Nextdoor Blog (Aug. 25, 2020)). Thus, even if plaintiff also intended the partnership to respond to HB 3107—and even if plaintiff's purported injury began with the failed 2018 rollout—the partnership is not fairly traceable to HB 3107's passage and implementation. *See Elfant*, 2022 WL 14782530, at *4-5.

### C. Section 1983 precludes plaintiff from basing its standing on the rights of Texas voters.

Even if plaintiff has Article III standing, it must still assert its own legal rights; it cannot "rest [its] claim . . . on the legal rights or interests of third parties." *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986). Thus, plaintiff cannot assert voting rights it does not have, and section 1983 does not grant statutory standing. Defendants' Br. 21-24.

That plaintiff cannot count as a "party injured" under section 1983 is borne out by the statute's text. "Every person who . . . subjects, or causes to be subjected, *any citizen of the United States or other person* . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable *to the party injured*." 42 U.S.C. § 1983 (emphasis added). The "citizen of the United States or other person" is "the party injured." *Id.* And for the state actor to be liable to "the party injured," that "party" must have been "depriv[ed]" of its rights. *See id.*; *Vote.org*, 39 F.4th at 303. Vote.org is therefore not entitled to sue under section 1983 for the vindication of *someone else's* rights.

Plaintiff's argument to the contrary (at 35-36) fails. It and its amicus ACLU of Texas (at 10 n.4) argue that plaintiff has standing under section 1983 due to a vendor–vendee relationship with its users. True, a litigant may have what the Supreme Court has termed "third-party standing" when (1) it "ha[s] suffered" an "injury in fact" giving it a "sufficiently concrete interest" in the issue's outcome; (2) it has a "close" relationship with the third party whose rights it asserts; and (3) something hinders that third party's ability to protect its own rights or interests. *Powers v. Ohio*,

499 U.S. 400, 411 (1991). That does not solve plaintiff's inability to establish *statutory* standing, *see* David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45 (1982), and in any event, plaintiff has made none of those necessary showings.

*First*, plaintiff has suffered no concrete injury in fact. *See* Section I.A. It cannot vindicate a third party's rights without an injury of its own. *See Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995). Plaintiff's cases regarding standing in the context of a vendor–vendee relationship are not to the contrary. *E.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977); *Craig v. Boren*, 429 U.S. 190, 194 (1976); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925).

*Second*, the relationship between plaintiff and its "users" is not sufficiently close for plaintiff to be entitled to vindicate its users' rights. *See Powers*, 499 U.S. at 411. Plaintiff's claim of a vendor–vendee relationship flounders on the fact that plaintiff is not a vendor. *See* ROA.2587 (describing Vote.org as a "nonprofit" with no share-holders), ROA.2039 (explaining that plaintiff has "users," not members). Quite the opposite: plaintiff charges nothing for its app. *See* ROA.2589. Vote.org cannot claim standing based on status as a vendor if it sells nothing. *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 697 (W.D. Tex. 2015) ("[I]t is not at all clear that dis-tribution of information for free via the Internet constitutes a commercial transac-tion" for purposes of third-party vendor standing).

A plaintiff suing on behalf of third parties must share an "identity of interests" "such that the plaintiff will act as an effective advocate of the[ir] interests." *Lepelle-tier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). Archetypal "special relationships" can link the parties in that "identity of interests"—relationships like those between

vendor and vendee, who are connected by a financial transaction, or between a doctor and a patient (even a prospective one). *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 691, 696 (7th Cir. 2011); *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 215-16 (4th Cir. 2020); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014). But an organizational plaintiff that could potentially gain paying clients differs from a plaintiff like Vote.org, which cannot. *Cf., e.g.*, *Ezell*, 651 F.3d at 691, 696. In fact, plaintiff lacks the kind of "close" or special relationships with its users that has allowed a plaintiff to sue regarding third parties' rights. *See, e.g.*, *Carey*, 431 U.S. at 681-82 (vendor and potential customers); *Craig*, 429 U.S. at 194-95 (same); *Pierce*, 268 U.S. at 535 (corporations with "business and property for which they claim[ed] protection"); *Hang On*, 65 F.3d at 1252 (employer and employees). The complete absence of such a link between Vote.org and its "users" (who are not even *potential* customers) provides no guarantee that plaintiff will "act as an effective advocate of the [users'] interest[]." *Lepelletier*, 164 F.3d at 44.

*Third*, Texas voters are not hindered from asserting their own rights. Defendants' Br. 23. Although plaintiff says (at 35) that vendors "have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function' *through [section] 1983 actions*" (second emphasis added), Vote.org points to no authority allowing a plaintiff to vindicate a third party's rights in the absence of a personal injury, regardless of whether it invokes section 1983. The concern that the third parties' rights might be "diluted or adversely affected" if the challenged law remains in force, *Craig*, 429 U.S. at 195, does not have purchase here: While would-be firearms owners

(for example) could experience a "dilution" of their Second Amendment rights if a law curtailed the operations of firearms vendors, *see, e.g.*, *Ezell*, 651 F.3d at 691, Vote.org has not shown that any Texas voters will be (or have been) deprived of their voting rights if Vote.org cannot use its app in the precise way it wishes.

* * *

Plaintiff does not have standing because it has not shown that it diverted resources such that its mission was impaired; has not established that any resource diversion was traceable to HB 3107; and has not located any statute allowing it to assert a third-party's claim.

## II. The Original Signature Requirement Does Not Violate Section 1971.

### A. Plaintiff does not have a private right of action.

For the reasons defendants previously set out, Defendants' Br. 25-28, plaintiff cannot bring a claim based on the materiality provision directly or in a section 1983 suit. Plaintiff's contrary arguments fail to show otherwise. *First*, plaintiff looks to two out-of-circuit cases, *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003), and *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *vacated sub nom. Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (2022)). But *Schwier* relied on a repudiated approach to recognizing implied causes of action, and the argument that the materiality provision does not create an individual right was forfeited in *Migliori*. Defendants' Br. 27-28.

*Second*, plaintiff obscures the statutory language and on that basis claims that the materiality provision focuses on individuals. Plaintiff insists (at 23) that the materiality provision "parallels" language in Title IX and Title VI that has been held to

create a private right of action. Unlike the materiality provision, however, the subject of those provisions is the person benefitted, not the regulated party. *Compare* 20 U.S.C. § 1681(a), *and* 42 U.S.C. § 2000d, *with* 52 U.S.C. § 10101(a)(2)(B). Plaintiff argues this framing makes no difference because the "plain purpose of th[e] provision[] is to protect rights afforded to individuals." *See* Vote.org Br. 24 (citing *Grammer v. John J. Kame Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 530 (3d Cir. 2009)). But that argument relies on an outlier opinion that ignored the Supreme Court's admonition that statutes must have "an unmistakable focus on the benefitted class" to create a private right of action. *Duncan v. Johnson-Mathers Health Care, Inc.*, 2010 WL 3000718, at *8 (E.D. Ky. July 28, 2010); *see Liptak v. Ramsey County*, 2016 WL 5349429, at *5 (D. Minn. Sept. 23, 2016) (criticizing *Grammer* and "sid[ing] with the majority"); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring) (flagging that parties may be wrongly assuming that section 2 of the Voting Rights Act of 1965, which focuses on the regulated party, creates an implied cause of action).

To be sure, the materiality provision is different from the statute in *Gonzaga* that was "two steps removed" from the interests of individuals. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002). *Gonzaga*, however, does not suggest that a provision with a focus one step removed from individuals' interests like the materiality provision *unambiguously* confers a federal right as required. *See Delancey v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009) ("Congress may choose to confer individual rights subject to private enforcement, but to do so the statute must 'speak with a clear

voice' and 'unambiguous[ly]' confer those rights." (quoting *Gonzaga*, 536 U.S. at 280)).

*Third*, Plaintiff relies on legislative history. But that is improper because section 1971's text is clear. *See Alexander v. Sandoval*, 532 U.S. 275, 288 (2001); *Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018). Regardless, the legislative history is inconclusive at best. One court concluded, for example, that the history showed that "the alternative to the newly devised Attorney General enforcement mechanism was not one of private civil suits but rather a criminal action." *Migliori v. Lehigh Cnty. Bd. of Elections*, 2022 WL 802159, at *11 (E.D. Pa. Mar. 16, 2022), *rev'd Migliori*, 36 F.4th 153, *vacated sub nom. Ritter v. Migliori*, 2022 WL 6571686. That legislative history can be used to support either side illustrates how reliance on legislative history is "akin to looking over a crowd and picking out your friends." *In re Deberry*, 945 F.3d 943, 949-50 (5th Cir. 2019) (quotation omitted).

*Fourth*, plaintiff argues it can enforce section 1971 through section 1983 based on *Allen v. State Board of Elections*, 393 U.S. 544 (1969), and *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996) (plurality op.). But *Allen* "has been relegated to the dustbin of history," and "the *Morse* approach to the private-right-of-action analysis does not survive *Sandoval* and its progeny." *Ark. State Conference NAACP v. Ark. Bd. of Apportionment*, 586 F. Supp. 3d 893, 912, 913 (E.D. Ark. 2022); *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (plurality op.) (characterizing *Allen* as part of the "*ancien regime*" that *Sandoval* rejected). Regardless, section 1983 enforcement is available only if section 1971 unambiguously creates an individual right, which it does not. *See* Defendants' Br. 25-28; *Gonzaga*, 536 U.S. at 284 n.4. And, even if it did,

plaintiff would fall outside of the class of beneficiaries: individuals who have the right to vote. *See* 52 U.S.C. § 10101(a)(2)(B); *see also supra* pp. 6-8 (plaintiff lacks statutory standing under section 1983).

In any event, section 1983 enforcement is unavailable unless "Congress meant the judicial remedy expressly authorized" in section 1971 "to coexist with an alternative remedy available in a § 1983 action." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120-21 (2005). Congress lacked this intent, because it included a "comprehensive enforcement scheme" for the Attorney General with unique remedies, special evidentiary presumptions, and different options for judicial review. *See id.* at 120; *id.* at 121 (recognizing "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others"; 52 U.S.C. § 10101(c) (creating "a rebuttable presumption"), (e) (allowing the appointment of "voting referees"), (g) (authorizing a three-judge court). Nor does subsection (d) indicate a different congressional intent or "establish[] jurisdiction for any 'proceedings instituted' by a 'party aggrieved' to enforce the law." *See* Vote.org Br. 29. Instead, subsection (d) was added at the same time as the Attorney-General-enforcement provision to eliminate any exhaustion requirements that may otherwise preclude the Attorney General from filing suit in district court. *See* Pub. L. No. 85-315, § 131(d), 71 Stat. 637. It does not authorize any aggrieved individual to institute a suit under section 1971 or show section 1971 creates a private right.[1]

---

[1] Individuals, however, can obtain relief in an Attorney-General-instituted suit by applying to the court for an order. 52 U.S.C. § 10101(e).

## B. Plaintiff cannot prevail on a section 1971 claim absent evidence of racial discrimination.

Even assuming a private, enforceable right, plaintiff still lacks a viable section 1971 claim. When section 1971 is read as a whole, *see In re Lopez*, 897 F.3d 663, 670 n.5 (5th Cir. 2018), the materiality provision in sub-section (a)(2) is violated only when official conduct is racially discriminatory. Sub-subsection (a)(1) reiterates the Fifteenth Amendment's guarantee that citizens' right to vote shall not be abridged based on race, sub-subsection (a)(2) details discriminatory tactics that state officials cannot employ, and sub-subsection (a)(3) defines terms used in subsection (a).

Plaintiff disagrees, preferring to read subsection (a)'s subparts in isolation even though Congress divided (a) into subparts rather than creating a new section like it did for subsection (b). *Compare* 52 U.S.C. § 10101(a)(2), *with id.* § 10101(b). But section 1971 was passed under Congress's authority "to enforce th[e Fifteenth] Amendment's guarantee, which protects against any discrimination" by state officials. *United States v. Mississippi*, 380 U.S. 128, 138 (1965).[2] That means if legislation attacks "evils not comprehended by the Fifteenth Amendment," it exceeds

---

[2] If the materiality provision were passed pursuant to the Fourteenth Amendment, *see* Vote.org Br. 46, that would not resolve the constitutional problem created by plaintiff's interpretation. Both Fourteenth and Fifteenth Amendment violations require purposeful discrimination. *See City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality op.); *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997). Although Congress can enact legislation that "proscrib[es] practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause," *Tennessee v. Lane*, 541 U.S. 509, 520 (2004), that legislation must still be congruent and proportional, *see City of Boerne v. Flores*, 521 U.S. 507, 519-20 (1997); *Allen v. Cooper*, 140 S. Ct. 994, 1004 (2020).

Congress's enforcement power. *See South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966), *see also Veasey v. Abbott*, 13 F.4th 362, 375 (5th Cir. 2021) (Ho, J., concurring) (recognizing that laws enacted under the Fifteenth Amendment must be "congruent and proportional").[3] Under plaintiff's interpretation, the materiality provision would be unmoored from the Fifteenth Amendment's protection against racial discrimination and thus exceed Congress's enforcement authority.

Plaintiff contends otherwise (at 46) based on the literacy test ban. But the ban was upheld as a proper use of Congress's enforcement power because there was evidence those tests were "used to discriminate against voters on account of their color," *Oregon v. Mitchell*, 400 U.S. 112, 117, 132 (1970) (Op. of Black, J., announcing the judgments of the Court), and would have the "inevitable effect of denying the vote to members of racial minorities," *id.* at 235 (Brennan, J., concurring in part and dissenting in part). A blanket prohibition on all registration requirements that are immaterial to voter qualifications—regardless of whether they are used to discriminate or have a discriminatory effect—is not a similarly appropriate means of enforcing the Fifteenth (or Fourteenth) Amendment.

---

[3] The United States argues that the congruent-and-proportional test does not apply to the Fifteenth Amendment, but that ignores that the Supreme Court looked to Fifteenth Amendment cases when announcing the congruent-and-proportional test in *City of Boerne*. *See* 521 U.S. at 518. In any event, plaintiff did not make this argument and has forfeited it. *See United States v. Bonilla-Mungia*, 422 F.3d 316, 319 & n.1 (5th Cir. 2005).

### C. The original signature requirement does not deprive anyone of the right to vote and is material to whether an individual is a qualified voter.

The original signature requirement does not deny any individual the right to vote or register, which is why plaintiff cannot identify a single individual who was unable to vote or register due to the original signature requirement. And even if plaintiff could show a denial of the right to vote or register, the requirement would still not violate the materiality provision because an original signature is material under state law. Plaintiff's response to these points is unavailing.

Plaintiff's primary complaint is that the original signature requirement denies the right to vote (or register) because individuals must comply with it if they want to register. But section 1971 does not give voters the right to refuse to comply with non-discriminatory requirements with which they disagree; instead, it protects voters against immaterial mistakes or requirements that are used to discriminate. *See United States v. Ward*, 345 F.2d 857, 862 (5th Cir. 1965) (allowing registrar to reject a registration application where an "error or omission has been specifically pointed out and explained to him by the registrar or his agent and the applicant refuses to supply the requested information"). Because applicants are given a cure opportunity, they can register even if they initially omit an original signature. The original signature requirement accordingly does not deny applicants the right to vote or to register. Any failure to comply with the original signature requirement "constitutes the forfeiture of the right to vote [and to register], not the denial of that right." *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting from denial of stay application).

Likewise, plaintiff cannot show the original signature requirement is immaterial to determining voter qualifications. That is why it resorts to mischaracterizing Texas law (at 38) and relying on nonexistent concessions (at 38-39). But these attempts fail. Texas law requires a person to be a "registered voter" in order to be a "qualified voter," *see* Tex. Elec. Code § 11.002(a)(6), which means a voter must "mail her application to the county registrar with a wet signature" (if she decides to register via fax), *see Vote.org*, 39 F.4th at 307.[4] State law thus dictates that the original signature requirement is material to determining a voter's qualifications.[5] This precludes plaintiff from showing the requirement is "not material in determining whether such individual is qualified *under State law* to vote." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). And this conclusion does not render the materiality provision meaningless as Plaintiff alleges (at 42); instead, it gives effect to the provision's directive to look to qualifications under state law. *See Migliori*, 142 S. Ct. at 1826 (Alito, J.,

---

[4] The Texas Constitution does not preclude registration from being a requirement to be a qualified voter. *Contra* Vote.org Br. 42 n.10. Instead, it defines the term "qualified voter" only "as used" in the Constitution and specifically allows registration to be considered as it relates to "qualification and eligibility to vote at an election." *See* Tex. Const. art. VI, § 2(a).

[5] Plaintiff's misleading quotations from the Texas Attorney General's filings in a separate matter do not constitute a concession here that the original signature requirement serves no purpose. *See Stringer v. Pablos*, 320 F. Supp. 3d 862, 899-900 (W.D. Tex. 2018), *rev'd sub nom. Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019). Interrogatory responses by defendants who declined to defend the law are also not concessions. *See* ROA.1314, 1372. Furthermore, the testimony that plaintiff cites shows an original signature is material, because officials look for an original signature to confirm the registration application is complete (and thus to determine whether the voter is registered—and qualified—to vote). *See, e.g.*, ROA.1198-99, 1293.

dissenting) ("[The materiality provision] leaves it to the States to decide which voting rules should be mandatory."); The Civil Rights Act of 1964: Legislative History; Pro and Con Arguments 33 (Paul M. Downing, ed. 1965) (explaining the amendments to section 1971 "do[] not establish substantive standards for qualifying voter registrants, but only ensures equal application of whatever standards the States determine").

Plaintiff also cannot show that an *original* signature is immaterial while agreeing (at 40) that a signature is important. An original signature and DPS-imaged signature help an official determine a voter's qualifications in a way an imaged signature submitted through plaintiff's app does not. Requiring a voter to affirm he is qualified to vote with an original signature—right after the list of eligibility requirements and perjury warning—provides evidence that the person is indeed qualified to vote. Defendants' Br. 35-37. The same is true when an applicant is required to provide a signature on a DPS keypad after being read the list of voting requirements and perjury warning. Defendants' Br. 44; ROA.2374, 2377. Free-floating signatures uploaded to a web app do not provide the same assurance, especially when they are illegible. Defendants' Br. 37; *infra* p. 23. Indeed, plaintiff's cited evidence indicates that applicants using the app do not even see the Texas requirements when they affirm their eligibility to vote by marking a checkbox. *See* ROA.2594, 3138.

Finally, plaintiff is both wrong that the original signature requirement does not deter fraud and that fraud deterrence is irrelevant to determining voter qualifications. For starters, it is "almost unquestionable that the wet signature requirement helps deter voter registration fraud," *Vote.org*, 39 F.4th at 308, and it encourages

applicants to provide truthful information, *see* Defendants' Br. 36, 44-45; ROA.2374-75. Furthermore, if applicants are deterred from providing false information, then officials can better rely on information provided by those individuals to determine whether they are qualified to vote. A requirement that deters fraud, such as the original signature requirement, is thus material.

## III. The Original Signature Requirement Does Not Violate the Constitution.

In its second claim, plaintiff contended, and the district court agreed, that the original signature requirement transgresses the First and Fourteenth Amendments because (1) it imposes hurdles for some (but not all) voters to register, and (2) the State has not proffered any legitimate interest in the requirement. Vote.org Br. 48, 51; ROA.1813-14, 1816-19. Both arguments are wrong. To adopt them, the Court would have to disregard both *Crawford v. Marion County Election Board*, 553 U.S. 181, 199 (2008) (plurality opinion) and *Richardson v. Texas Secretary of State*, 978 F.3d 220, 239 (5th Cir. 2020).

As this Court put it, "one strains to see how [the original signature requirement] burdens voting at all." *Vote.org*, 39 F.4th at 308. Signature requirements are a common fact of life, *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008), and requiring a prospective voter to provide an original signature is not a severe burden—especially in light of the expansive options Texans can choose from to register. Defendants' Br. 3-4 (providing examples). But even if the requirement imposes some *de minimis* burdens, the State's interests in the requirement satisfy *Anderson-Burdick* balancing. Defendants' Br. 42-45. "Texas 'indisputably has a compelling interest in

preserving the integrity of its election process,'" *Richardson*, 978 F.3d at 239, and in preventing voter fraud, *Crawford*, 553 U.S. at 196 (plurality op.). The original signature requirement is carefully tailored to those interests: it guarantees that registrants attest to meeting the State's qualifications to vote; it ensures that election officials can review those signatures to verify a voter's identity; and it impresses upon the registrant the seriousness of the act in a way that submitting an electronic image of a signature through a web app does not. Defendants' Br. 43-44.

**A.** Conceding that HB 3107 does not burden the general electorate, Vote.org insists (at 49) that the Court must focus its analysis on the subset of electors likely to register to vote by fax. *E.g.*, ROA.2239-40 (reflecting that in 2018, only 500 voters out of a total of 142,000 registered in Travis County via fax). Just two years ago, the Court rejected an identical argument. "[T]he severity analysis," the Court explained, is not limited "to the impact that a law has on a small number of voters." *Richardson*, 978 F.3d at 236. *Crawford* supplies an apt illustration: the Supreme Court found that a photo-identification requirement was not severe under *Anderson-Burdick*, even though "a somewhat heavier burden may be placed on a limited number of persons." 553 U.S. at 199 (plurality op.) "*Crawford*'s three concurring Justices concluded that '[the Court's] precedents refute the view that individual impacts are relevant to determining the severity of the burden' that a voting law imposes." *Richardson*, 978 F.3d at 236 (quoting *Crawford*, 553 U.S. at 205 (Scalia, J., concurring)). Likewise, "[t]hough *Crawford*'s three-Justice plurality did not go as far as the three-Justice concurrence, it too examined the burden on 'most voters.'" *Id.* (quoting *Crawford*, 553 U.S. at 198). If this Court "were '[t]o deem ordinary and widespread

burdens like these severe' based solely on their impact on a small number of voters, [it] 'would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes.'" *Id.* (quoting *Clingman v. Beaver*, 544 U.S. 581, 593 (2005)).

Plaintiff largely ignores *Crawford* and fails to cite *Richardson* entirely. Instead, plaintiff points (at 49) to a case from the Sixth Circuit for the proposition that in analyzing disparate treatment claims, courts consider the "perspective of only affected [voters]." *Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020). But that observation has no bearing here. The law at issue in *Mays* facially discriminated against voters confined by the State. *Id.* That separated the challenged law from the voter identification law in *Crawford*, which the Sixth Circuit recognized "applied non-discriminately to all voters." *Id.* And *Mays* emphasized that courts must "consider[] all voting opportunities that the plaintiffs could have taken advantage of" to exercise the franchise. *Id.* at 786.

As in *Crawford*, the original signature requirement applies across the board to all Texas voters. And *Mays* is otherwise generally consistent with this Court's precedent, which requires courts to "account for the numerous ways Texans" can vote, and by extension, register to vote. *Tex. League of United Latin Am. Citizens v. Hughs* (*LULAC*), 978 F.3d 136, 145 (5th Cir. 2020); Defendants' Br. 40 (citing Tex. Elec. Code §§ 13.002(a), 13.003, 20.001, 20.122); *e.g.*, ROA.2120-21, 2158-62. Recent data reflects that Texas has succeeded in boosting voter registration. There were 17,672,143 registered voters in Texas for the 2022 general election—up 716,624

voters from the 2020 election.[6] How HB 3107 has *diminished* Texans' ability to register given the demonstrable *increase* in voter registration across the State over the past two years "is a mystery." *LULAC*, 978 F.3d at 145.

The best plaintiff can muster is what it calls "unrebutted expert testimony" establishing that HB 3107 might impose a burden on some (unidentified) voters.[7] But neither plaintiff nor plaintiff's expert offered evidence that a single person who used Vote.org's web app was unable to register to vote for lack of access to a printer or the mail. There is no dispute that Texans can request, and receive, postage-paid registration applications in the mail from the Secretary of State or a county registrar, ROA.1960, which means that transportation poses no problems for a voter with a smartphone but no printer or fax machine. He can call his county registrar or the Secretary and ask for an application. Plaintiff's expert even agreed that it is probably easier to locate a printer than a fax machine. ROA.2434. Presumably, then, if a voter accesses a fax machine, he can also access a printer. But if he cannot, he can register to vote by other methods. Nothing about that scheme suggests anything more than a

---

[6] *See* Tex. Sec'y of State, *November 2022 Voter Registration Figures,* https://www.sos.state.tx.us/elections/historical/nov2022.shtml (last visited Nov. 18, 2022); Tex. Sec'y of State, *November 2020 Voter Registration Figures,* https://www.sos.state.tx.us/elections/historical/nov2020.shtml (last visited Nov. 18, 2022) (reflecting 16,955,519 registered voters in November 2020); Fed. R. Evid. 201(b).

[7] On that basis, Vote.org incorrectly suggests (at 48) the district court's finding that the requirement burdens the right to vote is "entitled to deference." No such deference is appropriate on summary judgment. *Evanston Ins. Co. v. Mid-Continent Cas. Co.*, 909 F.3d 143, 146 (5th Cir. 2018).

slight burden. *See Veasey v. Abbott*, 830 F.3d 216, 316 (5th Cir. 2016) (en banc) (Jones, J., concurring) (cleaned up).

**B.** "[T]he State's important regulatory interests" are generally sufficient to justify the restrictions" when the burden of the voting restriction is not severe. *Richardson*, 978 F.3d at 239. Plaintiff's disagreements with the State's methods of advancing that interest, expressed primarily through an expert's conclusory opinion, *see* ROA.837, are no basis to find a constitutional infirmity. *E.g.*, *Richardson*, 978 F.3d at 240 (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) for the proposition that "we do not force states to shoulder 'the burden of demonstrating empirically the objective effects' of election laws"). Although plaintiff complains that is speculative whether a county election official will need to review the voter's original, wet signature in any particular instance, the State has "never been required to justify [its] prophylactic measures to decrease occasions for vote fraud." *LULAC*, 978 F.3d at 147. To that end, plaintiff also incorrectly assumes (at 7) that all counties electronically scan voter registration forms, but that is untrue: not all counties do so. *E.g.*, ROA.1266 (Real County). In those counties, when an official needs to review a voter's signature from his voter registration form, the original, wet signature—not a scanned copy of that signature—will serve as the exemplar.

The original signature requirement also protects the integrity of the electoral process by making sure voters read and understand each salient aspect of the State's registration laws and qualifications, among which that providing "false information to procure a voter registration is perjury." ROA.1958. Plaintiff's web app, by contrast, only requires voters to affirm that "I am a US citizen, and I am eligible to

22

register to vote in Texas." ROA.3138. It does not provide the detailed instructions that Texas's voter registration forms do. ROA.1958. And even if plaintiff's app tracked Texas's registration forms to the letter, which it does not, plaintiff cannot guarantee that other future web apps would include all (or even some) information on the qualifications for registering to vote in Texas.

If nothing else, Texas has an interest in ensuring that signatures from prospective voters are at least visible. The county defendants testified that when they received applications transmitted through plaintiff's web app, visibility issues with the signatures prevented processing. ROA.1680-81 (collecting examples); Defendants' Br. 7-8. Signatures were "poor . . ., some blank, and some blacked out," causing a "real problem" for the counties trying to process these applications. ROA.2222. When an imaged signature is so poor that the county cannot tell if a signature exists, the state's interest in election security is well-served by requiring a signature in writing, without passing it through an out-of-state, third-party intermediary with broken software. *See Richardson*, 978 F.3d at 238.

## Conclusion

The district court's judgment should be reversed.

Respectfully submitted.

Robert Henneke
General Counsel

Chance Weldon
Director of Litigation

/s/ Autumn Hamit Patterson
Autumn Hamit Patterson
Senior Attorney
apatterson@texaspolicy.com

Texas Public Policy Foundation
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

Attorneys for Intervenor Defendants-Appellants Lupe C. Torres and Terrie Pendley

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Judd E. Stone II
Solicitor General

/s/ Michael R. Abrams
Michael R. Abrams
Assistant Solicitor General
Michael.Abrams@oag.texas.gov

Kathleen Hunker
Special Counsel

Sara B. Baumgardner
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Telephone: (512) 936-1700
Facsimile: (512) 474-2697

Counsel for Intervenor Defendant-Appellant Ken Paxton, Attorney General of Texas

## CERTIFICATE OF SERVICE

On November 18, 2022, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Michael R. Abrams

MICHAEL R. ABRAMS

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,497 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Michael R. Abrams

MICHAEL R. ABRAMS